# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

ZACHARY KELLY, individually, and on          Case No.: 24-cv-60437-WPD
behalf of all others similarly situated,

     Plaintiff,

PHILIP MORRIS INTERNATIONAL, INC.,
and SWEDISH MATCH NORTH AMERICA, LLC,
SWEDISH MATCH USA, INC. PHILIP MORRIS GLOBAL BRANDS, INC., and PMI
GLOBAL SERVICES, INC.

     Defendants.

_____ /

**AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

**INTRODUCTION**

1.    Zyn is a small, flavored nicotine pouch that users place in their mouths. Like cigarettes and e-cigarettes, Zyns are Zyn is designed to create and sustain an addiction to nicotine. Nicotine is the fundamental reason why people use these products. Nicotine is a highly addictive drug, just as addictive as cocaine and heroin. Kids, especially, are vulnerable to nicotine addiction. Nine out of ten nicotine users start by the age of 18, and more than 80% who begin as teens will continue into adulthood. Defendants know this. And who better than Philip Morris International? PMI has, for decades, profited by addicting kids to Marlboro cigarettes, the world's most popular brand. It is no surprise then that PMI bought the company, Swedish Match, that makes the most popular oral nicotine pouch. Zyn sales are soaring. Zyn makes up about 70% of the nicotine pouch market. PMI shipped 350 million cans of it in 2023 - a 62% growth compared to the year before. PMI expects to earn $2 Billion in revenue from Zyn in 2024.

2.　　Zyn is just a recent iteration of the tobacco industry's historical practice of designing a nicotine delivery device that hooks kids to nicotine while making them think it is not dangerous or harmful. And so Zyn looks like chewing gum, and it comes in gum-like flavors: "wintergreen," "peppermint," "cool mint," "spearmint," "citrus," "cinnamon" and others. Flavored nicotine exists to addict kids to it.



3.　　Advertisements for Zyn emphasize the themes the industry has long-known resonates with kids, like "Freedom," "Finding Your Curiosity," "Never Miss a Moment" and "Find Your Zyn" - a clear play on the word "Zen," which generally connotes peace and inner calm.







4.      Defendants also benefit tremendously from "Zynfluencers," - social media influencers who promote Zyn. There are around 30,000 TikToks under the hashtag #Zyn, which has amassed more than 700 million views. Another hashtag, #Zynbabwe, has amassed about 95

million views. Young people are exposed, and according to the CDC, rates of oral nicotine pouch users among middle schoolers and highs schoolers are rising. Here are examples of such promotion:





5.      In addition to targeting kids through flavors, Defendants use deceptive advertising in describing Zyn as "**tobacco**-free," which falsely implies that Zyns are not harmful or there is a reduced risk of addiction. Technically, "tobacco-free" means that no part of the product is derived from the tobacco plant. But Zyn's nicotine is indeed derived from tobacco.



6.      Defendants further target youth by designing a tobacco or nicotine-based product that looks just like gum or breath mints.



7.   6. Like too many others, Plaintiff, Zachary Kelly, began using Zyn as a teenager. He was enticed by the flavors and by Defendants' deceptive advertising. He brings this suit to redress his injuries caused by Zyn.

**PARTIES, JURISDICTION, AND VENUE**

8.   7.  Plaintiff, Zachary Kelly, is a citizen of the state of Florida and resides in the Southern District of Florida. He began using Zyn when he was a teenager in or about 2019. He is addicted to the nicotine contained in Zyn and has suffered personal injuries as a result of his Zyn use. Plaintiff continues to use Zyn to this day because of his addiction. Plaintiff was influenced by Zyn's marketing and advertising, which drove purchaseshis purchases of Zyn when he began using Zyn and continued through the time Philip Morris International, Inc., acquired Swedish Match. Plaintiff has seen Zyn advertising on FaceBook and other forms of social media, of the type contained in this complaint, which suggests, falsely, that Zyn is not a tobacco product, and that Zyn is not harmful to one's health. Plaintiff did not know of Zyn's unreasonably dangerous characteristics when he began using Zynit. Plaintiff did not know that Defendants were concealing information to Plaintiff regarding potential health effects and the potency of the nicotine addiction. Defendants' wrongful conduct in marketing, promoting, manufacturing, designing, and selling Zyn caused or contributed substantially to causing his injuries. He purchased Zyn in the Southern District of Florida and was injured there.

8. Defendant, Swedish Match North America LLC, is headquartered in Richmond, Virginia, and is a citizen of the state of Virginia. Upon information and belief, no member of this LLC are citizens of the state of Florida.

9.   Defendant, Swedish Match North America LLC, is headquartered in Richmond, Virginia, and is a citizen of the state of Virginia. The sole member of Swedish Match North America LLC, is Defendant Swedish Match USA, Inc., which is a citizen of Virginia.

10.   Defendant, Swedish Match USA, Inc. is headquartered in Richmond, Virginia, and is a citizen of the state of Virginia. Upon information and belief, Swedish Match USA, Inc. owns Swedish Match North America LLC. Swedish Match North America LLC and Swedish Match

USA, Inc. are collectively referred to as the Swedish Match Defendants.

11.     Swedish Match Defendants design, manufacture, market, advertise, promote, distribute and sell Zyn in the United States, including in the Southern District of Florida. Plaintiff purchased Zyn in the Southern District of Florida.

12.     ~~9.~~ Defendant, Philip Morris International Inc. (PMI) is a citizen of the states of Connecticut and Virginia. It is headquartered in Stamford, Connecticut and is incorporated in the state of Virginia.

13.     Defendant Philip Morris Global Brands, Inc. is a citizen of the states of Delaware and Connecticut. It is headquartered in Stamford, Connecticut and is incorporated in the state of Delaware.

14.     Defendant PMI Global Services, Inc. is a citizen of the states of Delaware and Connecticut. It is headquartered in Stamford, Connecticut and is incorporated in the state of Delaware.

15.     PMI is the holding company and/or parent company of various subsidiaries including Swedish Match North America LLC, Swedish Match USA, Inc., Philip Morris Global Brands, and PMI Global Services, Inc.

16.     PMI exerts operational control over all its subsidiaries, including the Swedish Match Defendants. These subsidiaries function to solely achieve PMI's business purposes, which, as PMI describes its business it in its 2023 Integrated Report:

   A.   Philip Morris International (PMI) is a leading international tobacco company, actively delivering a smoke-free future and evolving its product portfolio for the long term to include products outside the tobacco and nicotine sector.
   B.   Since 2008, PMI has invested USD 12.5 billion to develop, scientifically substantiate and commercialize innovative smoke-free products.

   C.   In 2022, PMI acquired Swedish Match - a leader in oral nicotine delivery - creating a global smoke-free champion led by the companies' IQOS and ZYN

brands.

17.     In PMI's 2023 Annual Report, PMI's Chief Executive Officer, Jacek Olczak, and Executive Chairman of the Board, Andre Calantzopoulos, authored an opening letter to shareholders that suggests to investors that PMI controls and benefits financially from ZYN. They wrote:

> A.  In 2023, PMI delivered another year of strong financial performance with excellent organic top-line growth and the very positive contribution of smoke- free products.. .This reflects the.. .outstanding growth of ZYN[.]
>
> B.  In 2023, our smoke-free portfolio accounted for 36.5% of total net revenues. As of year-end, our smoke-free products had approximately 33 million users and were available in 84 markets.
>
> C.  In the attractive oral smoke-free category, ZYN in the U.S. delivered a truly remarkable performance and solidified its position as the clear nicotine pouch category leader. Outstanding volume growth and a substantial increase in category share in the U.S. were driven by accelerated momentum in consumer off-take and velocities at the retail level (measured in cans per store per week) as well as distribution expansion.. ,[W]e have launched or relaunched ZYN in 10 markets as we work to establish it as a truly global brand.

18.     PMI refers to itself and its subsidiaries as a singular collective unit. In its SEC filings, like the 2023 Annual Report, PMI represents that ""PMI," "we," "us" and "our" refers to Philip Morris International Inc. *and* its subsidiaries." (emphasis added). PMI's website similarly states that ""PMI" refers to Philip Morris International, Inc. *and* its subsidiaries." (emphasis added). PMI has also represented that PMI may mean the family of companies of PMI, and not PMI per se. No matter how PMI is read - as a standalone, or as PMI *and* its subsidiaries, or the family of companies, PMI exercises control.

19.     There is no differentiation between PMI and its subsidiaries. They function as one unit with a unified purpose. For example, PMI has represented in other litigation, under oath and in

an attempt to keep certain of its documents confidential and protected from public view, that it is a tobacco company that manufactures and sells among other things, non-combusted tobacco products and other nicotine-containing products; that PMI's focus is to deliver smoke-free products; that PMI takes measures to ensure the secrecy of its documents regarding its smoke-free products; and that PMI would be harmed by the disclosure of its confidential documents. Writing in the singular, PMI swore to the following:

A. PMI is an international tobacco company engaged in the manufacture and sale of cigarettes, as well as non-combusted tobacco products, associated electronic devices and accessories, and other nicotine-containing products.

B. PMI made a public statement that it had shifted its focus and purpose "to deliver a smoke free future by focusing its resources on developing, scientifically substantiating and responsibly commercializing smoke-free products that are less harmful than smoking, with the aim of completely replacing cigarettes as soon as possible." (citing PMI's Statement of Purpose, Excerpt from 2020 Proxy Statement).

C. Given PMI's focus on smoke-free tobacco and nicotine-containing products, information pertaining to PMI's smoke-free product development and commercialization is critically important to PMI. Because other firms compete with respect to these or similar products, both internationally and in the US, PMI's strategic documents pertaining to PMI's smoke-free products are highly commercially sensitive. Given the time it takes to research, develop, determine a plan for distribution, and receive authorization to commercialize these products, PMI's confidential documents regarding its smoke-free products and the industry will remain sensitive for several years.

D. PMI takes significant measures to ensure the secrecy of its confidential information.

E. PMI has taken and continues to take steps to limit the commercially sensitive information in the Confidential Documents to PMI senior management and select employees.

F. [T]he disclosure of the Confidential Documents to the public, PMI's competitors, and PMI's potential business partners would cause serious injury to PMI.

20.     Whether the above activities are carried out by entities within the "family" of PMI entities, PMI's description of its business activities demonstrates a concerted, singular purpose with PMI in control. PMI represents, speaks for its subsidiaries, and takes legal action on behalf of its subsidiaries.

21.     This also applies to PMI's control regarding Zyn when it says: "PMI also sells evapor products, such as *VEEV,* and oral smokeless products, such as *ZYN* nicotine pouches." (Screenshot below).



22.     PMI's 10K further makes clear that PMI and its subsidiaries like the Swedish Match Defendants function as one cohesive group. PMI refers to a Zyn production facility in

Kentucky as *"our* ZYN production facility." (emphasis added). Using PMI's definition of "our", which includes PMI, means that Zyn facility is also PMI's.

23.     The Swedish Match Defendants do not manifest separate corporate interests of their own. Swedish Match Defendants act on behalf of PMI. Upon PMI's acquisition of Swedish Match, Swedish Match delisted its shares on a Nasdaq exchange. Swedish Match has since worked to integrate into PMI's structure. Swedish Match's 2023 Annual Report describes the "work to integrate Swedish Match into PMI's global sustainability structure, strategy and policies."[1] Swedish Match represents that "PMI's Integrated Report 2023 presents a consolidated view of both companies." *Id.* Swedish Match further describes its integration into PMI and adoption of PMI's standards: "PMI began its Legal & Compliance integration efforts with Swedish Match to ensure that PMI's standards and requirements are also applied across Swedish Match entities"; Swedish Match is "ensuring that PMI's diversity, equality, and inclusion strategy is implemented throughout the Swedish Match organization"; and Swedish Match is working to integrate into PMI's supply chain.

24.     PMI also exerts control over the Swedish Match Defendants and the sale of Zyn. For example, in June 2024, Swedish Match North America LLC received a subpoena from the Attorney General of the District of Columbia requesting information regarding Swedish Match's compliance with D.C.'s ban of flavored tobacco products. Upon receiving said subpoena, PMI conducted an investigation into the matter, and, at PMI's direction, Swedish Match immediately suspended online sales on ZYN.com.

25.     PMI's public announcements regarding Zyn also evidence PMI's control over the

[1] Swedish Match, Annual Report, 2023 (available at) https://www.swedishmatch.com/globalassets/reports/annual-reports/2023-annual-report-swedish-match-ab eng2.pdf) (last visted Dec. 3, 2024)

Swedish Match Defendants. On May 3, 2023, CEO Jacek Olczak stated the following on behalf of PMI at the annual shareholder meeting, which recognizes PMIs supportive commercial capabilities fuel Zyn growth:

    A. 2022 was a remarkable year in our smoke-free transformation. We achieved two critical strategic milestones, successfully completing the acquisition of Swedish Match

    B. We are very pleased to welcome the Swedish Match organization to the PMI family, along with their #1 global nicotine pouch brand, *ZYN.* Together we are now a global smoke-free champion and leading the industry with scientifically substantiated reduced risk products.

    C. There is a significant opportunity to further accelerate *ZYNs* outstanding success in the U.S., and for international expansion with the support of PMI's commercial capabilities. Importantly, we believe the acquisition is financially attractive and will be accretive to our growth, margin profile and cash generation over the coming years.

26.    On July 16, 2024, "PMI announced an investment of $600 million over the next two years through one of its U.S. affiliates to open a state-of-the-art manufacturing facility in Aurora, Colo. The facility is expected to create 500 direct jobs with ongoing annual economic impact of $550 million and an additional 1,000 indirect jobs for the State of Colorado as it produces Swedish Match *ZYN* nicotine pouches...."

27.    On August 27, 2024, PMI announced a $232 million investment through one of its Swedish Match affiliates to expand production capacity of its manufacturing facility on Kentucky. These announcements demonstrate that PMI is actively investing in or controlling the investment of manufacturing facilities to produce ZYN for commercialization in the U.S.

28.    Employees within PMI's family of companies consider themselves as employees of PMI. This is evident if one searches for employment opportunities on SwedishMatch.com. There, clicking on the "Career" tab takes the applicant to a PMI website: joinpmicareers.com. If

the applicant looks for jobs in the United States, numerous employment opportunities in Aurora, CO are listed. (PMI made a $600 million investment there). The applicant will not only see PMI's logo, at the top of the page, but the job description reads, in pertinent part: "Be a part of a revolutionary change! We've chosen to do something incredible at Philip Morris International (PMI). We're totally transforming out business.. .to deliver a smoke-free future.. Join us at PMI!" This further shows that PMI subsidiaries and PMI operate as one cohesive group and that PMI has control over the Swedish Match Defendants. The following is demonstrative:







10.    The Defendants design, manufacture, market, advertise, promote, distribute and sell Zyn in the United States.

29.    PMI is also responsible for setting the marketing policies, which regulate its subsidiaries, again demonstrating control over how subsidiaries must operate. PMI has a Code for Design, Marketing and Sales of Non-Combusted Alternatives and its Implementation Guidelines. Code applies to the Swedish Match Defendants. It is mandatory: "All PMI employees directly involved in developing or deploying Adult Consumer-focused product, packaging, Advertising, Marketing, engagement, and Sales initiatives for Non-Combusted Alternatives must follow this Code and the Implementation Guidelines that accompany it." The Code "establishes] the core principles, practices, and governance processes to follow when developing, designing, marketing, engaging with Adulting Consumers about, and selling PMI's Non-Combusted Alternatives to Combusted Tobacco Products." PMI considers Zyn a smoke-free, non-combusted product. The Code is approved by PMI's CEO and contains PMI's logo.

30.     Upon information and belief, PMI further controls regulatory filings and communications on behalf of its subsidiaries with the U.S. FDA regarding combustible and non-combustible tobacco products, which includes Zyn.

31.     PMI also funds trade groups like Foundation for a Smoke-Free World, that purport to be independent scientific organizations, but instead generate "science-for-profit."[2] Various FSFW activities have helped ensure research favorable to the tobacco industry. FSFW is now goes by the name Global Action to End Smoking, which continues to be funded by PMI. On May 1, 2024, the GAES issued a press release on Zyn, claiming that nicotine pouches are a reduced-risk nicotine product, and that such pouches reduce the rate of combustible cigarette smoking. GAES is funded by Defendant PMI Global Services, Inc. at the control of PMI. PMI boasts that it has invested $12.5 billion to "develop, scientifically substantiate, and commercialize smoke-free products." Zyn has not been approved by FDA as a modified risk tobacco product or a smoking cessation device. It would be unlawful for PMI to directly state that Zyn is reduced risk. So it fronts a purported agency to make the claims it cannot make.

32.     PMI also has Florida-specific contacts. For example, PMI hired firms to lobby Florida law makers in an effort to transform its image as a purveyor of cigarettes to "smoke-free" products.[3] According to LinkedIn, various people who hold themselves out as employees for PMI reside in Florida. Kevin Kelsy, a Senior VP for PMI resides in Miami Beach, Florida. Jessica Coral, a People & Culture Business Partner at PMI, resides in Miami, Florida. Their employment profile contains the PMI logo and their respective work experience states they work for PMI.

---

[2] Legg, et al. Document Analysis of the Foundation for a Smoke-Free World's scientific outputs and activities: a case study in contemporary tobacco industry agnogenesis (May 2023)

[3] Philip Morris hires U.S. lobbyists as key IQOS launch nears (available at) https://www.reuters.com/business/retail-consumer/pmi-hires-us-lobbyists-key-iqos-launch-nears-2023-09-27/ (last visited Dec. 3, 2024)

33.     Defendants, Philip Morris Global Brands, Inc. and PMI Global Services, Inc. provide various services to the Swedish Match Defendants regarding and assisting in their business operations, including regulatory compliance, risk, legal issues, facility and security operations, and accounting and finance activities. The Swedish Match Defendants have contracts for services with Defendants, Philip Morris Global Brands, Inc. and PMI Global Services, Inc. These services are part of the Swedish Match Defendants' integration into PMI and, upon information and belief, assist the Swedish Match Defendants' manufacturing, marketing, promotion, and sale of Zyn.

34.     ~~11.~~ This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because: (i) there are 100 or more class members; (ii) the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and (iii) at least one Plaintiff and Defendant are citizens of different states.

35.     ~~12.~~ This Court has personal jurisdiction over the Swedish Match Defendants because they have committed the acts complained of herein in this State and in this District. The Swedish Match Defendants ~~have significant contacts with the District such that they are subject to personal jurisdiction of the Court.~~ design, manufacture, promote, market and sell Zyn, in the United States, including Florida. They personally availed themselves of doing business in this District.

36.     This Court has personal jurisdiction over PMI. PMI publicly represents, among other things, that it sells Zyn, and is investing in facilities to manufacture and commercialize Zyn in the United States. Florida is among the markets where Zyn is sold. Based on the allegations above, PMI also controls the Swedish Match Defendants. PMI therefore has personally availed itself of doing business in this District.

37.     This Court has personal jurisdiction over Defendants, Philip Morris Global Brands, Inc. and PMI Global Services, Inc. because they provide services to the Swedish Match Defendants as described in this Complaint, which assist the Swedish Match Defendants in its integration into

PMI, and its business operations.

38. ~~13.~~ This Court has personal jurisdiction over Defendants for the additional reason that they have engaged in substantial, systematic and continuous contacts with this State by, *inter alia,* regularly conducting and soliciting business in this State and this District, deriving substantial revenue from products and/or services provided to persons in this State and this District, and in some circumstance, from products and services provided from persons in this State.

39. ~~14.~~ A substantial part of the events and omissions giving rise to ~~Plaintiffs'~~ Plaintiff's causes of action occurred in the Southern District of Florida. Plaintiff purchased Zyn in this District and was harmed as a result of his usage. Pursuant to 28 U.S.C. § 1391(a), venue is proper in said District.

40. The term Defendants, herein, means Defendants collectively.

## FACTUAL ALLEGATIONS

41. ~~15.~~ Zyn is an oral nicotine product (ONP) that comes in a pouch, a small, pillow-like container.

42. ~~16.~~ The nicotine in Zyn is derived from tobacco leaf but the pouches do not contain the tobacco leaf itself. Instead, they contain pharmaceutical grade nicotine salt and other ingredients like flavors.[1,2] [4,5]

---

[1] ~~Ramamurthi, Divya; Chau, Cindy; Zhuojing, Lu; Rughoobur, Ilina; Sanaie, Keon; Krishna, Partha; Jackler, Robert MD. *Marketing of "Tobacco-Free" and "Synthetic Nicotine" Products,* White Paper, Stanford Research into the Impact of Tobacco Advertising. March 8, 2022, (available at) https://tobacco-img.stanford.edu/wp-content/uploads/2022/03/13161808/Synthetic- Nicotine White Paper 3-8-2022F.pdf~~
[2] ~~*Can Nicotine Pouches Like Zyn Harm Your Health?* (available at) https://www.nytimes.com/2024/01/25/well/live/zyn-nicotine-pouches-health-risks.html~~

[4] Ramamurthi, Divya; Chau, Cindy; Zhuojing, Lu; Rughoobur, Ilina; Sanaie, Keon; Krishna, Partha; Jackler, Robert MD. *Marketing of "Tobacco-Free" and "Synthetic Nicotine" Products,* White Paper, Stanford Research into the Impact of Tobacco Advertising. March 8, 2022, (available at) https://tobacco-img.stanford.edu/wp-content/uploads/2022/03/13161808/Synthetic- Nicotine-White-Paper-3-8-2022F.pdf
[5] *Can Nicotine Pouches Like Zyn Harm Your Health?* (available at) https://www.nytimes.com/2024/01/25/well/live/zyn-nicotine-pouches-health-risks.html

43.   ~~17.~~ Zyn works by delivering nicotine orally. The nicotine leaks out of a permeable wrapper and is absorbed into the bloodstream through the oral mucosa, the lining of the mouth.

44.   ~~18.~~ Once the user places Zyn in her mouth, the nicotine immediately takes effect, increasing heart rate and blood pressure, followed by the release of dopamine and other neurotransmitters. The release of dopamine signals pleasure and keeps users addicted.

45.   ~~19.~~ Zyn is available in nicotine concentrations of 3mg, 6mg, and 8mg.

46.   ~~20.~~ Zyn is designed to create and sustain addiction to nicotine. A typical cigarette smoker absorbs 1mg of nicotine into the body per cigarette. Zyn's own research shows that at its 3 mg nicotine concentration, 1.59 mg of nicotine per single pouch is absorbed into the body; at its 6 mg concentration, 3.51 mg of nicotine per pouch is absorbed; and at its 8 mg concentration, 3.79 mg of nicotine per pouch is absorbed.~~[3]~~[6] Zyn, therefore, delivers a potent dose of nicotine into the bloodstream.

47.   ~~21.~~ The Swedish Match Defendants, and since its acquisition, all Defendants falsely maintain that Zyn is a smokeless nicotine replacement therapy from cigarettes or e-cigarettes, yet the nicotine concentration levels in Zyn exceed the levels found in nicotine replacement therapies.~~[4]~~[7] Defendants have not received authorization from the FDA to market its product as a modified risk tobacco product or tobacco cessation device. What's more, Nicotine pouches are

---

~~[3] Lunell, Erik, et al. *Pharmacokinetic Comparison of a Novel Non-tobacco-BasedNicotine Pouch (ZYN) With Conventional, Tobacco-Based Swedish Snus and American Moist Snuff.* Nicotine & Tobacco Research, 2020, 1757-1763.~~

[6] Lunell, Erik, et al. *Pharmacokinetic Comparison of a Novel Non-tobacco-Based Nicotine Pouch (ZYN) With Conventional, Tobacco-Based Swedish Snus and American Moist Snuff.* Nicotine & Tobacco Research, 2020, 1757-1763.

~~[4] Majmundar, Anuja, et al. *Nicotine Pouch Sales Trends in the US by Volume and Nicotine Concentration Levels From 2019 to 2022.* JAMA Network Open, Substance Use and Addiction. 2022; 5(11):e2242235.~~

[7] Majmundar, Anuja, et al. *Nicotine Pouch Sales Trends in the US by Volume and Nicotine Concentration Levels From 2019 to 2022.* JAMA Network Open, Substance Use and Addiction. 2022; 5(11):e2242235.

available in a wider variety of flavors compared to FDA approved nicotine replacement gum or lozenges.[5],[8]

48.    ~~22.~~ The Swedish Match Defendants, and since its acquisition, all Defendants also falsely maintain that Zyn is "tobacco-free." It is not. The nicotine in Zyn is derived from tobacco. Promoting Zyn as "tobacco-free" and like descriptors such as "cleaner than anything out there," or placing Zyn among produce - as in the Zyn advertisements below - explicitly or implicitly represents that Zyn is less harmful that other nicotine-based products, or that Zyn contains less of a substance, like nicotine, than others, or that Zyn is free of a substance compared to others. All of which is false, misleading, and purposefully targets youth and naive tobacco users.



---

[5] Ling, Pamela M. et al, *Tobacco-Derived Nicotine Pouch Brands and Marketing Messages on Internet and Traditional Media: Content Analysis.* JMIR Formative Research. 2023; 7:e39146. (available at)
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC9978966/

[8] Ling, Pamela M. et al, *Tobacco-Derived Nicotine Pouch Brands and Marketing Messages on Internet and Traditional Media: Content Analysis.* JMIR Formative Research. 2023; 7:e39146. (available at)
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC9978966/



49. ~~23.~~ Defendants have long known that nicotine is the fundamental reason that people persist in using nicotine-based products.

50. ~~24.~~ According to the U.S. Surgeon General, about 90% of nicotine users start by the age of 18, of which, more than 80% will continue using into adulthood. Moreover, and more than 80% of whom choose brands that are most heavily advertised.~~[6]~~[9] Defendants have long known this as well.

51. ~~25.~~ Defendants' business model today is exactly how Philip Morris described it long ago:

> Today's teenager is tomorrow's potential regular customer and the overwhelming majority of smokers first begin to smoke while in their teens. . . . The smoking patterns of teen-agers are particularly important to Philip Morris. . . the share index is highest in the youngest group for all Marlboro and Virginia Slims packings. At least a part of the success of Marlboro Red during its most rapid growth period was because it became the brand of

---

~~[6] *Preventing Tobacco Use Among Youths, Surgeon General Fact Sheet,* Surgeon General., https://www.hhs.gov/surgeongeneral/reports-and-publications/tobacco/preventing-youth- tobacco-use-factsheet/index.html (last visited, Feb. 29, 2024).~~

[9] *Preventing Tobacco Use Among Youths, Surgeon General Fact Sheet,* Surgeon General., https://www.hhs.gov/surgeongeneral/reports-and-publications/tobacco/preventing-youth- tobacco-use-factsheet/index.html (last visited, Feb. 29, 2024).

choice among teenagers who then stuck with it as they grew older.

"Marlboro's phenomenal growth rate in the past has been attributable in large part to our high market penetration among young smokers ... 15 to 19 years old . . . my own data, which includes younger teenagers, shows even higher Marlboro market penetration among 15-17-year-olds."

"The ability to attract new smokers and develop them into a young adult franchise is key to brand development."[7],[10]

52. 26. To "get our share of the youth market," as Claude Teague of R.J Reynolds, PMI's one-time conspirator, had said, Defendants employ the same kind of fraudulent and deceptive youth marketing business practices that PMI has been using for decades - the very practices adjudged to violate federal racketeering laws. They exploit themes that resonate with teenagers while falsely deny doing so.[8],[11]

53. 27. For decades, Philip Morris intentionally exploited adolescents' vulnerability to imagery by creating advertising that utilizes themes of independence, adventurousness, sophistication, glamour, athleticism, social inclusion.. .and being "cool."[9],[12]

---

[7] *Tobacco Company Quotes on Marketing to Kids,* Campaign for Tobacco-Free Kids (May 14, 2001), https://www.tobaccofreekids.org/assets/factsheets/0114.pdf.
[10] *Tobacco Company Quotes on Marketing to Kids,* Campaign for Tobacco-Free Kids (May 14, 2001), https://www.tobaccofreekids.org/assets/factsheets/0114.pdf.
[8] *USA v. Philp Morris,* 449 F. Supp. 2d 1 (D.D.C. 2006) (J. Kessler).
[11] *USA v. Philp Morris,* 449 F. Supp. 2d 1 (D.D.C. 2006) (J. Kessler).
[9] *Id,* 449 F. Supp. 2d at 571.
[12] *Id,* 449 F. Supp. 2d at 571.



54.   ~~28.~~ The Swedish Match Defendants, and since its acquisition, all Defendants just replaced Marlboro with Zyn.

55.   ~~29.~~ One recent study showed that Zyn is gaining popularity among teens because of Defendants' increased marketing.~~[10]~~[13] The study found that the marketing of oral nicotine products was "remarkably similar to the marketing for popular tobacco products."~~[11]~~[14] Participants under 21 felt targeted by Zyn's marketing. Among the 2,738 study participants who saw the Zyn marketing, 28.1% felt that it targeted "people younger than me." Those in the 13-20 year age group were more likely to buy Zyn based on its marketing if they perceived the marketing was about good tasting

---

~~[10]~~ ~~Gaiha, Shivani M; Lin, Crystal; Lempert, Lauren K; Halpern-Felsher, Bonnie.~~ *~~Use, marketing, and appeal of oral nicotine products among adolescents, young adults, and adults.~~* ~~Addictive Behaviors 140 (2023) 107632.~~

[13] Gaiha, Shivani M; Lin, Crystal; Lempert, Lauren K; Halpern-Felsher, Bonnie. *Use, marketing, and appeal of oral nicotine products among adolescents, young adults, and adults.* Addictive Behaviors 140 (2023) 107632.

~~[11]~~ *~~Id.~~*

[14] *Id.*

flavors or helping to feel comfortable in social situations.¹² ¹⁵

56.   30. Defendants use and promote flavors that are known to entice underage users.¹³ ¹⁶ "Taken as a category, mint/menthol/ice flavors were the most popular. These findings mirror studies demonstrating the popularity of flavored tobacco products such as e-cigarettes."¹⁴ ¹⁷

57.   31. The reason why Defendants use chewing gum flavors is to capture non-tobacco users through the use manipulative techniques to make a product attractive to the uninitiated. The problem, however, is what lies beneath. Drug addiction. This strategy is in keeping with and expanding on the internal knowledge of the nicotine industry. As Claude Teague stated perfectly in a secret memo ".. .the non-[cigarette] smoker has little or no knowledge of what satisfactions it may offer him and no desire to try it. Instead, we must somehow convince him with wholly irrational reasons that he should try smoking, in the hope that he will for himself then discover the real "satisfactions" obtainable."¹⁵ ¹⁸

---

¹² *Id*

¹⁵ *Id.*

¹³ *Id.*

¹⁶ *Id.*

¹⁴ *Id.*

¹⁷ *Id*.

¹⁵ *Research and Planning Memorandum on The Nature of the Tobacco Business and the Crucial Role of Nicotine Therein. 1972. Claude Teague, RJR Confidential.* https://www.industrydocuments.ucsf.edu/docs/kpkj0191

¹⁸ *Research and Planning Memorandum on The Nature of the Tobacco Business and the Crucial Role of Nicotine Therein. 1972. Claude Teague, RJR Confidential.* https://www.industrydocuments.ucsf.edu/docs/kpkj0191



desire. We have deliberately played down the role of nicotine, hence the
non-smoker has little or no knowledge of what satisfactions it may offer him,
and no desire to try it. Instead, we somehow must convince him with wholly
irrational reasons that he should try smoking, in the hope that he will for
himself then discover the real "satisfactions" obtainable. And, of course, in

58. ~~32.~~ "Satisfaction" in tobacco industry lingo means nicotine addiction. The flavors
Defendants use are the "wholly irrational reasons" to use flavored nicotine, which makes Zyn
unreasonably dangerous and defective.

59. ~~33.~~ Defendants' marketing efforts are paying off. Zyn made its debut in 2014.
Since 2016, it has become the overwhelming market leader of oral nicotine pouches.~~[16]~~ [19]
Nationwide sales of nicotine pouches continued to rise dramatically, as 808 million pouches were
sold in the first three months of 2022 alone. Zyn has accounted for about 60% of those sales.

60. ~~34.~~ PMI bought Zyn for $16 Billion in 2022. PMI's marketing efforts and tobacco

~~[16] Ling, Pamela M. et al, *Tobacco-Derived Nicotine Pouch Brands and Marketing Messages on Internet and Traditional Media: Content Analysis.* JMIR Formative Research. 2023; 7:e39146. (available at) https://www.ncbi.nlm.nih.gov/pmc/articles/PMC9978966/~~

[19] Ling, Pamela M. et al, *Tobacco-Derived Nicotine Pouch Brands and Marketing Messages on Internet and Traditional Media: Content Analysis.* JMIR Formative Research. 2023; 7:e39146. (available at) https://www.ncbi.nlm.nih.gov/pmc/articles/PMC9978966/

sale know-how has fueled growth and secured market dominance as exhibited in this chart:



61. ~~35.~~ Zyn is unreasonably dangerous, and therefore defective, particularly for youth. Chief among the reasons is that Zyn creates and sustains an addiction to nicotine. Nicotine is a drug that is as addictive as heroin and cocaine.~~[17]~~ [20]

62. ~~36.~~ Nicotine fosters addiction through the brain's "reward" pathway. Both a stimulant and a relaxant, nicotine affects the central nervous system; increases blood pressure, pulse, and metabolic rate; constricts blood vessels of the heart and skin; and causes muscle relaxation. Long-term exposure to nicotine causes upregulation—an increase in the number of these high-affinity nicotinic receptors in the brain. When nicotine binds to these receptors it triggers a series of physiological effects in the user that are perceived as a "buzz" that includes pleasure, happiness, arousal, and relaxation of stress and anxiety. With regular nicotine use, however, these feelings diminish, and the user must consume increasing amounts of nicotine to achieve the same effects.

---

~~[17]~~ ~~*See e.g.,*~~ US Department of Health and Human Services. ~~*Nicotine Addiction: A Report of the Surgeon General.* DHHS Publication Number (CDC) 88 -8406, (1988).~~
[20] *See e.g.,* US Department of Health and Human Services. *Nicotine Addiction: A Report of the Surgeon General.* DHHS Publication Number (CDC) 88 -8406, (1988).

63.   ~~36.~~ The Surgeon General has explained how nicotine affects the developing brain and can addict kids more easily than adults: "Until about age 25, the brain is still growing. Each time a new memory is created, or a new skill is learned, stronger connections—or synapses—are built between brain cells. Young people's brains build synapses faster than adult brains. Because addiction is a form of learning, adolescents can get addicted more easily than adults.~~[18]~~ [21]

64.   ~~37.~~ Nicotine use during adolescence disrupts the formation of brain circuits that control attention, learning, and susceptibility to addiction. Research has shown early age of nicotine use is correlated with daily use and lifetime nicotine ~~dependence.[19]~~ dependence.[22]

65.   ~~38.~~ Nicotine exposure during adolescence likely has lasting adverse consequences for brain development.~~[20]~~ [23]

66.   ~~39.~~ Nicotine use can also intensify symptoms of depression and anxiety. It also ~~increases stress levels.[21]~~ increases stress levels.[24]

67.   ~~40.~~ Overall, with chronic drug use, the brain becomes chemically altered,

---

~~[18]~~ *~~Know The Risks: E-Cigarettes & Young People,~~* ~~https://e-cigarettes.surgeongeneral.gov/~~
~~knowtherisks.html.~~
[21] *Know The Risks: E-Cigarettes & Young People,* https://e-cigarettes.surgeongeneral.gov/
knowtherisks.html.
~~[19]~~   *~~Nicotine and the young brain.~~* ~~Truth Initiative, Jun. 8, 2022. (available at)~~
~~https://truthinitiative.org/research-resources/harmful-effects-tobacco/nicotine-and-young-brain.~~
[22]   *Nicotine and the young brain.* Truth Initiative, Jun. 8,         2022. (available at)
https://truthinitiative.org/research-resources/harmful-effects-tobacco/nicotine-and-young-brain.
~~[20]~~ ~~U.S. Department of Health and Human Services.~~ *~~E-Cigarette Use Among Youth and Young~~*
*~~Adults. A Report of the Surgeon General.~~* ~~CDC, Office of Smoking and Health; 2016.~~
[23] U.S. Department of Health and Human Services. *E-Cigarette Use Among Youth and Young*
*Adults. A Report of the Surgeon General.* CDC, Office of Smoking and Health; 2016.
~~[21]~~ *~~Id.~~*
[24] *Id.*

transforming a user into an addict.[22],[25]

68. 41. Nicotine poses other health hazards. For example, nicotine use is associated with increased risk of cardiovascular, respiratory, and gastrointestinal disorders. There is decreased immune response and it also poses ill impacts on the reproductive health. It affects cell proliferation, oxidative stress, apoptosis, DNA mutation by various mechanisms which leads to cancer. It also affects the tumor proliferation and metastasis and causes resistance to chemo and radio therapeutic agents.[23],[26]

69. 42. Health experts are also concerned that Zyn causes gum damage and periodontal disease.[24],[27] That's because oral nicotine pouches like Zyn contain toxic chemicals, which can lead to injury of the gums. "Persistent, recurrent injury can end up leading to inflammation, infection, but most importantly cancer."[25],[28]

70. 43. Defendants fail to disclose these health risks. The "warning" saying "This product contains nicotine. Nicotine is an addictive chemical" is entirely insufficient to communicate

[22] *Neurochemical Effects of Nicotine,* Tobacco Dependence and Treatment for Smokers with Co-occurring mental illnesses (available at) https://iprc.indiana.edu/training/courses/Tobacco%20Dependence%20and%20Treatment/a_04_05_01.html

[25] *Neurochemical Effects of Nicotine,* Tobacco Dependence and Treatment for Smokers with Co-occurring mental illnesses (available at) https://iprc.indiana.edu/training/courses/Tobacco%20Dependence%20and%20Treatment/a_04_05_01.html

[23] Mishra, Aseem, et al. *Harmful effects of nicotine.* Indian J Med Paediatr Oncol. 2015 Jan-Mar; 36(1): 24-31.

[26] Mishra, Aseem, et al. *Harmful effects of nicotine.* Indian J Med Paediatr Oncol. 2015 Jan-Mar; 36(1): 24-31.

[24] *What is Zyn? Doctors share health concerns of the popular and controversial nicotine pouch.* February 8, 2024 (available at) https://www.cbsnews.com/news/zyn-health-impacts-controversial-nicotine-pouch/

[27] *What is Zyn? Doctors share health concerns of the popular and controversial nicotine pouch.* February 8, 2024 (available at) https://www.cbsnews.com/news/zyn-health-impacts-controversial-nicotine-pouch/

[25] *Id.*

[28] *Id.*

the true extent of the dangers posed by Zyn.

## CLASS REPRESENTATION ALLEGATIONS

71.   44. Plaintiff brings this class action against Defendants on behalf of Plaintiff and all others similarly situated, as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure. The proposed classes are defined as follows:

> All persons who purchased, in the United States, Zyn products;
>
> All residents of Florida who purchased Zyn products;
>
> All residents of Florida who, at the time of their use of Zyn products, were under the age of 21, and who procured and used Zyn products.

72.   45. Plaintiff reserves the right to propose subclasses or modify the above class definitions, based on the evidence adduced in discovery, or as necessary and appropriate.

73.   46. This action has been brought and may properly be maintained as a class action against the Defendants pursuant to the provisions of Rule 23 of the Federal Rules of Civil Procedure because there is a well-defined community of interest in the litigation and the proposed classes are ascertainable.

74.   47. Numerosity: Plaintiff does not know the exact size of the Classes but they are each composed of more than 500 persons. The persons in the Classes are so numerous that joinder of all such persons is impracticable and the disposition of their claims in a class action rather than in individual actions will benefit the parties and the courts.

75.   48. Commonality: There are questions of law or fact common to the Class or Classes that predominate over any questions affecting only individual members, including:

> a. Whether Defendants engaged in unlawful, unfair or deceptive business practices, as alleged herein;
>
> b. Whether Defendants made unlawful and misleading representations or material omissions with respect to Zyn products;

    c.   Whether Defendants unlawfully marketed Zyn to minors;

    d.   Whether Zyn was defective in design;

    e.   Whether Zyn lacked adequate warnings;

    f.   Whether Defendants were negligent;

    g.   Whether Plaintiff and class members are entitled to equitable and injunctive relief;

    h.   Whether punitive damages should be awarded.

76. ~~49.~~ Typicality: Plaintiff's claims are typical of the claims of the class. Plaintiff and class members were injured through Defendants' substantially uniform misconduct. Plaintiff is advancing the same claims and legal theories on behalf of Plaintiff and class members, and there are no defenses that are unique to Plaintiff's claims. Plaintiff and class members' claims are from the same set of operative facts and are based on the same legal theories.

77. ~~50.~~ Adequacy: Plaintiff will fairly and adequately protect the interests of the class. Plaintiff has retained competent and capable attorneys experienced in complex and class action litigation, including consumer class actions. Plaintiff and Plaintiff's counsel are committed to prosecuting this action vigorously on behalf of the class and have the financial resourced to do so. Neither Plaintiff nor counsel have interests that are contrary to or that conflict with the class.

78. ~~51.~~ Predominance: The common issues that comprise the basis for this lawsuit predominate over any individual issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

79. ~~52.~~ Superiority: A class action is superior to other available methods for the fair and efficient adjudication of the controversy because, absent a class action, class members as a practical matter will be unable to obtain redress; Defendants' violations of their legal obligations will continue without remedy, additional consumers will be harmed, and Defendants will continue to

retain ill-gotten gains; it would be a substantial hardship for most individual class members if they were forced to prosecute individual actions; once liability has been adjudicated, the Court will be able to determine the claims of all class members; a class action will permit an orderly and expeditious administration of the claims, foster economies of time, effort and expense, and ensure uniformity of decisions; the lawsuit presents no difficulties that would impede its management by the Court as a class action; and Defendants acted on grounds generally applicable to class members, making class-wide relief appropriate.

**CAUSES OF ACTION**

**CAUSE OF ACTION I**

**Strict Liability - Design Defect**

80.  ~~53.~~ Plaintiff incorporates paragraphs ~~1-44~~1-70 by reference as though set forth fully at length herein.

81.  ~~54.~~ The Swedish Match Defendants designed manufactured, assembled, inspected, tested (or not), packaged, labeled, marketed, advertised, promoted, supplied, distributed, and/or sold Zyn that Plaintiff consumed. PMI controls the Swedish Match Defendants and all PMI subsidiaries. Philip Morris Global Brands and PMI Global Services provide necessary services to the Swedish Match Defendants conduct their business activities to sell Zyn in the United States, including Florida. Given PMI's control over its subsidiaries, it is as if PMI designed manufactured, assembled, inspected, tested (or not), packaged, labeled, marketed, advertised, promoted, supplied, distributed, and/or sold Zyn that Plaintiff consumed, and PMI is otherwise vicariously liable for the conduct of its subsidiaries.

82.  ~~55.~~ Zyn was designed and intended to be used as a method of ingesting nicotine and the other constituents in the Zyn pouch.

83.  ~~56.~~ Zyn was sold in a defective condition that is unreasonably dangerous and unsafe,

and posed a substantial likelihood of harm to Plaintiff because of reasons including the high delivery of nicotine, the likelihood of nicotine addiction and the risks of behavioral, cognitive, and mental health injuries, cardiovascular injuries, gastrointestinal injuries, and periodontal injuries, among other harmful effects.

84.   57. Zyn was sold in a defective condition that is unreasonably dangerous and unsafe to Plaintiff because the Swedish Match Defendants, and since its acquisition, all Defendants failed to adequately warn about the risk of nicotine addiction and failed to warn of the risks of behavioral, cognitive, and mental health injuries, cardiovascular injuries, gastrointestinal injuries, and periodontal injuries, among other harmful effects.

85.   58. The Swedish Match Defendants designed and promoted Zyn to specifically appeal to minors and young adults, who were particularly unable to appreciate the risks posed by Zyn.

86.   59. The Swedish Match Defendants designed Zyn with a pharmacokinetic profile engineered to create risks of abuse and addiction.

87.   60. The Swedish Match Defendants defectively designed Zyn that is inherently dangerous because it included features making the product attractive and more palatable to youth and non-smokers. These features include its concealability and its so called "tobacco-free" condition, which is false and misleading.

88.   61. Zyn does not perform as safely as a reasonable and ordinary consumer would reasonably assume and reasonably expect, as Zyn is designed to cause and sustain nicotine addiction, delivers a potent amount of nicotine, and is likely to cause behavioral, cognitive, and mental health injuries, cardiovascular injuries, gastrointestinal injuries, and periodontal injuries, among other harmful effects.

89.   62. The risks inherent in the design of Zyn significantly outweigh any benefits of

such design.

90.   63. The Swedish Match Defendants, and since its acquisition, all Defendants could have utilized cost effective, reasonably feasible alternative designs to minimize these harms, such as by designing products that delivered less nicotine, and/or did not have flavors that attract youth like Plaintiff.

91.   64. Plaintiff used Zyn as intended or in reasonably foreseeable ways.

92.   65. Plaintiff's injuries, physical, emotional, and economic, were reasonably foreseeable at the time of Zyn's design, manufacture, distribution, and sale.

93.   66. Zyn was defective and unreasonably dangerous when they left the Swedish Match Defendants' possession. The defects continued to exist through the products' sale to and use by consumers, including Plaintiff, who used the products without any substantial change in the products' condition.

94.   67. Plaintiff was injured as a direct and proximate result of Zyn's defective design as described herein. The defective design of Zyn was a substantial factor in causing Plaintiff's harms.

95.   68. Plaintiff demands judgment against Defendants for compensatory and punitive damages, medical monitoring to diagnose Zyn induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.


**CAUSE OF ACTION II**

**Strict Liability - Failure to Warn**

96.   69. Plaintiff incorporates paragraphs 1-44 1-70 by reference as though set forth fully at length herein.

97.   70. The Swedish Match Defendants designed manufactured, assembled, inspected, tested (or not), packaged, labeled, marketed, advertised, promoted, supplied, distributed, and/or sold Zyn that Plaintiff consumed. PMI controls the Swedish Match Defendants and all PMI subsidiaries. Philip Morris Global Brands and PMI Global Services provide necessary services to the Swedish Match Defendants conduct their business activities to sell Zyn in the United States, including Florida. Given PMI's control over its subsidiaries, it is as if PMI designed manufactured, assembled, inspected, tested (or not), packaged, labeled, marketed, advertised, promoted, supplied, distributed, and/or sold Zyn that Plaintiff consumed, and PMI is otherwise vicariously liable for the conduct of its subsidiaries.

98.   71. Zyn was sold in a defective condition that is unreasonably dangerous and unsafe to Plaintiff because the Swedish Match Defendants, and since the acquisition, all Defendants failed to adequately warn about the risk of nicotine addiction and failed to warn of the risks of behavioral, cognitive, and mental health injuries, cardiovascular injuries, gastrointestinal injuries, and periodontal injuries, among other harmful effects.

99.   72. Defendants were aware that Zyn posed risks that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of design, manufacture, distribution, and sale of Zyn.

100.   73. Zyn is defective because, among other reasons described herein, the Swedish Match Defendants, and since the acquisition, all Defendants failed to warn consumers, including Plaintiff, in Zyn's labeling, packaging, and through the marketing promotion, and advertising of Zyn including that:

    a.  Zyn causes, maintains, or aggravates nicotine addiction and subject consumers to the risks of concomitant health hazards that addictive, i.e., compulsive behavior can result in, and that this danger was even greater for minors;

b.   Zyn causes harm by increased exposure to nicotine and other harmful ingredients;

c.   Zyn is a nicotine delivery device not intended for persons under 26 years old;

d.   Zyn delivers nicotine derived from tobacco;

e.   Zyn delivers nicotine at greater levels than nicotine replacement therapies;

f   Zyn carries risks of behavioral, cognitive, and mental health injuries, cardiovascular injuries, gastrointestinal injuries, and periodontal injuries, among other harmful effects.

g.   Which and when medical symptoms warranted medical care; and

h.   How many Zyn pouches are safe to consume in a day.

101.   ~~74.~~ The failure to adequately warn about its defective products and to misleadingly advertise through conventional and social media avenues created a danger of injuries described herein that were reasonably foreseeable at the time of labeling, design, manufacture, distribution, and sale of Zyn.

102.   ~~75.~~ Ordinary consumers would not have recognized the potential risks of Zyn when used in a manner reasonably foreseeable to Defendants.

103.   ~~76.~~ Defendants are strictly liable for the sale of defective Zyn products that contained inadequate warnings.

104.   ~~77.~~ Plaintiff could not have averted injury through exercise of reasonable care for reasons including Defendants' concealment of the true risks posed by Zyn.

105.   ~~78.~~ Zyn was defective and unreasonably dangerous when they left Defendants' possession because it lacked adequate warnings. The defects continued to exist through the products' sale to and use by consumers, including Plaintiff, who used the products without any substantial change in the products' condition.

106.   ~~79.~~ The Swedish Match Defendants, and since the acquisition, all Defendants could have provided adequate warnings and instructions to prevent the harms and injuries set forth herein.

107. 80. Plaintiff was injured as a direct and proximate result of Defendants' failure to warn because Plaintiff would not have used or purchased Zyn had Plaintiff received adequate warnings and instructions.

108. 81. Defendants' lack of adequate and sufficient warnings and instructions and its inadequate and misleading advertising was a substantial contributing factor in causing the harm to Plaintiff.

109. 82. Plaintiff demands judgment against Defendants for compensatory and punitive damages, medical monitoring to diagnose Zyn induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## CAUSE OF ACTION III

### Negligence

110. 83. Plaintiff incorporates paragraphs 1-44 1-70 by reference as though set forth fully at length herein.

111. 84. The Swedish Match Defendants designed manufactured, assembled, inspected, tested (or not), packaged, labeled, marketed, advertised, promoted, supplied, distributed, and/or sold Zyn that Plaintiff consumed. PMI controls the Swedish Match Defendants and all PMI subsidiaries. Philip Morris Global Brands and PMI Global Services provide necessary services to the Swedish Match Defendants conduct their business activities to sell Zyn in the United States, including Florida. Given PMI's control over its subsidiaries, it is as if PMI designed manufactured, assembled, inspected, tested (or not), packaged, labeled, marketed, advertised, promoted, supplied, distributed, and/or sold Zyn that Plaintiff consumed, and PMI is otherwise vicariously liable for the conduct of its subsidiaries.

112. 85. Zyn was the type of product that could endanger others if negligently made,

promoted, and sold.

113.    86. The Swedish Match Defendants, and since the acquisition, all Defendants had a duty of reasonable care in designing, manufacturing, assembling, inspecting, testing, packaging, labeling, marketing, advertising, promoting, supplying, distributing and/or selling Zyn to avoid causing harm to those that consumed Zyn.

114.    87. The Swedish Match Defendants, and since the acquisition, all Defendants knew or should have known through the exercise of reasonable care that the risks of consumers of Zyn, a powerfully addictive and dangerous nicotine delivery device.

115.    88. The Swedish Match Defendants, and since the acquisition, all Defendants knew or should have known through the exercise of reasonable care, that minors and young people would be attracted to Zyn.

116.    89. The Swedish Match Defendants, and since the acquisition, all Defendants knew or should have known through the exercise of reasonable care, that Zyn was dangerous, harmful and injurious when used by Plaintiff in a reasonably foreseeable manner, particularly with minors and young adults.

117.    90. The Swedish Match Defendants, and since the acquisition, all Defendants knew or should have known through the exercise of reasonable care, that Zyn was designed to cause or sustain nicotine addiction, and that Zyn posed a risk of harm including risks of addiction, behavioral, cognitive, and mental health injuries, cardiovascular injuries, gastrointestinal injuries, and periodontal injuries, among other harmful effects, as described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of design, manufacture, distribution, promotion, and sale of Zyn.

118.    91. The Swedish Match Defendants, and since the acquisition, all Defendants knew or should have known through the exercise of reasonable care that Zyn needed to be researched,

designed, manufactured, assembled, inspected, tested packaged, labeled, marketed, advertised, promoted, supplied, distributed, and/or sold properly, without defects and with due care to avoid needlessly causing harm.

119. 92. The Swedish Match Defendants, and since the acquisition, all Defendants knew or should have known through the exercise of reasonable care that Zyn could cause serious risk of harm, particularly to young persons and minors.

120. 93. The Swedish Match Defendants, and since the acquisition, all Defendants were negligent, reckless, and careless and failed to take the care and duty owed to Plaintiff, thereby causing Plaintiff to suffer harm.

121. 94. The Swedish Match Defendants, and since the acquisition, all Defendants breached their duty of care by, among other things:

   a. Failing to perform adequate testing of Zyn prior to marketing to ensure safety, including long-term testing of the product, and testing for injury to the brain and cardiovascular systems, respiratory, gastrointestinal, and periodontal, and other related medical conditions, as well as its effect on mental health;

   b. Failing to inform or warn consumers, including Plaintiff, that Zyn had not been adequately tested or researched prior to marketing to ensure safety;

   c. Failure to take reasonable care in the design of Zyn;

   d. Failure to take reasonable care in the advertising, promoting, and marketing of Zyn;

   e. Failure to warn consumers, including Plaintiff, of the dangers associated with Zyn, including that it was unsafe, is powerfully addictive, can cause permanent changes in the brain, mood disorders, and impairment of thinking and cognition;

   f Failure to use reasonable care in the sale of Zyn without adequate warnings; use of flavors and design to appeal to minors and young people;

   g. Misleadingly stating that Zyn is "free of tobacco";

   h. Failure to provide any instructions regarding a safe amount of Zyn to consume in a day;

   i. All other failures, acts and omissions set forth herein.

122.   ~~95.~~ The Swedish Match Defendants, and since the acquisition, all Defendants further acted and or failed to act willfully and with conscious and reckless disregard for the rights, interests, and safety of Plaintiff, and Defendants acts and omissions had a great probability of causing significant harm; and in fact resulted in such harm.

123.   ~~96.~~ The Swedish Match Defendants, and since the acquisition, all Defendants reasonably should have foreseen that young people would try Zyn and quickly become addicted, resulting in teenagers and young adults developing lifelong addictions.

124.   ~~97.~~ Plaintiff was injured as a direct and proximate result of negligence and/or gross negligence as described herein.

125.   ~~98.~~ Defendants' negligence was a substantial factor in causing and or contributing to

Plaintiff's harms.

126.   ~~99.~~ Plaintiff demands judgment against Defendants for compensatory and punitive damages, medical monitoring to diagnose Zyn induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**CAUSE OF ACTION IV**

**~~Fraud~~Fraudulent Concealment**

127.   ~~100.~~ Plaintiff incorporates paragraphs ~~1-44~~1-70 by reference as though set forth fully at length herein.

128.   ~~101.~~ The Swedish Match Defendants designed manufactured, assembled, inspected, tested (or not), packaged, labeled, marketed, advertised, promoted, supplied, distributed, and/or sold Zyn that Plaintiff consumed. PMI controls the Swedish Match Defendants and all PMI

subsidiaries. Philip Morris Global Brands and PMI Global Services provide necessary services to the Swedish Match Defendants conduct their business activities to sell Zyn in the United States, including Florida. Given PMI's control over its subsidiaries, it is as if PMI designed manufactured, assembled, inspected, tested (or not), packaged, labeled, marketed, advertised, promoted, supplied, distributed, and/or sold Zyn that Plaintiff consumed, and PMI is otherwise vicariously liable for the conduct of its subsidiaries.

129.   102. The Swedish Match Defendants, and since the acquisition, all Defendants created and implemented a plan to generate a market for Zyn and substantially increase sales of Zyn through a pervasive pattern of false and misleading statements and omissions. Defendants' plan was intended to portray Zyn as cool and safe alternatives to combustible cigarettes and e-cigarettes, with a particular emphasis on appealing to minors, based in part on flavors while misrepresenting or omitting key facts concerns Zyn's nicotine content, addictiveness, flavoring content and safety.

130.   103. The Swedish Match Defendants', and since the acquisition, all Defendants ' marketing, promoting, and advertising contained deceptive statements like "tobacco free" when in fact Zyn is derived from tobacco.

131.   104. The Swedish Match Defendants, and since the acquisition, all Defendants further fraudulently and deceptively marketed Zyn as safe, healthful, or not harmful when Defendants knew it to be untrue.

132.   105. The Swedish Match Defendants, and since the acquisition, all Defendants further fraudulently and deceptively downplayed, minimized, and concealed the risks associated with Zyn generally. Defendants concealed that the nicotine in Zyn can cause cognitive and mental health injuries, periodontal disease, vascular injuries. Defendants further fraudulently and deceptively concealed that Zyn was powerfully addictive and that its design inherently demanded

dependency.

133.   ~~106.~~ Defendants' marketing, promoting, and advertising failed to disclose that it was an extremely potent nicotine delivery device; Zyn was designed to create and sustain nicotine addiction; and posed significant risks of substantial injury resulting from use of Zyn. Promoting Zyn as "tobacco-free" and like descriptors such as "cleaner than anything out there" explicitly or implicitly represents that Zyn is less harmful that other nicotine-based products, or that Zyn contains less of a substance, like nicotine, than others, or that Zyn is free of a substance compared to others.

134.   ~~107.~~ The Swedish Match Defendants, and since the acquisition, all Defendants' conduct was fraudulent and deceptive because their misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiff.

135.   ~~108.~~ Defendants owed Plaintiff a duty to disclose these facts because they were known and/or accessible exclusively to Defendants, who have had exclusive and superior knowledge of the facts; because the facts would be materials to reasonable consumers; because ~~Zyns pose~~ Zyn poses an unreasonable risk of substantial bodily injury.

136.   Plaintiff had viewed Zyn advertising ads, including on Face Book, which state, falsely that Zyn is tobacco-free, and imply that Zyn is otherwise not harmful.

137.   ~~109.~~ Plaintiff reasonably and justifiably relied on the misrepresentations and/or omissions. Reasonable consumers would have been expected to have relied on Defendants' misrepresentations and omissions.

138.   ~~110.~~ Defendants knew or should have known that its misrepresentations and/or omissions were false and misleading, and intended for consumers, including Plaintiff, to rely on such misrepresentations and omissions.

139.   ~~111.~~ Defendants' misrepresentations and/or omissions were a substantial factor in

causing Plaintiff's harms. Plaintiffs were injured as a direct and proximate result of Defendants' fraudulent conduct as described herein.

140.   ~~112.~~ Plaintiff demands judgment against Defendants for compensatory and punitive damages, medical monitoring to diagnose Zyn induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

141.   ~~113.~~ Through the exercise of reasonable diligence, Plaintiff did not and could not have discovered that Zyn caused Plaintiff's injuries and/or sequelae thereto because, at the time of these injuries and/or sequelae thereto, the cause was unknown to Plaintiff.

142.   ~~114.~~ Plaintiff did not suspect and had no reason to suspect Zyn caused Plaintiff's injuries and/or sequelae thereto until less than the applicable limitations period prior to the filing of this action.

143.   ~~115.~~ In addition, Defendants' fraudulent concealment has tolled the running of any statute of limitations. Through their affirmative misrepresentations and omissions, Defendants actively concealed from Plaintiff the risks associated with the defects of Zyn and that these products caused their injuries and/or sequelae thereto. Through their ongoing affirmative misrepresentations and omissions, Defendants committed continual tortious and fraudulent acts.

144.   ~~116.~~ As a result of Defendants' fraudulent concealment, Plaintiff was unaware and could not have reasonably known or learned through reasonable diligence that Plaintiff had been exposed to the defects and risks alleged herein and that those defects and risks were the direct and proximate result of Defendants' acts and omissions.

## PRAYER FOR RELIEF

Plaintiff demands judgment against Defendants to the full extent of the law, including but

not limited to:

1. Judgment for Plaintiff against Defendants;

2. Damages to compensate Plaintiff for injuries sustained as a result of the use of Zyn, including but not limited to physical pain and suffering, mental anguish, loss of enjoyment of life, emotional distress, medical expenses, economic harm;

3. Punitive damages;

4. Attorneys' fees and costs;

5. Prejudgment and post-judgment interest at the lawful rate;

6. ~~Medical monitoring;~~

6. ~~7.~~ An order certifying the proposed classes, designating Plaintiffs as the named representatives of the classes, and designating the undersigned class counsel;

7. ~~8.~~ A trial by jury on all issues;

8. ~~9.~~ Any other relief the Court deems just and proper.

Dated: ~~March 19~~ December 4, 2024

By:   /s/ Jeffrey L. Haberman
      Jeffrey L. Haberman Scott P Schlesinger
      Jonathan R. Gdanski **SCHLESINGER LAW OFFICES, P.A.** 1212 SE Third Avenue, Fort Lauderdale, FL 33316
      Telephone: (954) 467-8800
      jhaberman@schlesingerlaw.com
      *Attorneys for Plaintiffs*


### DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury as to all issues.

Dated: ~~March 19~~ December 4, 2024

By:   /s/ Jeffrey L. Haberman
      Jeffrey L. Haberman
      Scott P Schlesinger
      Jonathan R. Gdanski
      **SCHLESINGER LAW OFFICES, P.A.**
      1212 SE Third Avenue, Fort Lauderdale,

FL 33316 Telephone: (954) 467-8800
jhaberman@schlesingerlaw.com
*Attorneys for Plaintiffs*