## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case no. 0:24-cv-60437 - DIMITROULEAS/HUNT

DARRYL MAULTSBY, individually and
on behalf of all others similarly situated,

      Plaintiff,

v.

PHILIP MORRIS INTERNATIONAL, INC.;
SWEDISH MATCH NORTH AMERICA, LLC;
SWEDISH MATCH USA, INC.;
PHILIP MORRIS GLOBAL BRANDS, INC.; and
PMI GLOBAL SERVICES, INC.;

      Defendants.

_____/

## PLAINTIFF'S MOTION FOR CLASS CERTIFICATION
## AND REQUEST TO APPOINT CLASS COUNSEL

## INTRODUCTION

This case is about Zyn, a nicotine pouch. Zyn is a relatively new product on the market. *See* Expert Report of Robert K. Jackler (Jackler Rep., Exhibit 1) at 10. Zyn is placed in a user's mouth between the lip and gums:



*Id.* at 11.

Zyn pouches come in different flavors and are sold in cans that resemble containers of candy, such as Ice Breakers:



*Id.* at 139.

"[A] sizeable fraction of ZYN customers are adolescents and young adults who were not previously addicted to nicotine but are becoming 'hooked' through nicotine pouch use." *Id.* at 2. "A major factor in ZYN's attractiveness to youth is its product design and packaging." *Id.* "ZYN lifestyle advertisements emphasize youthful, active lifestyles . . . ." *Id.* at 3. "Associating ZYN use with vigorous, vivacious youth performing arduous exercise conveys the message that the product is healthy." *Id.* Advertisements for Zyn "convey, implicitly or explicitly, that ZYN

helps smokers to quit smoking cigarettes." *Id.* Advertisements also "convey reassurance about health effects, such as 'smoke-free,' 'tobacco-free,' and 'spit-free.'" *Id.*

Zyn is not healthy. *See, e.g.*, Expert Report of Benjamin A. Toll (Toll Rep., Exhibit 2). "Youth and young adults are uniquely at risk for long-term, long-lasting effects of exposing their developing brains to nicotine, including nicotine addiction, mood disorders, and permanent lowering of impulse control." *Id.* at 8. "ZYN with their patented nicotine formulation were designed to deliver high levels of nicotine comparable to that achieved with a combustible cigarette or a nicotine salt e-cigarette." *Id.* "ZYN failed to meet a reasonable consumer expectation of delivering nicotine at consistent levels under normal conditions as necessary for health protection, safety, and quality purposes, including avoiding the risk of consumption of high doses and developing drug addiction." *Id.*

"Zyn is designed to create and sustain addiction, and in this sense is defective and unreasonably dangerous." *See* Expert Report of Robert N. Proctor (Proctor Rep., Exhibit 3) at 4. "Zyn products are harmful to adolescents and young adult[s]." Expert Report of Dr. Bonnie Halpern-Felsher (Halpern-Felsher Rep., Ex. 4) at 5. "Zyn is unreasonably dangerous especially to young people, for several reasons:  Zyn is high in nicotine, that changes adolescents' brain structure and increases likelihood of addiction, and yet consumers and potential consumers are not warned of the risks of addiction from Zyn; addiction to nicotine products including Zyn is severe and difficult to quit; nicotine is also associated with behavioral, cognitive issues, and mental health issues including depression and anxiety; Zyn has become the most popular nicotine pouch product on the market, with more and more marketing that is appealing to youth and with youth use increasing; and yet Zyn failed to warn consumers and potential consumers about all of these risks nor did Zyn try to mitigate adolescent use." *Id.* at 7

Plaintiff, Darryl Maultsby, has brought this putative class-action against Defendants, who are responsible for the design, marketing, and sale of Zyn. *See generally* Doc. 157, *2d Am. Compl.* The operative complaint pleads four counts: (I) strict liability design defect; (II) strict liability failure to warn; (III) negligence; and (IV) violation of Florida's Deceptive and Unfair Trade Practices ACT (FDUTPA). *Id.* Plaintiff moves to certify a Florida class and youth subclass for count IV—the FDUTPA claim. Plaintiff also moves to certify a Florida class for the particular issue of liability only (not causation or damages) on counts I and II—the design-defect and failure-to-warn claims. Finally, Plaintiff requests to appoint class counsel.

**ARGUMENT**

**I.      The proposed class is ascertainable.**

"Rule 23 implicitly requires that a proposed class be ascertainable; that is, the class must be 'adequately defined such that its membership is capable of determination.'" *Rensel v. Centra Tech, Inc.*, 2 F.4th 1359, 1361 (11th Cir. 2021) (citation omitted). "[T]o meet this ascertainability requirement, the party seeking certification need not establish its ability to identify class members in a convenient or administratively feasible manner." *Id.*

The proposed class is: "All persons who purchased, in Florida, Zyn products."

Plaintiff also proposes a subclass: "All persons who procured and used, in Florida, Zyn products while under the age of 21." As explained *infra* § III.A, damages under the FDUTPA claim are calculated differently for this youth subclass.

The class and subclass are ascertainable because membership is based solely on "objective, verifiable criteri[a]." *See Rensel*, 2 F.4th at 1370; *see also, e.g.*, *Connor v. Permanent Gen. Assurance Corp.*, No. 9:20-CV-81979, 2022 WL 1642866, at *3 (S.D. Fla. Apr. 11, 2022) (Dimitrouleas, J.) (class was ascertainable because the definition used "objective criteria"). Specifically, membership in the class is based solely on whether a person purchased Zyn products in Florida. Membership in the subclass is based solely on whether a person procured and used Zyn products in Florida while under the age of 21.

**II.      The rule 23(a) requirements are satisfied.**

**A.      Numerosity**

Rule 23(a)(1) requires that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "[W]hile there is no fixed numerosity rule, 'generally less than twenty-one is inadequate, more than forty adequate, with numbers between varying according to other factors.'" *Cox. v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1554 (11th Cir. 1986). "[A] plaintiff need not show the precise number of members in the class." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1267 (11th Cir. 2009).

"Sales of ZYN nicotine pouches have been surging:, from 42 million cans sold in 2022, 421 million in 2023, to 644 million in 2024 . . . ." Jackler Rep. at 15. "Zyn sales in the US in 2024 represented 65.9% of the US nicotine pouch market." *Id.* "In 2024, an inventory of 156,449 USA ZYN sales locations were identified spanning 12,790 cities." *Id.* at 16. "In mid-2024, ZYN sales

3

had risen so rapidly that demand was outstripping the capacity of PMI to manufacture the product, and many vendors were rationing or were out of stock." *Id.* at 2. "As of November 2025, PMI sold ZYN in some 170,000 stores in the US." *Id.* at 20. The ZYN website identifies hundreds if not thousands of stores in Florida that sell ZYN.[1]

"The U.S. Food & Drug Administration ('FDA') and Centers for Disease Control ('CDC') annually monitor and evaluate underage tobacco product usage, including the usage of nicotine pouches, through the annual National Youth Tobacco Survey ('NYTS')." Expert Report of Hal J. Singer (Singer Rep., Exhibit 5) ¶ 5. "According to the 2024 edition of this report, approximately 1.8 percent of middle and high school students report current nicotine pouch use, with Zyn the most commonly reported brand among current nicotine pouch users." *Id.*

From these figures, this Court can reasonably infer that the proposed class and subclass each have more than 40 members. *See, e.g.*, *Taylor v. Screening Reports, Inc.*, 289 F.R.D. 370, 373 (N.D. Ga. 2013) ("A finding of numerosity can be based on reasonable inferences . . . ."). "[W]here the numerosity question is a close one, a balance should be struck in favor of a finding of numerosity, since the court has the option to decertify pursuant to Rule 23(c)(1)." *Evans v. U.S. Pipe & Foundry Co.*, 696 F.2d 925, 930 (11th Cir. 1983).

### B.      Commonality

Rule 23(a)(2) requires that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Commonality is a "relatively light burden," and it "does not require that all the questions of law and fact raised by the dispute be common." *Vega*, 564 F.3d at 1268. "Even a single common question will do." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011) (cleaned up). The claims must "depend upon a common contention," which "must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* at 350.

Here, there are multiple common questions, capable of classwide resolution, that will resolve an issue central to the validity of the claims:

For the FDUTPA claim, a common question is: "Did Defendants engage in a deceptive act or unfair trade practice with respect to Zyn?"

---

[1] https://us.zyn.com/find-a-store/

For the issue of liability on the design-defect claim, a common question is: "Was Zyn defectively designed?"

For the issue of liability on the failure-to-warn claim, a common question is: "Did Defendants fail to adequately warn of Zyn's dangers?"

### C.      Typicality

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "Class members' claims need not be identical to satisfy the typicality requirement; rather, there need only exist a sufficient nexus between the legal claims of the named class representatives and those of individual class members to warrant class certification." *Ault v. Walt Disney World Co.*, 692 F.3d 1212, 1216 (11th Cir. 2012) (cleaned up). "This nexus exists 'if the claims or defenses of the class and the class representative arise from the same event or pattern or practice and are based on the same legal theory.'" *Id.* (citation omitted). "Differences in the amount of damages between the class representative and other class members does not affect typicality." *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984).

Here, the claims of the representative party—Darryl Maultsby—are typical of the claims of the class. All of the claims arise from the same event or pattern or practice: Defendants' design, marketing, and sale of Zyn. And all of the claims are based on the same legal theories: design defect, failure to warn, and violation of the FDUTPA.

Typicality is not defeated by any differences in the "nicotine journey" of the representative parties and the class. *See In re JUUL Labs, Inc. Mtkg. Sales Pracs. & Prods. Litig.*, 609 F. Supp. 3d 942, 961–64 (N.D. Cal. 2022). In *In Re JUUL Labs*, the plaintiffs moved for class certification for claims concerning JUUL electronic cigarettes. *See id.* at 957. The defendants argued that typicality was lacking because there were differences between the proposed class representatives and class members regarding "(i) when and why each proposed representative or class member first used JUUL; (ii) what each knew about JUUL prior to their use or their first purchase; (iii) their experiences with cigarettes or other nicotine products; (iv) when each became aware of JUUL containing nicotine and its addictiveness; and (v) how each was impacted by the purported-addictiveness of the product." *Id.* at 961. The court held that "[t]he differences do not preclude typicality." *Id.*

For example, it did not matter that one named representative "was a pack-a-day smoker for seven years prior to purchasing JUUL, knew JUUL contained nicotine, was familiar with nicotine products, was influenced by the 'testimonials' marketing about making a switch, and state[d] that the products helped him stop smoking for 2.5 years." *Id.* at 962. Those differences did not preclude typicality on claims under California's consumer-protection statutes because the named representative nevertheless testified that "he saw and relied on [the defendants'] marketing before starting to use JUUL, that those marketing materials made it seem like JUUL was safer and easier to use than cigarettes, and that if defendants had disclosed the risks, he would not have purchased the product." *Id.* At bottom, the claims were "based on the theory that had defendants disclosed the safety and addiction risks of using JUUL products, they would have paid less or purchased different products," and the named representative's testimony did not raise atypical differences with respect to that theory. *Id.*

### D.      Adequacy

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This requirement applies to both the named representatives and counsel. *See London v. Wal-Mart Stores, Inc.*, 340 F.3d 1246, 1253 (11th Cir. 2003). Plaintiff addresses each in turn.

#### <u>Class representative:</u>

To determine the adequacy of class representatives, a court must consider "(1) whether any substantial conflicts of interest exist between the representatives and the class; and (2) whether the representatives will adequately prosecute the action." *In re Equifax Inc. Customer Data Sec. Breach Litig.*, 999 F.3d 1247, 1275 (11th Cir. 2021) (citation omitted).

***First***, no conflict of interest exists between the representative party—Darryl Maultsby—and the class. "Only a 'fundamental' conflict 'going to the specific issues in controversy' can defeat class certification." *Id.* (citation omitted). "A conflict is fundamental 'where some party members claim to have been harmed by the same conduct that benefitted other members of the class.'" *Id.* No such conflict exists here. No member of the class has benefitted from the conduct at issue.

"[T]he law does not demand a plaintiff to prove a negative;" in other words, the plaintiff is not required to submit "affirmative evidence of a lack of a conflict of interest." *Duncan v. Governor of Virgin Islands*, 48 F.4th 195, 211–12 (3d Cir. 2022). "Rather, the definition of a class,

the factual allegations of the complaint, and the relief sought are themselves highly indicative of a putative class representative's theory of the case and whether she will seek relief that benefits the entire class." *Id.*

**Second**, Mr. Maultsby will adequately prosecute the action. As reflected in his deposition testimony and declaration, Mr. Maultsby has sufficient knowledge of the case, interest in and enthusiasm for the litigation and for representing the class, willingness to respond to interrogatories and depositions, and understanding of the role and duties of a class representative.

Mr. Maultsby sat for a deposition from 9:55 am to 4:22 pm. *See* January 16, 2026 Deposition of Darryl Maultsby (Maultsby Dep., Ex. 6) at 1. He has reviewed the operative complaint. *Id.* at 12:18–20, 17:5–12. He understands that this case has been brought as a class action and what a class action is. *Id.* at 13:1–7. He understands that he is proposing to serve as a class representative. *Id.* at 13: 8–11. He has met with his attorneys and had calls with them to discuss this case. *Id.* at 19:9–20:7.

Mr. Maultsby provided initial disclosures in discovery, responded to Defendants' first set of requests for production, and responded to Defendants' interrogatories. *See id.* at 28:1–7, 59:17–60:1, 116:19–117:3. Mr. Maultsby personally looked for items in response to the requests for production, producing responsive photographs and a receipt. *See id.* at 46:1–25, 48:3–48:7.

Mr. Maultsby graduated from high school. *Id.* at 20:16–22. As an adult, he has never been charged with a crime or been convicted of a crime. *Id.* at 27:15–20.

Mr. Maultsby has used Zyn for approximately ten years. *Id.* at 62:13–15. Before using Zyn, he "might have tried a cigarette in [his] youth when [he] was a bad kid, but that was it." *Id.* at 67:10–14. He first tried Zyn because, in his words: "It looked cool. It was appealing. It was like in the family of looking like mints kind of, like it was like a candy-looking thing so it got to be light, right? So something that was just an alternative to smoking, no tar bar." *Id.* at 68:8–12. When he first saw Zyn, he thought it was "not tobacco." *Id.* at 82:8–13. He thought Zyn was "healthier." *Id.* at 83:13–25. He has used both the 3mg and 6mg versions of Zyn. *Id.* at 106:15–18.

Mr. Maultsby's goal in bringing this suit is that he doesn't "want anyone to suffer the physical problems that come with nicotine addiction." *Id.* at 211:7–12. He said the lawsuit would make people "aware of the actual damages that it can cause. It's not cool, clean, better. It's addicting." *Id.* at 211:13–17.

Mr. Maultsby also signed a declaration. In the declaration, he confirmed that he understands the duties and responsibilities of a class representative. *See* Declaration of Darryl Maultsby, Exhibit 7.

**Class counsel**

Plaintiff requests this Court to appoint the following attorneys as class counsel: Scott P. Schlesinger, Jonathan R. Gdanski, Jeffrey L. Haberman, and Bryan Gowdy.

In appointing class counsel, a court must consider: "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A). As reflected in their declarations, the proposed attorneys have sufficient experience, knowledge, and resources to serve as class counsel. *See* Declarations of class counsel, Exhibit 8.

### III.   The rule 23(b)(3) requirements are satisfied for the FDUTPA claim.

In addition to meeting the requirements of rule 23(a), parties moving for class certification must also satisfy one of the subsections of rule 23(b). Here, Plaintiff moves to certify the Florida class and subclass on the FDUTPA claim under rule 23(b)(3), which requires the court to find that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

#### A.   Predominance

"Common questions 'predominate' within the meaning of Rule 23(b)(3) when the substance and quantity of evidence necessary to prove the class claims won't vary significantly from one plaintiff to another." *Tershakovec v. Ford Motor Co.*, 79 F.4th 1299, 1306 (11th Cir. 2023). "The first step in assessing predominance is to 'identify the parties' claims and defenses and their elements' and to categorize 'these issues as common questions or individual questions by predicting how the parties will prove them at trial.'" *Id.* (citation omitted). "A common issue is one that will likely be proved using the same evidence for all class members; an individualized issue, by contrast, is one that will likely be proved using evidence that 'var[ies] from member to member.'" *Id.*

8

"To establish a consumer claim for damages under FDUTPA, a plaintiff must show (1) a deceptive act or unfair practice, (2) causation, and (3) actual damages." *Id.* at 1311. Each of these elements is "objective." *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 985 (11th Cir. 2016). "[A] plaintiff asserting a FDUTPA claim need not show actual reliance on the representation or omission at issue." *Tershakovec*, 79 F.4th at 1311 (citation omitted). In other words, "the mental state of each class member is irrelevant." *Carriuolo*, 823 F.3d at 985.

For the first element, the class will need to prove "a deceptive act or unfair practice."

"A deceptive act involves 'a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment.'" *CMR Constr. & Roofing, LLC v. UCMS, LLC*, No. 21-11183, 2022 WL 3012298, at *4 (11th Cir. 2022) (unpublished) (citation omitted). This does not require any individualized inquiries. Rather, "a plaintiff must simply prove that an objective reasonable person would have been deceived." *Fitzpatrick v. Gen. Mills, Inc.*, 635 F.3d 1279, 1283 (11th Cir. 2011).

Here, the operative complaint alleges that Defendants misled consumers in various ways, which has been substantiated by Plaintiff's experts Jackler, Toll, Halpern-Felsher, and Proctor:

- "Defendants portray Zyn as cool and safe alternatives to combustible cigarettes and e-cigarettes, with a particular emphasis on appealing to minors based in part on flavors, while representing or omitting facts concerning Zyn's nicotine content, addictiveness, flavoring content, and safety." Doc. 157, *2d Am. Compl.* at 43 ¶ 137. *See also*, Exhibits 1-4, generally. Toll Rep. at 9, 15; Proctor Rep. at 4; Jackler Rep. at 33, 140; Halpern-Felsher Rep. at 6, 7.

- "Defendants' marketing, promoting, and advertising contained statements like 'tobacco free' when in fact Zyn is derived from tobacco." *Id.* ¶ 138 *See also*, Exhibits 1-4, generally. Toll Rep. at 66; Proctor Rep. at 9; Jackler Rep. at 4; Halpern-Felsher Rep. at 21.

- "Defendants represented Zyn as safe, healthful, or not harmful." *Id.* ¶ 139. *See also*, Exhibits 1-4, generally. Toll Rep. 8; Proctor Rep. at 4; Jackler Rep. at 3;

- "Defendants made misleading representations about and omitted the risks associated with Zyn generally. Defendants omitted that the nicotine in Zyn can cause cognitive and mental health injuries, periodontal disease, vascular injuries. Defendants omitted that Zyn was powerfully addictive and that its design inherently demanded

9

dependency." *Id.* ¶ 140. *See also*, Exhibits 1-4, generally. Toll Rep. 13-16, 30; Proctor Rep. at 4; Jackler Rep. at 72; Halpern-Felsher Rep. at 7.

- "Defendants' marketing, promoting, and advertising omitted that Zyn was an extremely potent nicotine delivery device; Zyn was designed to create and sustain nicotine addiction; and posed significant risks of substantial injury resulting from use of Zyn. Promoting Zyn as 'tobacco-free' and like descriptors such as 'cleaner than anything out there' explicitly or implicitly represents that Zyn is less harmful that other nicotine-based products, or that Zyn contains less of a substance, like nicotine, than others, or that Zyn is free of a substance compared to others." *Id.* ¶ 141. *See also*, Exhibits 1-4, generally. Toll Rep. at 9; Jackler Rep. at 69; Halpern-Felsher Rep. at 10.

- "Defendants' representations and omissions were likely to mislead consumers acting reasonably in the circumstances and influence them to purchase Zyn, to the consumers' detriment. Reasonable consumers would likely have been misled that Zyn: (a) is a smoking-cessation device (even though it is not); (b) is a reasonable alternative to combustible or e-cigarettes (even though it is not); (c) is not a potent nicotine-delivery mechanism (even though it is); (d) is not powerfully addictive (even though it is); (e) is healthy and safe (even though it is not); (f) does not pose unreasonable risks of substantial bodily injury resulting (even though it does), and (g) is not derived from tobacco (even though it is)." *Id.* ¶ 142. *See also*, Exhibits 1-4, generally. Toll rep. at 59; Proctor Rep. at 59; Halpern-Felsher Rep. 11, 30.

Because the standard is based on an objective reasonable person, no individual inquiries will be required. Instead, the proof will be the same for each member of the class. *See Carriuolo*, 823 F.3d at 986 ("[T]he first FDUTPA element is amenable to class-wide resolution: the factfinder must only determine whether a Monroney sticker that inaccurately states a vehicle had received perfect safety ratings in three categories would deceive an objectively reasonable observer when in fact no safety ratings had been issued."); *Fitzpatrick*, 635 F.3d at 1283 (agreeing with the district court that "whether that allegedly deceptive conduct would deceive an objective reasonable consumer is a common issue for all the putative class members, amenable to classwide proof" (cleaned up)).

Similarly, "because the injury is not determined by the plaintiffs' subjective reliance on the alleged inaccuracy, causation and damages may also be amenable to class-wide resolution."

*Carriuolo*, 823 F.3d at 986. Causation simply requires a plaintiff to show that they "suffered losses because of Defendants' alleged omissions"—i.e., that they paid a price premium for Zyn. *See, e.g.*, *Feaster v. Electrolux Consumer Prods.*, No: 8:25-cv-00910, 2026 WL 183559, at *7 (M.D. Fla. Jan. 23, 2026); *see also Francoforte v. Graco Children's Prods., Inc.*, No. 2:20-CV-00137, 2026 WL 582860, at *6 (N.D. Ga. Jan. 20, 2026). That requirement is necessarily satisfied here because the class definition is limited to those who purchased Zyn.

Actual damages for a FDUTPA claim are typically measured by a "benefit of the bargain" model based on the difference in value "between what was promised and what was delivered." *See Carriuolo*, 823 F.3d at 986; *Apollo Mgmt. Grp. v. Croxall*, No. 22-62398-CIV, 2023 WL 11799718, at *6 (S.D. Fla. Mar. 29, 2023) (Dimitrouleas, J.) (citation omitted). Again, this does not require individualized inquiries. Because market value is an objective measure, the difference in value between what was promised and what was delivered will be the same for each class member. *See Carriuolo v. Gen. Motors, LLC*, No. 14-61429-CIV, 2015 WL 12434325, at *7 (S.D. Fla. July 9, 2015) ("FDUTPA damages are objective and uniform. FDUTPA entitles each class member to recover the difference between what he bargained for . . . and what he received . . . . This determination requires no individualized inquiry and can be resolved through class-wide proof."), *affirmed*, 823 F.3d at 986 ("[T]he FDUTPA 'benefit of the bargain' model provides a standardized class-wide damages figure because the plaintiff's out-of-pocket payment is immaterial.").

Damages have been calculated on a classwide basis in analogous circumstances. In the *JUUL* litigation, for instance, the plaintiffs retained expert Hal J. Singer to conduct conjoint analyses to determine benefit-of-the-bargain damages.[2] *See* 609 F. Supp. 3d at 973. The district court concluded that Singer's conjoint analyses supported the plaintiffs' motion for class certification. *Id.* at 975.

Here, too, Plaintiff has retained Mr. Singer to conduct conjoint analyses. Mr. Singer proposes to determine damages based on the benefit-of-the-bargain model—that is, the "difference in value" between Zyn as it was actually advertised and Zyn as it ought to have been advertised.

---

[2] "Conjoint analysis is a form of statistical analysis that firms use in market research to understand how customers value different components or features of their products or services." https://online.hbs.edu/blog/post/what-is-conjoint-analysis

*See* Singer Rep. ¶¶ 4, 6. He concludes that "economic injury and aggregate damages to the Florida Class can be reliably demonstrated using Choice-Based Conjoint ('CBC') analysis." *Id.* ¶ 7.

Courts recognize an exception to FDUTPA's benefit-of-the-bargain model in cases where products are worthless or valueless. *See, e.g.*, *Marrache v. Bacardi U.S.A., Inc.*, 17. F4th 1084, 1100 (11th Cir. 2021). In those circumstances, "benefit of the bargain damages will be equal to the entire purchase price of the product." *Id.*; *see also, e.g.*, *Democratic Republic of Congo v. Air Cap. Grp.*, 614 F. App'x 460, 472 (11th Cir. 2015) (unpublished) ("[P]laintiffs must marshal evidence to prove the gap in value between what was promised and what was delivered, *unless* defendant palmed off a product that was truly worthless. In the latter situation, plaintiff may recoup the full price he paid for the valueless good or service.").

Mr. Singer proposes to use this exception to calculate damages for the subclass of underage purchasers (the Florida Youth Class) because minors should not have been marketed or sold Zyn products; thus, all expenditures by minors on Zyn products constitute overpayment damages. *See* Singer Rep. ¶¶ 11, 95. He concludes that "economic injury and aggregate damages to the Florida Youth Class can be demonstrated using survey-based methodologies in concert with publicly available data regarding youth use and mis-use of Zyn and like products." *Id.* ¶ 11.

To the extent there are any individualized damages calculations, that is "insufficient to foreclose the possibility of class certification, especially when, as here, the central liability question is so clearly common to each class member." *Carriuolo*, 823 F.3d at 988. "Nothing in this Rule requires plaintiffs to prove predominance separately as to both liability and damages." *Id.* "The 'black letter rule' recognized in every circuit is that 'individual damage calculations generally do not defeat a finding that common issues predominate.'" *Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1239 (11th Cir. 2016); *accord South v. Progressive Select Ins.*, No. 19-21760, 2020 WL 8641572, at *10 (S.D. Fla. Dec. 2020) (granting class certification and rejecting the defendant's arguments that individualized considerations regarding damages predominate the common questions as to liability).

## B.    Superiority

Factors relevant to superiority include: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the

desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." All four factors favor class certification.

*First*, class members are unlikely to be interested in individually controlling prosecution of separate actions because "their claims may be so small that it would be a waste of their time and/or resources to litigate individually." 2 William B. Rubenstein, *Newberg and Rubenstein on Class Actions* § 4:69 (6th ed.); *see also, e.g. South*, 2020 WL 8641572, at *10 ("Class treatment is supported by the consideration that each individual member's financial interest in vindicating their contractual rights in the present case is relatively small, in comparison to the cost of litigation a breach of contract case against a large company."). For example, even if a person had purchased 1000 cans of Zyn at $5 a tin, and even if Zyn were found to be totally worthless, that person's actual damages would be only $5000.

*Second*, the only other pending litigation that Plaintiff is aware is an action in the District of Connecticut that has been stayed pending this Court's ruling on class certification in this case,[3] and an action in the District of Columbia filed by a nonprofit corporation that is seeking only injunctive relief.[4] The fact that few other individuals have filed suit is evidence that class action is superior. *Rubenstein*, *supra*, § 4:69 ("[I]f individuals have not filed other suits, they appear to have little interest in pursuing individual litigation, and hence, a class action will likely be superior. . . . The presence of a few other suits does not undercut that conclusion as the filing of but a few cases indicates that a minute percentage of the class has an interest in individual litigation.").

*Third*, it is desirable to concentrate the litigation in this particular forum. "Courts have found that class actions in a particular forum are particularly appropriate when that court has already made several preliminary rulings . . . ." *Rubenstein*, *supra*, § 4:71; *see also, e.g.*, *Klay v. Humana, Inc.* ,382 F.3d 1241, 1271 (11th Cir. 2004) ("[I]t is desirable to concentrate claims in a particular forum when that forum has already handled several preliminary matters."), *abrogated on other grounds as recognized in Green-Cooper v. Brinker Int'l, Inc.*, 73 F.4th 883, 893 (11th Cir. 2023). Here, this litigation has been ongoing in this Court since March 2024, and this Court has made multiple preliminary rulings.

---

[3] *Siegert v. Swedish Match North America, LLC*, No. 3:25-cv-01606 (D. Conn.).

[4] *Breathe DC v. Swedish Match North America, LLC*, No. 2024-CAB-006163 (D.C. Super. Ct.).

*Fourth*, this case does not present substantial difficulties in managing a class action. "[C]ourts deny class certification on manageability grounds relatively infrequently and primarily in certain carefully circumscribed situations." *Rubenstein*, *supra*, § 4:72. Indeed, "the factor of manageability is ordinarily satisfied so long as common issues predominate over individual issues"—as they do here. *Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1358 (11th Cir. 2009). This is because "we are not assessing whether this class action will create significant management problems, but instead determining whether it will create relatively more management problems than any of the alternatives" *Id.* (citation omitted). "[W]here a court has already made a finding that common issues predominate over individualized issues, we would be hard pressed to conclude that a class action is less manageable than individual actions." *Id.*

C.      **Alternative request for partial certification under rule 23(c)(4).**

To the extent this Court concludes that certification on the entire FDUTPA claim is inappropriate, Plaintiff requests in the alternative that this Court certify under rule 23(c)(4) for any issues this Court determines are fit for class treatment.

IV.     **Certification under rule 23(c)(4) of a Florida class on the particular issues of liability for the defective-design and failure-to-warn claims.**

Rule 23(c)(4) allows a court to certify a class action "with respect to particular issues." Fed. R. Civ. P. 23(c)(4). Certifying an issue class "may enable a court to achieve the economies of class action treatment for a portion of a case, the rest of which may either not qualify under Rule 23(a) or may be unmanageable as a class action." Federal Judicial Center, *Manual for Complex Litigation* § 21.24 (4th ed. 2004). Here, Plaintiff moves for class certification on the particular issue of liability only (not causation or damages) on counts I and II—the design-defect and failure-to-warn claims.

"[T]he proponent of an issue class—like the proponent of any other class action—must demonstrate that the proposed issue class meets all of the requirements of Rule 23(a) and fits into one of the categories of Rule 23(b); however, the class proponent need only make that showing *with regard to the issue proposed for certification*." *Rubenstein*, *supra*, § 4:92. In addition, the proponent must also show that issue certification is "appropriate." *Id.* Plaintiff addresses these requirements in turn.

**A.      The basic class certification requirements are satisfied.**

The rule 23(a) requirements are addressed *supra* § II. In this section, Plaintiff addresses the rule 23(b)(3) requirements with respect to the issue of liability on the design-defect and failure-to-warn claims.

**1.      Predominance**

As explained *supra* § III.A., analyzing predominance requires this Court to look at the elements of a claim—or, in this case, the particular element of liability (not causation or damages)—and determine whether it will likely be proved using the same evidence for all class members. That requirement is satisfied here.

For a design-defect claim under Florida law, courts can apply "the consumer expectations test" or the "risk utility test." *See Cates v. Zeltiq Aesthetics, Inc.*, 73 F.4th 1342, 1351–52 (11th Cir. 2023). The consumer-expectations test "considers whether a product is unreasonably dangerous because it failed to perform as safely as *an ordinary consumer would expect* when used as intended or in a reasonably foreseeable manner." *Id.* at 1351 (citation omitted) (emphasis added). The risk-utility test "requires a plaintiff demonstrate the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a *reasonable alternative design*, and the omission of the alternative design renders the product not reasonably safe." *Id.* (cleaned up) (emphasis added).

As noted above, both tests rely on objective criteria: what "an ordinary consumer would expect" or the adoption of a "reasonable alternative design." *See id.* at 1353 ("Whether a product is 'unreasonable dangerous' is 'based on an objective standard and not the viewpoint of any particular customer.'" (citation omitted)); *Id.* at 1353 ("the consumer expectations test is an objective test"); *see also, e.g.*, *Henry v. Phila Adult Prob. & Parole Dep't*, No. 05-4809, 2007 WL 2670140, at *13 (E.D. Pa. Sept. 6, 2007) ("Risk-utility analysis is an objective test that focuses on the product." (citation omitted).

The same is true of a failure-to-warn claim under Florida law. The liability issue analyzes whether "the product warning was inadequate." *Cates*, 73 F.4th 1342, 1347 (11th Cir. 2023). "To conduct this inquiry, we put ourselves in the shoes of a 'reasonable person,' setting aside any individual's 'subjective appreciation of the danger.'" *Id.* at 1348 (citation omitted). In other words, it is an objective test. *Id.* ("[W]e ask whether [the] warnings were objectively 'accurate, clear, and

unambiguous,' to warn . . . about the 'apparent potential harmful consequences' . . . ." (citation omitted)); *id.* at 1350 ("[A]s to the warning's *adequacy*, our analysis under Florida law is objective.").

Because the issue of liability on the design-defect and failure-to-warn claims is entirely objective, it is subject to class-wide proof. *See, e.g.*, *Sharpe v. A&W Concentrate Co.*, No. 19-cv-768, 2021 WL 3721392, at *3 (E.D.N.Y. July 23, 2021) ("[W]hen an element follows an objective standard, it typically 'can be proved through evidence common to the class' and presents 'a common question.'") (quoting *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 467 (2013)); *Andrews v. Sazerac Co.*, No. 23-cv-1060, 2025 WL 1808797, at *3 (S.D.N.Y. July 1, 2025) ("When an issue is "objective," it "can be proved through evidence common to the class.")") (citation omitted)); *Dennis v. Kellogg Co.*, No. 09–CV–1786, 2013 WL 1883071, at *3 (S.D. Cal. May 3, 2013) ("Because these questions are objective, they can be proven by evidence common to the class."). Accordingly—like the FDUTPA claim, *see supra* § III.A.—the predominancy requirement is satisfied.

Finally, some judges in the Southern District of Florida have ruled that "the proper interplay between Rules 23(b)(3) and 23(c)(4) is that a class action *as a whole* must satisfy the Rule 23(b)(3) predominance requirement." *Echevarria v. Expedia, Inc.*, No. 19-22621, 2024 WL 3429106, at *9 (S.D. Fla. July 16, 2024) (emphasis added) (citation omitted). That is wrong, and it is "an outlier position." 1 Joseph M. McLaughlin, *McLaughlin on Class Actions* § 4:43 (22nd ed.). The Eleventh Circuit has not ruled on the issue, but the "[t]he D.C., Second, Fourth, Sixth, Seventh, Ninth, and Tenth Circuits have encouraged district courts to take full advantage of issue certification to reduce the number of disputed issues in complex litigation and achieve judicial efficiencies. In those courts, a Rule 23(c)(4) issue class certified 'with respect to particular issues' must satisfy Rule 23(a) and (b) *only with respect to the issue or issues isolated for classwide adjudication*." *Id.* (emphasis added). "The majority-approach's requirement that the proposed issue class satisfy Rule 23(a) and (b) as to the certified issues is surely correct . . . ." *Id.*

### 2.      Superiority

Superiority is satisfied for the same reasons argued *supra* § III.B. Although the damages for a design-defect and failure-to-warn claim may be higher than a FDUTPA claim, Plaintiff is not seeking class certification for the issue of damages. Accordingly, "the class members' interests in

individually controlling the prosecution or defense of separate actions" does not weigh against class certification on the issue of liability only.

### B. Certification under rule 23(c)(4) is "appropriate."

Rule 23(c)(4) states: "When *appropriate*, an action may be brought or maintained as a class action with respect to particular issues." Fed. R. Civ. P. 23(c)(4) (emphasis added). "[M]ost courts take the view that an issue class is appropriate if it will 'materially advance the disposition of the litigation as a whole.'" *Rubenstein*, *supra*, § 4:92.

Here, resolution of liability on the design-defect and failure-to-warn claims will materially advance the litigation. When it originally created the rule, "the Advisory Committee identified using an issue class for liability, and individual proof for damages, as a core purpose." *Id.* § 4:89. That is what Plaintiff seeks to do here. Namely, Plaintiff moves this Court to certify nationwide issue classes on the issue of liability for the defective-design and failure-to-warn claims. The remaining issues of causation and damages can be left to individual actions. "Class members would receive the benefit of a declaratory judgment (if the class prevails) on the issue but would need to proceed in individual suits to seek damages; by contrast, if the class loses, every [member] would be bound through the doctrine of issue preclusion." *Bennett v. Dart*, 53 F.4th 419, 420 (7th Cir. 2022).

Courts have granted class certification on the issue of liability in similar circumstances. *See, e.g.*, *In re Copley Pharm.*, 158 F.R.D. 485, 492 (D. Wyo. 1994) (certifying class on the issue of liability on a strict products liability claim); *Pella Corp. v. Saltzman*, 606 F.3d 391, 395 (7th Cir. 2010) ("The class jury will be asked to decide only if there was an inherent design defect present in the windows when they left the factory, whether Pella had a duty to disclose the defect, and whether Pella attempted to modify its warranty. Issues of causation and damages issues, such as whether that defect caused the damage to a particular window and how much the design contributed to the rot, will be handled individually."); *Philip Morris USA, Inc. v. Douglas*, 110 So. 3d 419, 427–28 (Fla. 2013) (discussing *Engle* class certification, which "include[d] common liability findings, including findings regarding strict liability ('that the [*Engle*] defendants placed cigarettes on the market that were defective and unreasonably dangerous')," and left specific causation and damages to be decided in individual actions); *In re FCA US LLC Monostable Elec. Gearshift Litig.*, 334 F.R.D 96, 117 (E.D. Mich. Dec. 9, 2015) (certifying a class on the issue of

whether a product "ha[d] a design defect"). Accordingly, certification under rule 23(c)(4) is appropriate.

## CONCLUSION

Plaintiff requests this Court to:

- under Federal Rule of Civil Procedure 23(b)(3), certify a class for count IV, the claim under Florida's Deceptive and Unfair Trade Practices ACT (FDUTPA), with the class being defined as: "All persons who purchased, in Florida, Zyn products."

- under Federal Rule of Civil Procedure 23(b)(3), certify a subclass for count IV, the claim under Florida's Deceptive and Unfair Trade Practices ACT (FDUTPA), with the class being defined as: "All persons who procured and used, in Florida, Zyn products while under the age of 21."

- under Federal Rule of Civil Procedure 23(c)(4), certify an issue class for the particular issue of liability only (not causation or damages) on counts I and II, the design defect and failure-to-warn claims, with the class being defined as "All persons who purchased, in Florida, Zyn products."

- under Federal Rule of Civil Procedure 23(g), appoint as class counsel the following attorneys: Scott P. Schlesinger, Jonathan R. Gdanski, Jeffrey L. Haberman, and Bryan Gowdy.

## CERTIFICATE OF CONFERRAL

Consistent with Southern District of Florida Rule 7.1(a)(3), the undersigned certifies that counsel for Plaintiff has conferred with counsel for Defendants about the relief sought in this motion in a good faith effort to resolve the issues raised in the motion and has been unable to do so.

**REQUEST FOR HEARING**

Plaintiff respectfully requests oral argument on this motion.  Plaintiff estimates the hearing may take up to an hour of the Court's time.  Oral argument would assist the Court in addressing the arguments and points of authority in this proposed class action.

Respectfully submitted,

**SCHLESINGER LAW OFFICES, P.A.**

/s/ Jeffrey L. Haberman
**Jeffrey L. Haberman**
Florida Bar no. 98522
jhaberman@schlesingerlaw.com
**Scott P. Schlesinger**
Florida Bar no. 444952
scott@schlesingerlaw.com
**Jonathan R. Gdanski**
Florida Bar no. 32097
jgdanski@schlesingerlaw.com
1212 SE Third Avenue,
Fort Lauderdale, FL 33316
Telephone: (954) 467-8800
*Attorneys for Plaintiff*

19