UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

CASE NO. 0:24-60437-CIV-DIMITROULEAS/HUNT

ZACHARY KELLY, DARRYL
MAULTSBY, and GRIFFIN DYKES,
Individually and on behalf of all others
Similarly situated,

        Plaintiffs,

vs.

PHILIP MORRIS INTERNATIONAL INC.,
SWEDISH MATCH NORTH AMERICA LLC,
SWEDISH MATCH USA, INC., PHILIP
MORRIS GLOBAL BRANDS, INC., and PMI
GLOBAL SERVICES, INC,

        Defendants.

_____/

VIDEOTAPED

| | |
|---|---|
| DEPOSITION OF: | DARRYL MAULTSBY, II |
| DATE: | January 16, 2026 |
| TIME: | 9:55 a.m. - 4:22 p.m. |
| TAKEN BY: | Defendants |
| PLACE: | Lawson Huck Gonzalez |
| | 4705 South Apopka Vineland Road |
| | Suite 210 |
| | Orlando, Florida 32819 |
| REPORTED BY: | Sara Miller, Notary Public |
| | State of Florida |

Page 1

A P P E A R A N C E S:


ELANA B. GOODMAN, ESQUIRE

OF:   Schlesinger Law

      1212 SE 3rd Avenue

      Fort Lauderdale, Florida 33316

      954.467.8800

      Egoodman@schlesingerlaw.com

 On behalf of the Plaintiffs


JOHN L. SCHWAB, ESQUIRE

JOSEPH MANTEGANI, ESQUIRE (Via Videoconference)

OF:   Munger, Tolles & Olson, LLP

      350 South Grand Avenue

      50th Floor

      Los Angeles, California 90071

      213.683.9100

      John.schwab@mto.com

 On behalf of the Swedish Match Defendants


NATHAN A. SANDALS, ESQUIRE

OF:   Latham & Watkins

      200 Clarendon Street

      Boston, Massachusetts 02116

      617.880.4648

      Nathan.sandals@lw.com

 On behalf of the PM Defendants


Also Present:

John Greifzu, Esquire, In-House Counsel for PM

Austin Sanchez, Videographer

Page 2

INDEX

TESTIMONY OF DARRYL MAULTSBY

Direct Examination by Mr. Schwab..............6

Cross-Examination by Ms. Goodman..............217

Redirect Examination by Mr. Schwab...........230

EXHIBITS

Exhibit 1    Second Amended Complaint.............17

Exhibit 2    Initial Disclosures..................27

Exhibit 3    Zyn Receipt..........................46

Exhibit 4    Pictures.............................47

Exhibit 5    Response to RFP......................59

Exhibit 6    Interrogatory Responses.............116

Exhibit 7    Modern Day Smiles Doc...............124

Exhibit 8    Advertisement.......................176

Exhibit 9    Advertisement.......................176

Exhibit 10   Advertisement.......................176

Exhibit 11   Advertisement.......................177

Exhibit 12   Advertisement.......................177

Exhibit 13   Class Action Complaint..............188

Exhibit 14   Class Action Complaint..............193

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

S T I P U L A T I O N S

It is hereby stipulated and agreed by and between counsel present for the respective parties, and the deponent, that the reading and signing of the deposition are hereby RESERVED.

Page 4

P R O C E E D I N G S

THE VIDEOGRAPHER:  Hello and good morning.  We are going on the record.  The time on the video monitor is 9:52 a.m.  Today's date is January 16th, 2026.  Please note that the microphones are sensitive and may pick up whispering and private conversations.  Please mute your phones at this time.  Audio and video recording will continue to take place unless all parties agree to go off the record.  This is media unit one of the video-recorded deposition of Darryl Maultsby taken by counsel for defendant in the matter of Zachary Kelly, Darryl Maultsby and Griffin Dykes, individually on behalf of all others similarly situated versus Philip Morris International, Inc. et al filed in the United States District Court, Southern District of Florida case number 0:24-60437-CIV-DIMITROULEAS/HUNT.  My name is Austin Sanchez representing Veritext.  The court reporter is Sara Miller from the firm Veritext.  I am not authorized to administer an oath.  Nor am I financially interested in the outcome.  If there are any objections to proceeding, please state them at the time of your appearance.

Page 5

Counsel and all present, including remotely, will now state their appearances for the record beginning with the noticing attorney.

MR. SCHWAB:  John Schwab on behalf of the Swedish Match defendants.

MR. SANDALS:  Nathan Sandals on behalf of the defendants.

MS. GOODMAN:  Elana Goodman on behalf of the plaintiff, Darryl Maultsby.

THE COURT REPORTER:  Do you swear or affirm the testimony you're about to give will be the truth, the whole truth, and nothing but the truth?

THE WITNESS:  Yes.

DIRECT EXAMINATION

BY MR. SCHWAB:

Q.   Good morning, Mr. Maultsby.

A.   Good morning.

Q.   So as I just said, my name is John Schwab.  I am going to be primarily asking the questions today.  Okay?

A.   Okay.

Q.   Can you state your full name for the record, please?

A.   Darryl Keith Maultsby, II.

Page 6

Q.   Have you been deposed before, Mr. Maultsby?

A.   Not to my knowledge.  Not to my knowledge, no, sir.

Q.   So I'm going to go over a few of the ground rules of the deposition with you.  Okay.  So the first one is the -- we have a court reporter here sitting to your left.  You see her?

A.   Yes.

Q.   And to make her job easier, I'm going to ask you to do a few things.  First, I'm going to ask you to verbalize your answers.  So even if it's like a yes or a no, rather than nodding, say yes.  Okay?

A.   Okay.

Q.   And that way she can type it down.  Okay?

A.   Okay.

Q.   Similarly, both you and I need to speak loudly enough for her to hear.  Okay?

A.   Okay.

Q.   And we should -- I'm going to try not to talk over you, meaning I'm going to let you finish your answer before I ask another question, and I'll ask you to let me finish my question before you give your answer.  Okay?

A.   Okay.

Page  7

Q.   If any of my questions are unclear or you don't understand them, will you please let me know?

A.   Absolutely.

Q.   If I ask you a question and you answer it, I'm going to assume that you understood it. Okay?

A.   Okay.

Q.   At some point during the day today, some points during the day today, I may ask a question and your attorney may object.  Unless your attorney instructs you not to answer the question, I'm still entitled to an answer from you even if she objects. Do you understand that?

A.   All right.

Q.   I am going to try to take a break here roughly every hour or so, but if you ever need a break for any reason, just ask me and we will take a break.  Okay?

A.   Okay.

Q.   The one thing I'll ask you is that if I have a question pending, so if I have asked you a question, I'll ask you to answer that question before we take a break.  Okay?

A.   Okay.

Q.   You understand that you're testifying

Page 8

under oath today?

A.   Yes.

Q.   And do you understand that your testimony under oath today is just as if we were sitting in a courtroom and you were testifying under oath in a courtroom?

A.   Yes.

Q.   And you understand that your responsibility (sic) to answer truthfully and accurately today?

A.   Yes.

Q.   Is there any reason that you can't give truthful and accurate testimony today?

A.   No.

Q.   What did you do to prepare for your deposition today?

A.   Spoke with my attorney and just read over a couple documents.

Q.   When you said you spoke with your attorney, is that with your attorney who's present here today?

A.   Yes.

Q.   And for how long did you speak with your attorney?

A.   I'm not sure.  Probably an hour.

Page 9

Q.   And you said you reviewed a couple documents; is that right?

A.   Yes.

Q.   Do you remember what documents you reviewed?

A.   Just the overall things concerning the case.

Q.   Other than reviewing those documents and speaking to your attorney, did you do anything else to prepare for today's deposition?

A.   I don't think so, no, sir.  I don't think so, no, sir.  No, sir.

MS. GOODMAN:  That's good.

BY MR. SCHWAB:

Q.   This is part of the deposition, so you'll need to speak more loudly.  At some point today, the court reporter's going to tell me to speak more slowly because I always speak too fast, so that's just totally normal.  She'll remind us when she needs more from us.

MS. GOODMAN:  Are the attorneys who are appearing by Zoom, are they going to come up on the screen?  Are we going to see?

THE VIDEOGRAPHER:  They're just listening in.

Page 10

MR. SCHWAB:  Happy to -- do you want me to put it on the record?

MS. GOODMAN:  Yeah, you can put it on the record, like, who they are.

MR. SANDALS:  Your Joseph or mine?

MR. SCHWAB:  So just for the record, joining us now via Zoom is Joe Mantegani from Munger Tolles & Olson on behalf of the Swedish Match defendants.

BY MR. SCHWAB:

Q.   Did you look at any Zyn products to prepare for the deposition today?

A.   No.

Q.   Did you look at any Zyn advertisements to prepare for the deposition today?

A.   No.

THE COURT REPORTER:  We have another joiner.  We have John G-r-e-i-f-z-u joining.

MR. SCHWAB:  Yes.  Do you want to...

MR. SANDALS:  Joining is John Greifzu, in-house counsel for the PM.

THE COURT REPORTER:  For the what?

MR. SANDALS:  PM defendants.

THE COURT REPORTER:  Thank you.

BY MR. SCHWAB:

Page 11

Q.   So did you look at any Zyn social media posts to prepare for the deposition today?

A.   No.

Q.   Did you review any news stories or articles about nicotine pouches to prepare for the deposition today?

A.   No.

Q.   Did you look at any documents from Swedish Match to prepare for the deposition today?

A.   No.

Q.   Did you look at any documents from Philip Morris International to prepare for the deposition today?

A.   No.

Q.   Did you do any other kind of research on the internet like Googling Zyn, for example?

A.   No.

Q.   Did you review the complaint in this case to prepare for today's deposition?

A.   Yeah.  Yeah.

Q.   Other than what we just discussed, including meeting with your attorney and reviewing the documents with her, did you do anything else to prepare for today's deposition?

A.   No, sir.

Page 12

Q.   Do you understand that this case has been brought as a class action?

A.   Yes.

Q.   What is your understanding of what a class action is?

A.   Representation for those that suffer the same problem as I do.

Q.   Why did you -- do you understand that you're serving or proposing to serve as a class representative in this case?

A.   Yes.

Q.   Why did you decide to serve as a class representative in this case?

A.   Why?

Q.   Why?

A.   Why did I choose?  Could you ask the question again?

Q.   Yes, I can.  So why did you decide to serve as a class representative in this case?

MS. GOODMAN:  And objection to the extent that it might invoke attorney/client privilege, but with regards to your own knowledge, why did you decide that you would be a class representative, if you know?  You can answer.

THE WITNESS:  Gosh.  I mean, I don't

Page 13

know.  I don't know.

BY MR. SCHWAB:

Q.   Did you originally seek out your lawyers because you wanted to bring a class action lawsuit?

A.   Well, I -- no, class action wasn't in my original intent, no.

Q.   How many classes are you proposing to represent in this case?

A.   I don't know.

Q.   Do you know -- or do you personally know any members of the class that you are seeking to represent?

A.   No, sir.

Q.   Has anyone who claims to be a member of the class reached out to you?

A.   No, sir.

Q.   When did you decide to become a class representative?

A.   I'm not sure.

Q.   Who decided that you would become a class representative?

A.   I'm not sure how that works.

Q.   Have you spoken to anyone else who was considering being a class representative?

A.   No.

Page 14

MS. GOODMAN:  Let's go off the record for one second.

MR. SCHWAB:  Can we go off the record?

THE VIDEOGRAPHER:  Off the record at 10:03 a.m.

(Recess taken -- 10:03 a.m.)

(After recess -- 10:04 a.m.)

THE VIDEOGRAPHER:  Back on the record at 10:04 a.m.

BY MR. SCHWAB:

Q.   Mr. Maultsby, do you know what a fiduciary duty is?

A.   No.

Q.   Do you know what duties you owe to the class as a class representative?

A.   No.

Q.   What do you understand to be your responsibilities as a class representative in this case?

A.   What are my responsibilities?  To tell the truth.

Q.   Anything else?

A.   No.

Q.   In your view, what is your role in this case?

Page 15

A.    I don't know.  Sorry.  I don't know what it's called.

Q.    How much time have you spent on this case as of today?

A.    Could you be more specific?

Q.    Sure.  So we already talked about the time you spent preparing for this deposition with your lawyers.  In addition to that, how much more time have you spent on this case, like, for example, reviewing the complaint or other legal documents or anything like that, talking to your lawyers, etc.?

A.    I'm not sure.  I don't really log those things.

Q.    Would you guess that it would be more than ten hours?

A.    I'm not sure.  I'm not big on guessing.

MS. GOODMAN:  And you should not guess.

THE WITNESS:  Yeah.

BY MR. SCHWAB:

Q.    Guess is a wrong word.  If you can approximate.  I don't want you to guess today.

A.    Yeah.  I'm not guessing.

Q.    If you can approximate something, I'll ask you to approximate, but if you can't, you can't.  Okay?

Page 16

A.   Okay.

(Exhibit No. 1 was marked for identification.)

BY MR. SCHWAB:

Q.   So I'm going to hand the court reporter a document that will be marked as Exhibit 1. Mr. Maultsby, this document is entitled, "Second amended complaint and demand for jury trial."  Do you see that?

A.   Yes.

Q.   Have you seen this document before?

A.   Yes, I have.

Q.   Did you review it before it was filed?

A.   I'm not sure.  I don't remember.

Q.   This -- I'll tell you that this is the second amended complaint in your case.  If you look at the upper left-hand corner, you'll see your name along with two other plaintiffs' names.  Do you see that?

A.   Yes, I see that.

Q.   What do you think makes you a good class representative for this case?

A.   I don't know.  I never thought of that.

Q.   Do you know Zachary Kelly whose name appears next to yours on this caption?

Page 17

A.    No.

Q.    Have you ever spoken to Mr. Kelly?

A.    No.

Q.    Same question, do you know Griffin Dykes?

A.    No.

Q.    Ever spoken to Mr. Dykes?

A.    No.

Q.    Do you know if there's any other individuals who are proposing to be class representatives in this case?

A.    Can you say it one more time, please?

Q.    Do you know if there's anyone else who is proposing to be a class representative in this case?

A.    I'm not sure.

Q.    Have you considered how the claims of a large class would be managed at a trial in this case?

A.    One more time, please.

Q.    Have you considered how the claims of a large class would be managed at trial in this case?

A.    Have I --

MS. GOODMAN:   Form.

THE WITNESS:   Have I considered that?

BY MR. SCHWAB:

Q.    Yes.

A.    No.

Page 18

Q.   Do you know how the members of the proposed class would be notified of this lawsuit?

MS. GOODMAN:  Form.

THE WITNESS:  Do I know...

BY MR. SCHWAB:

Q.   How the members of the proposed class will be notified of the existence of this lawsuit.

A.   No.

Q.   Other than what we already discussed about the preparation for this deposition, have you met with your lawyers regarding this case?

A.   Can you be more specific as to what you mean by meet with them?  As in person?

Q.   Good point.  So have you met with them in person to discuss this case other than the deposition preparation we already discussed?

A.   No.  No.

Q.   Have you met with them by video conference to discuss this case other than the deposition preparation we already discussed?

A.   I believe so, yes.

Q.   Approximately how many times have you met with your lawyers by video?

A.   I'm not sure.

Q.   Can you approximate how many times?

Page 19

A.   No, sir.

Q.   How about phone conversations?  Have you had phone conversations with your lawyers about this case?

A.   Have I had phone conversations with my lawyers about this case, absolutely.

Q.   And approximately how many times?

A.   I don't keep a log.  I'm not sure.

Q.   More than ten?

A.   I wouldn't be able to tell you accurately.  It would be guessing.

Q.   What is your date of birth?

A.   October 5th, 1998.

Q.   And where were you born?

A.   In Lakeland, Florida.

Q.   What is the highest level of education that you have completed?

A.   High school.

Q.   Where did you graduate from?

A.   Christian Academy of Winter Haven Incorporated formerly known as the Pentecostal Church of God Christian Academy.

MS. GOODMAN:  Just as a reminder, let the attorney complete his question completely and then answer.  We do that in everyday

Page 20

conversation, but in the deposition it's really important that we not speak over each other.

THE WITNESS:  Yes, ma'am.

BY MR. SCHWAB:

Q.   And I'll say it in advance, we're going to make this mistake today.  It will happen.  The court reporter or your lawyer will remind us not to.  It's fine.

Is the -- what was the name of the high school at the time you graduated from it?

A.   Christian Academy Winter Haven Incorporated.

Q.   Did you receive any substance use education while at Christian Academy?

A.   I don't believe so, no, sir.

Q.   Did the Christian Academy offer something like the D.A.R.E program?

A.   No.

Q.   Did the Christian Academy offer any education as it relates to nicotine?

A.   No.

Q.   Who is your current employer?

A.   Publix.

Q.   How long have you worked at Publix?

A.   Since August of 2025.

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Q.    And where did you work prior to starting at Publix in August?

A.    Aptive Environmental.

Q.    And what is -- sorry, can you spell that name?

A.    A-p-t-i-v-e.

Q.    What does Aptive Environmental do?

A.    Pest control.

Q.    How long were you there?

A.    Since July of 2024.

Q.    And what did you do -- where did you work before you worked at Aptive?

A.    Old Man Frank's.  I was a cook.

Q.    Is Old Man Frank's a restaurant?

A.    Yes.

Q.    Approximately what time period did you work at Old Man Frank's?

A.    About -- probably a year or a year and a half up until I worked at Aptive, so July back a year.

Q.    Back like 12, 18 months?

A.    Yeah.

Q.    Okay.  Where did you work before Old Man Frank's?

A.    I was a construction worker.

Page 22

Q. What was the name of the company you worked for?

A. AWC Construction.

Q. And how long were you with AWC approximately?

A. Basically since out of high school in 2017 pretty much.

Q. Okay. Speaking of high school, so you said a moment ago -- I believe you testified that there was no substance abuse education at your high school, correct?

A. Correct.

Q. Did you receive any substance abuse education before high school, like, in junior high school or elementary school?

A. No.

Q. Outside of school, had you received any substance abuse education?

A. No.

Q. So at a high level, what do you do at Publix?

A. I'm a dock person. I unload trucks, wash out the trailers and sometimes I wash totes. It's basically the recycle center.

Q. Do any of your co-workers at Publix use

Page 23

nicotine products?

A.    People smoke.

Q.    Smoke cigarettes?

A.    Yeah.

Q.    Do people vape?

A.    Yeah.

Q.    Do people use Zyn?

A.    I wouldn't know.

Q.    How about chewing tobacco?  Do people use chewing tobacco?

A.    I wouldn't know.

Q.    Have you ever used nicotine products with your co-workers?

A.    No.

Q.    Never taken, like, a smoke break with them or anything?

A.    Not with nobody, no.  No.

Q.    Same question, high level, what did you do for Aptive Environmental?

A.    I was a service technician.

Q.    Why did you leave Aptive Environmental?

A.    Higher pay.

Q.    Higher pay at Publix?

A.    Higher pay at Publix, better schedule.

Q.    Did any of your Aptive co-workers use

Page  24

nicotine products?

A. I wouldn't know. We didn't work together.

Q. So you were -- as a tech, you were making visits, home visits, I assume, by yourself; is that right?

A. That's right.

Q. Why did you leave Old Man Frank's?

A. Looking for career advancement.

Q. Did any of your Old Man Frank's coworkers use nicotine products?

A. I'm sure they do. I don't know who works there now.

Q. Did you ever use nicotine products with any of your Old Man Frank's coworkers?

A. No.

Q. And then AWC construction, why did you leave that to go to Old Man Frank's?

A. The current project we were working on was no more, so I moved on.

Q. Were you let go from that job?

A. No.

Q. Did any of your coworkers at AWC use nicotine products?

A. I don't think so. Not to my knowledge.

Page 25

Q. Did any of them introduce you to any nicotine products?

A. No.

Q. Did you ever use nicotine products with any of them?

A. No.

Q. So we've discussed Publix, Aptive, Old Man Frank's and AWC Construction. Have you held any other jobs since graduating high school?

A. Not consistently, no.

Q. Where do you live currently?

A. Lake Alfred, Florida.

Q. And how long have you lived in lake Alfred?

A. Pretty much my whole life.

Q. Have you ever been arrested?

MS. GOODMAN: We're going to go off the record.

MR. SCHWAB: Well, no, I have a question --

MS. GOODMAN: Objection. There's a sensitive issue that I'm going to instruct him not to answer and then we'll go off the record.

MR. SCHWAB: Let's get the instruction first, so let me ask the question.

Page 26

MS. GOODMAN:  Sure.

BY MR. SCHWAB:

Q.   Have you ever been arrested?

MS. GOODMAN:  Objection.  Form.  Another privilege that we'll address off the record and I'm instructing the client not to answer.

MR. SCHWAB:  Let's go off the record.

THE VIDEOGRAPHER:  Going off the record at 10:19 a.m.

(Recess taken -- 10:19 a.m.)

(After recess -- 10:22 a.m.)

THE VIDEOGRAPHER:  We are back on the record.  The time on the monitor is 10:22 a.m.

BY MR. SCHWAB:

Q.   Mr. Maultsby, as an adult, have you ever been charged with a crime?

A.   No.

Q.   And Mr. Maultsby, as an adult, have you ever been convicted of a crime?

A.   No.

(Exhibit No. 2 was marked for identification.)

BY MR. SCHWAB:

Q.   I'm going to hand the court reporter what I will ask to be marked as Exhibit No. 2.

Page 27

Mr. Maultsby, do you recognize this document?

A.   Yes, sir.

Q.   And what is this document?

A.   I believe just an explanation of what's going on here today.

Q.   That's correct.  This is something that lawyers call initial disclosures in which you provide some basic information about your claims in the case.  Okay?  Did you work with counsel to prepare this document?

A.   It would depend on what you mean.

Q.   Did you review this document before it was sent to us?

A.   I'm not sure.

Q.   Did you understand that the statements in this document need to be complete and accurate?

A.   Yes, sir.

Q.   And did you understand that you have an obligation to supplement these responses with any information that belongs in them?

A.   Could you rephrase that?

Q.   Sure.  So if something arose after you supplied this that should have gone in here, meaning an identity of a witness, for example, you have a responsibility to update your statements in here.  Do

Page  28

you understand that?

A.   Okay.

Q.   So one of the people that you list in here as potentially having information that can support your case is your mother.  Is that correct?

A.   That's correct.

Q.   And what is your mother's name?

A.   Vivian.

Q.   Is that Vivian with a V?

A.   Yes, sir.

Q.   So --

MS. GOODMAN:  With a B as in boy, correct?

THE WITNESS:  It's a V.

MS. GOODMAN:  V as in Victor?

THE WITNESS:  Yes, ma'am.

MS. GOODMAN:  Okay.  There's a typo here.

THE WITNESS:  Oh, I'm sorry.

MS. GOODMAN:  Oh, it's not your fault.  I wasn't sure if that was a name I wasn't familiar with.  So it's Vivian with a V as in victory.

THE WITNESS:  Yes, ma'am.

BY MR. SCHWAB:

Q.   So if we look at the second page --

A.   Okay.

Page 29

Q.   -- here, you will see at the top, the following individuals are believed to have information to support plaintiff's claim and the first person is you, obviously?

A.   Okay.

Q.   And then the second it says, Bivian, with a B, Baker, do you see that?

A.   Yeah, I see that.

Q.   But that's a typo, correct?

A.   That's just a typo, yeah.

Q.   Okay.  Sitting here today -- actually, strike that.

The third name here is Alacia Maultsby. Am I pronouncing that correctly?

A.   Alacia.

Q.   Alacia.  And that's your wife, correct?

A.   Yes.

Q.   Other than yourself, your mother, and your wife, sitting here today are you aware of any individuals that may have information to support your claims?

A.   Not at this time.  Not really.

Q.   So let's start with your mother.  Has your mother ever used nicotine, to your knowledge?

A.   No.

Page 30

Q.   She is aware that you use nicotine; is that correct?

A.   It would depend.  I don't smoke in front of her.  Partake in my nicotine habit in front of my mother.

Q.   Do you think she knows about your nicotine habit?

A.   Possibly.

Q.   Have you ever discussed your nicotine use with her?

A.   I'm sure I've mentioned it to her before.

Q.   Do you remember what she said when you mentioned it?

A.   No, sir.

Q.   Does she know that you use Zyn?

A.   Probably not.  She not too hip on that type of thing.

Q.   Do you know when your mother first learned that you use nicotine?

A.   No.

Q.   In the times when you have mentioned to your mother that you use nicotine products, do you know -- do you recall what she said to you?

A.   No.  I wouldn't -- I don't remember.

Q.   Do you have any recollection of any

Page 31

discussions with your mother about using nicotine products?

A.   I just would say I've mentioned it to her in the past, but that's not something I talk about. I don't go around and be like hey, mom, no, I don't do that.

Q.   So would it be fair to say, like, you've mentioned it in passing, but you haven't had a discussion with her about it?

A.   Could you rephrase that, please?

Q.   Sure.  So would it be fair to say that you have mentioned your nicotine use to her in the past but you haven't had discussions with her about it?

A.   I probably mentioned some of the effects of the nicotine usage to my mom.

Q.   Do you remember any specific things that you told her?

A.   Definitely throwing up.  I've mentioned that to her before, my stomach issue with that.  I mentioned that to her before.

Q.   Do you remember any other effects of nicotine that you have mentioned to your mother?

A.   Mentioned to my mother specifically, no, sir.

Page 32

Q.   Before you started using nicotine, had you and your mother discussed nicotine products or tobacco generally?

A.   No, sir.

Q.   Has your mother expressed concern to you about you being addicted to nicotine?

A.   No.

Q.   Has your mother suggested that you quit nicotine?

A.   No.  She -- no.

Q.   Other than the nausea, have you talked to your mother about the injuries that you allege have been caused by Zyn?

A.   No.  I -- I haven't spoken to my mother about it.

Q.   You -- on this list, the list in your initial disclosures does not include your father, correct?

A.   Correct.

Q.   And why not?

A.   Because I'm not, going to say, close to him or he wouldn't know, just wouldn't know.

Q.   What is your father's name?

A.   Darryl.

Q.   Is he Darryl Maultsby Senior?

Page  33

A.   His name's just Darryl Maultsby.

Q.   Darryl Maultsby.  Do you know if your father used nicotine products?

A.   I don't know.

Q.   And do you know if he is aware of your nicotine use?

A.   No, I don't.

Q.   Under your initial disclosures, you also don't list any siblings.  Do you have any siblings?

A.   Yeah.  I got siblings.

Q.   How many siblings do you have?

A.   One.

Q.   And what is your sibling's name?

A.   Kaylee.

Q.   And why didn't you list Kaylee on the initial disclosure list?

A.   We're not close.  It's not...

Q.   Have you ever discussed your nicotine use with her?

A.   No.

Q.   Do you know if she even knows that you use nicotine?

A.   I doubt it.

Q.   Do you know if Kaylee used nicotine?

A.   I'm sure she doesn't.

Page  34

Q. I'm sure she does not?

A. Yeah. I'm sure she does not.

Q. Why do you say that?

A. My family are Christians. They don't smoke, drink, none of that.

Q. So you also listed your wife on these disclosures. When did you get married?

A. October 22nd, 2022.

Q. And approximately when did you meet Alacia?

A. I've known her all my life.

Q. So you knew her before you ever used nicotine, right?

A. Right.

Q. When did Alacia first learn that you used nicotine?

A. I don't know when she -- I don't know.

Q. When did she learn that you first used Zyn specifically?

A. I don't know.

Q. Does your wife use any nicotine products?

A. No.

Q. And so including she does not use Zyn; is that correct?

A. Correct.

Page 35

Q.   Has she ever expressed concern to you about your use of nicotine products?

A.   She hates them.

Q.   And what -- why has she said that she hates them?

A.   It makes me irritable, anxious, sometimes a little snappy.

Q.   Has she expressed concern about your use of Zyn specifically?

A.   Yes.

Q.   And what concerns has she expressed about the use of Zyn?

A.   She hates the fact that I get that little rough patch on my tongue in here.  I'm not sure what it's called, but down on the bottom of my lip, there's a little patch, area of rough skin and she hates that.

Q.   Anything else that she's -- any other concerns specifically about Zyn that she has raised?

A.   I'm sure there is, but at the time I wouldn't remember.

Q.   Has she expressed concern about you being addicted to nicotine?

A.   Yes.

Q.   And what concerns has she raised?

Page  36

A.    The -- basically my mood changes.  The physical effects that she notices sometimes that I don't even notice about myself.  Things like that.

Q.    And are those changes that occur whenever you use nicotine?

A.    Excuse me?

Q.    Do those -- does she see those changes in you whenever you use nicotine?

A.    It can be when I need it or sometimes when I use it or -- yeah.

Q.    It can be both?

A.    Yeah.

Q.    Has your wife ever tried a nicotine product, to your knowledge?

A.    Not to my knowledge, no, sir.

Q.    Other than what we've already discussed, so the mood changes, the rough patch on the lip, have you talked to your wife about any of the other injuries you allege have been caused by Zyn?

A.    Have I talked to my wife about what Zyn's done to me?

Q.    Yes.

A.    Yes.

Q.    And what have you said to her?

A.    The need for more to search for that

Page 37

specific feeling, looking for that rush, that little light-headed feeling sometimes.  Those are things I can say that's, like, not good.

Q.   And what has she said to you in response?

MS. GOODMAN:  Form.

THE WITNESS:  Not appropriate for the room.

BY MR. SCHWAB:

Q.   Sorry?

A.   Not appropriate for the room.

MS. GOODMAN:  Language?

BY MR. SCHWAB:

Q.   Is it a -- so she's used -- can I say -- would it be fair to say she's used strong language in response?

A.   Yes.

Q.   Has she encouraged you to quit using nicotine?

A.   Absolutely.

Q.   And have you made any attempts to quit using nicotine?

A.   I've tried.

Q.   When was the first time that you tried to quit using nicotine?

A.   I'm not too sure.

Page  38

Q. Can you give me an approximate time?

A. No, sir.

Q. How many times have you tried to quit using nicotine?

A. Numerous. Numerous times.

Q. What have you done to try and quit using nicotine?

A. Cold turkey.

Q. Have you tried any other ways of quitting other than the cold turkey quit?

A. No.

Q. Do you remember -- or sorry, can you approximate for me approximately how many times you have tried to quit cold turkey?

A. I wouldn't be able to give you an accurate number, even though you're saying estimate. I'm not sure. I'm not sure.

Q. Okay. And like I said before, if you can't estimate, I don't want a guess, so that's fine.

A. Yes, sir.

Q. So can you approximate what's the longest that you've gone quitting cold turkey?

A. A couple days max.

Q. So other than the immediate family members we already discussed, do you have any other

Page 39

family members who you are particularly close to?

A.   No, sir.

Q.   To your knowledge, do any of your family members suffer from tobacco or smoking-related disease?

A.   No.

Q.   To your knowledge, do any of your family -- are any of your family members addicted to nicotine?

A.   No.

Q.   To your knowledge, do any of your family members -- have any of your family members been diagnosed with anxiety?

A.   Not to my knowledge.

Q.   Have any of your family members been diagnosed with depression?

A.   Not to my knowledge.

Q.   Have any of your family members been diagnosed with attention deficit hyperactivity disorder sometimes called ADHD?

A.   Not to my knowledge.

Q.   Have any of your family members been diagnosed with gastrointestinal issues?

A.   Not to my knowledge.

Q.   Is there any -- does your family have a

Page  40

history of heart issues?

A.   No.

Q.   Do you have a family history of high blood pressure?

A.   I'm not sure.

Q.   So if we go back to this initial disclosures document that's in front of you, this is Exhibit 2.

A.   Mm-hmm.

Q.   Still on page 2.  We just discussed your mother and your wife.  You'll see number 4 on the list of individuals who are believed to have information that may be able to support your claims is any medical providers of you.  Do you see that?

A.   Mm-hmm.

Q.   How many medical providers have you had?

A.   In my lifetime?

Q.   In your lifetime.

A.   I don't know.

Q.   Who are the medical providers that might have information that could be used to support your claims in this case?

A.   I don't believe there is any at this time.  I haven't been to a doctor for that in particular.

Page  41

Q.   You have not been to a doctor for the issues raised in this case.  Is that what you're saying?

A.   What issues?

Q.   So have you seen a doctor regarding your nicotine addiction?

A.   No.

Q.   Have you seen a doctor regarding any of the other injuries that you are claiming in this case?

A.   No.

Q.   Okay.  Do you have a primary care physician?

A.   Not at this time.

Q.   When was the last time you had a primary care physician?

A.   It's been years.

Q.   Do you remember his or her name?

A.   It was like Dr. Wong, I think.  I think.

Q.   Was this a doctor in Winter Haven?

A.   It was in Auburndale.

Q.   Do you remember if you discussed nicotine use with that doctor?

A.   No, I didn't.

Q.   Have you discussed your nicotine use with

Page 42

any doctor?

A.   No.

Q.   Have you discussed Zyn with any doctor?

A.   No.

Q.   Has any doctor ever advised you not to use nicotine?

A.   No.

Q.   Has any doctor ever given you advice about using or not using alcohol?

A.   No.

Q.   Has any doctor given you advice about using or not using marijuana?

A.   No.

Q.   Has any doctor ever given you advice about using or not using any other drugs?

A.   No.

Q.   Do you currently have a dentist?

A.   No, I don't.

Q.   When was the last time you visited a dentist?

A.   It's been a couple years.

Q.   Have you ever talked to any of your dentists about nicotine?

A.   Have I ever spoken with a dentist about nicotine, no, sir.

Page 43

Q.   And that means -- is it also correct you haven't spoken to your dentist about using tobacco?

A.   I believe that is fair to say.

Q.   Before you began using -- sorry.  Strike that.

Have you ever spoken to any of your dentists about Zyn specifically?

A.   No, sir.

Q.   Have you spoken to any of your dentists about nicotine pouches generally?

A.   No, sir.

MR. SCHWAB:  Can we go off the record?

THE VIDEOGRAPHER:  One moment, please. We're going off the video record at 10:43.

(Recess taken -- 10:43 a.m.)

(After recess -- 10:54 a.m.)

THE VIDEOGRAPHER:  We're back on the record at 10:54 a.m.

BY MR. SCHWAB:

Q.   Mr. Maultsby, do you understand that you're still under oath?

A.   Yes, sir.

Q.   So I'd like you to keep looking at Exhibit 2, which is in front of you.

A.   Okay.

Page  44

Q.    That's the initial disclosures document that we were talking about before we took a break. At the bottom of the page we were looking at, do you see where it says relevant documents and tangible things?

A.    Mm-hmm.

Q.    Is that a yes?

A.    Yes.

Q.    And just a reminder to verbalize your answers so she can type them down for us.  So beneath where it says relevant documents and tangible things, it says, based upon information reasonably available to plaintiff, plaintiff identifies the following categories of documents that may be used to support her (sic) claim: one, records evidencing plaintiff's Zyn use or purchases; two, medical or dental records if applicable; three, medical billing records if applicable; and four, documents identified in defendant's Rule 26(a)(1) initial disclosures.  Do you see that?

A.    Yes.

Q.    And after that it says, plaintiff is gathering documents and will provide any such records in plaintiff's possession.  Do you see that?

A.    Yes.

Page  45

Q.   Have you gathered any such documents in your possession?

A.   Let me see.  I just found -- I provided all of these documents before.

Q.   You understand that you're required to produce or provide all documents that you might use to support your claims?

A.   Okay.

Q.   And have you done that to date?

A.   Yes, sir.

(Exhibit No. 3 was marked for identification.)

BY MR. SCHWAB:

Q.   I am going to have the court reporter mark what will become Exhibit 3.  Do you recognize this document, Mr. Maultsby?

A.   Yes, sir.

Q.   And what is this document?

A.   It is a document of one of my purchases of fuel and Zyn.

Q.   So is this one of the documents that you were thinking of when you were saying you had gathered your documents?

A.   Yeah.  This is the receipt that I could find.

Page  46

Q.   Other than this receipt, do you have any other documents that shows Zyn purchases you made?

A.   Not at this time, no.

Q.   I believe this receipt shows that you purchased Zyn at a 7-Eleven in Lake Alfred.  Is that correct?

A.   Mm-hmm.  That's correct.

Q.   And as you said, you also purchased gas at this time; is that right?

A.   That's right.

Q.   You bought two six-milligram packages of Zyn; is that right?

A.   That's right.

Q.   One of them was cool mint and one was menthol; is that correct?

A.   That's correct.

Q.   So I could not see on here a date.  Do you know when this receipt is from?

A.   I don't remember actually.  It was just one that was in my car.  I just took a photo of it and provided it.  I'm not sure.

Q.   Do you remember around when you found it in your car, like what date that was?

A.   No, sir.

(Exhibit No. 4 was marked for

Page  47

identification.)

BY MR. SCHWAB:

Q.   So now I'll hand you what I'll ask the reporter to mark as Exhibit 4.  Mr. Maultsby, what do these photos show?

A.   These are photos of me and some of the Zyn products I had laying around.

Q.   Besides these pictures, do you have any evidence, whether online documents or physical documents, that show you using Zyn?

A.   Could you rephrase that?

Q.   Sure.  Other than these photographs, do you have any other documents that support your claim that you use Zyn?

A.   No.

Q.   Did you take each one of those photos?

A.   Yeah.  These are my photos.

Q.   Why did you take them?

A.   Because it's my phone.

Q.   Why did you choose to take photos of Zyn?

A.   Well, this one I was just snapping -- this one is just a photo right here.  These right here I was -- if I had any photos of Zyn, I said probably so.  And then I went and looked around and these were the pictures I had in my phone.

Page  48

Q.   Do you remember why you took the pictures originally?

A.   No, I don't.

Q.   Do you -- were these pictures all taken at the same time?

A.   No.

Q.   So let's look at the first photo.  This is one that -- I believe that's you, correct?

A.   Correct.

Q.   So -- and is what you're showing there Zyn between your cheek and gums?

A.   Mm-hmm.  Yes, sir.

Q.   And then there's four more photos behind that; is that right?

A.   That's right.

Q.   And those four show two different Zyn cans, correct?

A.   I believe three -- it might be two.  It might be three.  I'm not sure.  Yeah.

Q.   So let's look at the second photograph --

A.   Okay.

Q.   -- which is labeled Maultsby 000003.

A.   Okay.

Q.   So this shows two Zyn cans, correct?

A.   Correct.

Page  49

Q. And they're both six milligram?

A. Correct.

Q. One is menthol; is that right?

A. I don't remember. I can't see it right here. It's not clearly shown in the photo.

Q. Do you know if either of these colors is the color that Zyn menthol is sold in?

A. It would have been the dark one if it was, or the more aqua-looking one in the bottom photo if it was menthol.

Q. Okay. Is the other flavor here cool mint?

A. Yes, sir.

Q. In the last two photos, so that is the one ending in 05 and the one ending 06 --

A. Okay.

Q. -- the cans -- the covers of the cans are ripped. Do you see that?

A. Yeah.

Q. Do you know how they got ripped?

A. Probably from sitting out in the weather and left them on the porch. Those would have been cans that was in the yard or on the porch, just gathering some of the cans I had.

Q. Okay. Let's go back to the first photo.

Page 50

Do you have two Zyn pouches between your lip and your gums here?

A. Yes, sir.

Q. Do you often use two pouches at once like this?

A. I do it time to time.

Q. Would you say you use two pouches like this more often or you use a single pouch more often?

A. I would probably say it's about an even split.

Q. Are you aware that Swedish Match warns against using two Zyn pouches at the same time?

A. No.

Q. This photo, this selfie, why did you take this photo?

A. I don't have no specific reasoning, honestly.

Q. Did you post it on social media?

A. No.

Q. Did you send it to anyone?

A. No.

Q. Okay. You can put those aside. I want to go back to what is Exhibit 2. So that is the one that says initial disclosures on it.

A. Okay.

Page 51

Q.   And just let me know when you get back there.

A.   Exhibit 2, initial disclosure.  Okay.

Q.   And now let's turn to the second-to-last page, please.

A.   Okay.

Q.   And specifically I'm looking at something, it's labeled with Roman numeral 3 and it says computation of damages.  So let me know when you get there.

A.   I'm here.

Q.   Okay.  And so you understand that you're required to provide a computation of each type of damages that you are claiming in this lawsuit?

A.   Could you explain computation?

Q.   I'll strike the question.  You understand that you're required to set out or explain the damages that you are claiming in this lawsuit?

A.   Okay.

Q.   Have you produced or gathered any documents that support your damages claims?

A.   Documents as in what?

Q.   So documents as in, like, receipts, photographs, medical records, any kind of writings that support your damages claims?

Page 52

A.  Other than what you have there, no, I haven't at this time.

Q.  Are you claiming that your damages include personal injury?

A.  If addiction is personal injury, yes, sir, absolutely.

Q.  Other than addiction, is there any other personal injury that you are claiming at this time?

A.  I don't think so, no, sir.

Q.  If you look -- and I should just tell you I am looking at this same paragraph where it says computation of damages.  The second sentence says, this includes but is not limited to past and future damages: for bodily or personal injury, and then it goes on.  Do you see that?

A.  Mm-hmm.

Q.  Okay.  So I just asked you about personal injury.  What is the pain and suffering that you have experienced as a result of your addiction?

A.  A lower quality of life having to spend time using nicotine products instead of just chilling and being regular, having a consistent craving to need to get a nicotine buzz.  Always having to put a pause to what I'm doing to satisfy my needs.

Q.  And what other ways have you, if any,

Page 53

have you suffered a lower quality of life?

A.   Overall I already wasn't big on being social, but I'm less social now.  Just anxiety, loss of concentration sometimes, anxiousness, irritability.  Sometimes I get headaches.  Stomach issues.  Yeah.

Q.   Okay.  Anything else that you can think of sitting here today?

A.   Anything else that I can think of that is what?

Q.   In terms of the pain and suffering from your addiction.

A.   Sucks being addicted to nicotine, however you want to put it.

Q.   You mentioned one issue is anxiety; is that correct?

A.   That's correct.

Q.   And how is anxiety linked to your nicotine use?

A.   When I don't have it, I need it, I get super jittery and get overwhelmed.  I start to get overpoured (sic) sometimes with emotions.  Sometimes I get real jittery.  Sometimes just real antsy, can't really focus on the task at hand.  Yeah.

Q.   And then so that's -- is that fair to

Page 54

say, anxiety, caused by wanting nicotine and not having it?

A.   Would I say that the anxiety is caused by wanting nicotine and not having it?

Q.   Yeah.

A.   I would say it was caused by nicotine overall as a whole, not just when I don't have it sometimes.  You're anxious when you're using it because you're looking for a specific feeling and you can't achieve it and then you got to do more.

Q.   I see.  So it's -- you can sometimes feel anxious even when you're using nicotine?

A.   (Witness nods head).

Q.   And then I think you said loss of concentration?

A.   Mm-hmm.

Q.   Same question, do you feel like you're -- you lose concentration even when you're using nicotine or only when you are craving it?

A.   No.  As far as concentration, nicotine definitely helps me lock in and focus.

Q.   Okay.  So Mr. Maultsby, I said at the beginning of this, but I'll just remind you if you want to take a break at any time --

A.   I'm fine.  I'm good.

Page 55

Q.   But there's no issue with you asking for one if you need it.  Okay?

A.   Okay.

Q.   And then the last thing that you mentioned was stomach issues.

A.   Mm-hmm.

Q.   What kind of stomach issues do you experience?

A.   I'm extremely nauseous.  I'm consistently gagging.  It's like just upsets my stomach like fierce.  That's -- when I need to use it, it settles it down just like -- but my stomach just be almost overactive.

Q.   Okay.  So do you experience these symptoms, anxiety, nausea, difficulty concentrating with all nicotine products?

A.   Excuse me?

Q.   Do you use any nicotine products other than Zyn?

A.   Yes.

Q.   What products?

A.   Black & Milds.

Q.   That's a cigar?

A.   Yes, sir, that's a cigar.

Q.   Do you smoke cigarettes?

Page 56

A.   Occasionally, seldomly.

Q.   Do you vape?

A.   Not really, no.

Q.   When you say "not really," do you mean -- let me ask a modifier.

Have you ever bought a vape?

A.   Not recently.  That's not something I go to the store looking for, no.

Q.   So when you say "not really," does that mean that you might have used a vape socially on occasion?

A.   On occasion, yeah.

Q.   Do you use chewing tobacco?

A.   No.

Q.   So when you use Black & Milds or cigarettes, do you also have jittery and nausea feelings?

A.   Not typically because I -- I usually use it in accordance with my Zyn.  Cigarettes, it's just something I'm doing when I'm working in the yard.  I got a pack in the shed, but my main intake is Zyn and Black & Milds.

Q.   And you're saying -- and you're using Zyn and Black & Milds sort of at the same time?

A.   Sometimes.

Page  57

Q.   Do you use any other cigar brands besides Black & Milds?

A.   No.

Q.   So I'm going to go back to the computation of damages section.  You also write here that you have experienced inconvenience.  Other than what you've already described, the time it takes and so on, is there any other inconvenience that has resulted from your use of nicotine?

A.   It pulls you away from what you're doing. You have to focus on one thing at a time.  You got to do what you got to do.  If you need to get that buzz, you have to do what you got to do to get that buzz. If you driving on the road, sometimes you got to take a can and get you one.  It's just what it is.

Q.   Any other inconvenience, or is that a fair summary that it drags you away from other things?

A.   That's a fair summary.

Q.   Next you write loss of capacity for the enjoyment of life.  Other than everything we've already discussed about the impacts on your life, are there any other ways in which your use of nicotine has led you to lose capacity for the enjoyment of life?

Page  58

A. To not be repetitive, I believe I've already explained it pretty well.

Q. Yeah. I'm not -- and I'm not asking you to repeat. I'm saying other than everything you already said, I just need to know if there's anything else?

A. That's pretty much...

Q. And the last line here is related medical and health care expenses. Do you see that?

A. Yes, sir.

Q. What related medical and health care expenses have you incurred as a result of your use of nicotine?

A. None at this time.

MR. SCHWAB: What exhibit number am I on?

THE COURT REPORTER: 5.

MR. SCHWAB: I'm going to hand the court reporter what I'll ask to be marked as Exhibit 5.

(Exhibit No. 5 was marked for identification.)

BY MR. SCHWAB:

Q. Have you seen this document before, Mr. Maultsby?

A. Yes, I believe so.

Q. So this is your response to defendant's

Page 59

first set of requests for production of documents. Do you see that title on the front?

A.   Yes, sir.

Q.   Did you help in preparing these responses?

A.   If you ask me did I type the document, no, I didn't.  If that's what you're asking.

Q.   Did you --

A.   Did I answer --

Q.   Other than typing the document, did you help in any way in preparing these responses?

A.   I believe so.

Q.   Okay.

A.   I'm not sure.

Q.   So if you could turn to the fourth page, please.  It's the one that almost at the very top it says request number 3 and let me know when you're there.

A.   Request 3?  Okay.

Q.   So I know you've seen this document before, but basically what this is showing is the words under request number 3 that are just in regular type, that is the request.  And then the language below that where it says response and it's all in bold, that is the response.  Do you understand that?

Page 60

A.    Okay.

Q.    Number 3 requests all documents and communications reflecting or referring to your procurement or purchase of Zyn.  Do you see that?

A.    Yes.

Q.    And we looked a moment ago at a receipt, correct?

A.    Correct.

Q.    And we also looked at the photos that you took of your Zyn cans, correct?

A.    Correct.

Q.    Do you have any other documents that show your purchase of Zyn?

A.    Not at this time.

Q.    Do you have any other documents that show your use of Zyn at this time?

A.    No.

Q.    The request asks for something called communications and that means text messages, e-mails, messaging apps, anything like that.  And we haven't looked at any communications that you've had about Zyn today, correct?

A.    Correct.

Q.    Do you have -- is it correct that you don't have any written communications about Zyn?

Page 61

MS. GOODMAN:  To clarify, other than anything his attorneys --

MR. SCHWAB:  Strike the question.

BY MR. SCHWAB:

Q.   Other than any written communications with your attorneys, is it correct that you don't have any written communications about Zyn?

A.   Correct.

Q.   So you've never texted anyone, putting aside your attorneys, you have never texted anyone about Zyn?

A.   No.

Q.   You've used Zyn for approximately ten years; is that right?

A.   Just about.

Q.   What did you do to figure out if you had communications about Zyn?

A.   One more time or in a different way, please.

Q.   Sure.  What did you do to figure out whether you had communications about Zyn?

A.   What did I do to figure out that I had communications about Zyn?

Q.   If you had them.

A.   What would I do to figure that out?

Page 62

Q.   Yes.

A.   I know I didn't text anybody about Zyn.

Q.   So you just -- you knew that you hadn't texted about Zyn?

A.   Yeah.

Q.   And same thing for e-mail or other written communications?

A.   Correct.

Q.   Other than what we've already looked at and including the receipt that we looked at, you don't have any other receipts showing your purchase of Zyn, correct?

A.   Correct.

Q.   And you don't have any other documents showing your purchase of Zyn; is that right?

A.   That's right.

Q.   Let's look at request number 10 and 11, a couple pages on.  Let's just start with 10.

A.   Okay.

Q.   So 10 asks for all documents and communications created by you reflecting or referring to nicotine or any tobacco or any nicotine-containing products.  Do you see that?

A.   Yes.

Q.   Would you understand nicotine-containing

Page 63

products to include Zyn?

A.   Yes.

Q.   And is it correct that you haven't created any documents relating to nicotine products including Zyn?

A.   Could you rephrase that, please?

Q.   Sure.  So you -- have you created any documents that relate to Zyn?  So, for example, a social media page, a text, a picture, anything like that?

A.   No.

Q.   And have you created something like that for any other nicotine product?

A.   No.

Q.   Do you have any documents or communications that refer in any way to nicotine?

A.   Nothing but what I sent my lawyers.

Q.   And is that any -- other than what we've looked at today, the photos, the receipt, is there anything else that you have that relates to nicotine or tobacco?

A.   No.

Q.   You've never made any social media posts about nicotine?

A.   No.

Page 64

Q.   Never made any social media posts about Zyn specifically?

A.   No.

Q.   Do you have social media accounts?

A.   Excuse me.  Yes.

Q.   What does that mean?

A.   I have a Facebook account that I'm not able to access any longer.  Been over 15 years and I haven't been able to log in or anything, so if you look me up, I am on social media, but no.

Q.   Okay.  So you have a Facebook account that you have not used in quite some time; is that fair?

A.   Yeah.  I have no access to it.

Q.   Other than Facebook, do you have any social media accounts?

A.   No.  Nothing with my face on it.  No -- nothing like that.

Q.   You don't have, like, an Instagram or a TikTok account?

A.   No.

Q.   Okay.  Let's look at number 24.  So number 24 -- sorry, Mr. Maultsby, are you there?

A.   Yes, sir, number 24?

Q.   Yes, sir.

Page 65

A.   Yes, sir.

Q.   So number 24 says, all documents and communications that support or otherwise relate to any allegation made by you that Zyn products are defectively designed.  Do you see that?

A.   Yes, sir.

Q.   Do you have any document related to the idea that Zyn is defective?

A.   No, sir.

Q.   Have you ever e-mailed or texted or otherwise communicated with anyone other than your lawyers about Zyn being defective?

A.   No, sir.

Q.   Let's look at number 25, if you can just turn the page, please.  Number 25 asks for all documents and communications that support or otherwise relate to any allegation made by you that any warnings or marketing related to Zyn products were false, misleading, deceptive or inadequate.  Do you see that?

A.   Yes.

Q.   You don't have any documents that relate to Zyn warnings; is that correct?

A.   Correct.

Q.   No documents that support your claims

Page 66

about Zyn's warnings, correct?

A.   No.

Q.   So what documents do you have that relate to Zyn warnings?

A.   I don't have any.

Q.   Okay.  Same question as to Zyn marketing.  Do you have any documents that support your allegations relating to Zyn's marketing?

A.   No.

Q.   You can put that aside.  So before you used Zyn, had you ever used any other nicotine product?

A.   I might have tried a cigarette in my youth just when I was a bad kid, but that was it.

Q.   Do you remember what kind of cigarette?

A.   No.

Q.   When did you start using Black & Milds?

A.   In 20 -- I want to say -- I don't remember.  I don't remember.

Q.   Okay.  So prior to Zyn, you may have occasionally tried a cigarette; is that correct?

A.   Not occasionally.  Probably once.

Q.   Once.  Okay.  Was that a cigarette that was given to you by a friend?

A.   I don't remember.  I don't remember.

Page  67

Q. Do you remember if you would have bought a pack of cigarettes?

A. No.

Q. Before using Zyn?

A. No.

Q. You did not?

A. (Witness shakes head). I don't remember. I don't want to tell you -- I don't think so. I wasn't no cigarette smoker.

Q. Is it correct that you started using -- sorry. Strike that.

Is it correct that you first tried Black & Milds after trying Zyn?

A. I believe so, yes.

Q. You ever smoke Newport cigarettes?

A. Yes.

Q. When did you smoke Newports?

A. Could you be more specific about the time frame you're asking about?

Q. Yes, sir. When did you first smoke Newports?

A. Consistently or first try it?

Q. When did you first try it?

A. When I was young.

Q. When did you consistently use Newports,

Page 68

start consistently using them?

A.   That would be in my later teenage years, going on my 20s.

Q.   How often in that period, in your late teenage -- early 20s, did you smoke Newports?

A.   It's been a while.  Quite frequently, though.

Q.   Did you buy Newports?

A.   I bought Newports before.

Q.   Do you remember if Newports had any kind of warning on their package about the product?

A.   At that time I wouldn't notice.  Probably did.  I don't know.

Q.   Why do you say you wouldn't have noticed at that time?

A.   I wouldn't necessarily been looking for that warning or even being aware that that was a thing.

Q.   Did you start regularly smoking Newports before or after you started regularly smoking Black & Milds?

A.   You said did I start smoking cigarettes regularly after I started smoking Black & Milds?

Q.   Or did you start Black & Milds first?

A.   I think I smoked a Black & Mild first

Page 69

because it was cheaper.  Smoked Black & Mild first.

Q.   Do you still smoke Newports today?

A.   Not as my main intake of nicotine, no.

Q.   Do you still buy Newports today?

A.   Probably not, no.  Not -- not every day.

Q.   When was the last time you remember buying a pack of Newports, approximately?

A.   I don't know.

Q.   In your entire history of nicotine use, did you regularly smoke any other brand of nic -- any other brand of cigarette besides Newports?

A.   No.  I might have smoked 305.

Q.   Sorry?

A.   I might have smoked a 305 cigarette.

Q.   But that -- would that have been something that you tried and then went back to Newports?

A.   Probably just cheaper at the time.

Q.   Do you still smoke cigarettes today at all?

A.   Like I said, if I was doing yard work, which isn't very often, so I would say probably every other weekend maybe when I'm out in the yard, something like that.

Q.   And when you do, because I think you said

Page 70

you have, like, a pack of cigarettes in the shed or something?

A.    Mm-hmm.

Q.    Is that pack -- is that typically a Newport?

A.    Yeah.  It's Newports.

Q.    When you were using Newports more regularly, how often did you use them?

A.    I would probably say probably four or five a day.  A pack would typically last me probably about two days, three days max.

Q.    Would you smoke Newports -- in that period, would you smoke Newports generally all day long?

A.    Throughout the day.  More so when I'm outside walking the dog or something, that's more of an outside pleasure.

Q.    Is there any aspect of Newports that you enjoyed?

A.    I actually am not a big fan of cigarettes in particular.  They stink, disgusting, but it gives you that feeling so...

Q.    Newports are a menthol cigarette; is that right?

A.    Yes, sir, I believe they come in menthol

Page 71

flavor, but I smoke menthols.

Q. You smoke menthols?

A. Mm-hmm.

Q. Is there a reason why you prefer menthols to nonmenthol cigarettes?

A. That would have just been the one that I picked and that's where it was -- that's what I'm using.

Q. What about Black & Milds, is there any aspect of using Black & Milds that you enjoy?

A. It boosts my nicotine buzz. It enhances the nicotine buzz. Helps me achieve my peak faster.

Q. Is there anything else about Black & Milds that you enjoy?

A. It works.

Q. Do you enjoy the flavor of Black & Milds?

A. Not necessarily, no, sir. It's tolerable.

Q. Do you enjoy the sensation of inhaling tobacco smoke?

A. I wouldn't say -- no, I really don't like smoking. Smoke is not an enjoyable feeling, honestly.

Q. I apologize, I think I asked this already, but have you ever used chewing tobacco

Page 72

regularly?

A.   No.

Q.   Other than Zyn, have you ever used a nicotine pouch?

A.   No.

Q.   Are you aware of other nicotine pouch brands?

A.   I know there's always competition for anything, so I'm sure there are other brands, yeah. I've seen --

Q.   But you've never been interested in trying one of those other brands?

A.   No.

Q.   Have you ever done a price comparison between other brands and Zyn?

A.   No.

Q.   When did you first begin using Zyn?

A.   When I was like 17 going on 18.

Q.   So was that in 2015?

A.   Or '16 to the best of my memories, I believe so.  To the best of my memory.  That's just an approximate.

Q.   Would in or around October 2015 sound right?

A.   Somewhere there.  I wouldn't say it

Page 73

sounds right, but it's just an estimate to the best of my remembrance, that's when.

Q. Do you remember the very first time you tried Zyn?

A. Yes, vaguely.

Q. What do you remember about it?

A. I got a head rush like no other.

Q. Okay. Did you buy that Zyn or did someone give it to you?

A. I bought it.

Q. Okay. Do you remember what strength of Zyn you bought?

A. I believe it was the small packets.

Q. So would that be the three milligram?

A. The three.

Q. Do you remember what flavor you bought?

A. I want to say it was the green one.

Q. What store did you buy it from?

A. I believe it was called Jamal's. It was like a little convenient store, smoke shop type deal. It is no longer in operation. It was in Winter Haven.

Q. It was in Winter Haven?

A. Yes, sir.

Q. You -- was the Zyn behind the counter at

Page 74

the smoke shop?

A.   I don't remember.  It's been a while.

Q.   Right.  This is -- we're talking about 2015, correct?

A.   Right.  It's been a minute.

Q.   Or two.  Did the clerk ask you for ID at that time?

A.   They wouldn't have.

Q.   Why do you say they wouldn't have?

A.   Because at that particular place I -- like I grew up with beer.  They wouldn't have asked me.  Kind of older.

Q.   I see.  Would it be fair to say Jamal's was a place where you could buy a number of things without ID being asked for?

A.   Yeah.

Q.   At that point in 2015, you would have been 17; is that right?

A.   I would have been like 17, yeah.

Q.   So -- and do you know what the legal age to purchase nicotine was at that time?

A.   Probably 18.

Q.   I think that's right.  So did you know that you were under the age that was legally allowed for Jamal's to sell you Zyn at that time?

Page  75

A.   I honestly wasn't thinking about it.  I wasn't thinking about that.

Q.   Did you buy -- so that's the first -- the first time you bought Zyn was from Jamal's and that's the first time you tried it, correct?

A.   Correct.

Q.   In 2015, did you buy -- did you go back and buy more Zyn?

A.   Eventually, yeah.

Q.   Did you buy it from Jamal's?

A.   Mm-hmm.  In the beginning I did.  That's where I used to go.

Q.   So at that -- in the beginning, I'm saying just in 2015, did you -- do you recall purchasing Zyn at any other stores?

A.   No.

Q.   In 2015, do you recall buying Zyn in any other states?

A.   No.

Q.   Did you buy Zyn online in 2015?

A.   No.

Q.   So in that -- again, that 2015 period, about how many cans of Zyn do you think you bought?

A.   I wouldn't be able to tell you.  I don't want to make up anything.

Page  76

Q.   Do you remember in that early period, again in 2015, did you try different flavors?

A.   If I did, it would have just been another mint flavor.  I've never been, like, the fruity-flavor type guy or anything like that, so it would have been mint.

Q.   One of the mint variations?

A.   Yes, sir.

Q.   So you described a strong head rush the very first time you used Zyn; is that correct?

A.   Right.

Q.   What else do you remember, if anything, about the first time you used Zyn?

A.   It's a heck of a lot better than smoking. It's clean.  It look kind of cool.  It was like a nice little discreet way to get my buzz off.  Don't got to worry about something like smoking or nothing like that.  Just a low key way to get your buzz off.

Q.   How did you first learn about Zyn?

A.   Curiosity trying some.  Let me get one of those.

Q.   So did you first learn about it by walking into Jamal's?

A.   Yeah.

Q.   And did you see -- did you see something

Page  77

in Jamal's that made you think what is that or did the clerk at the store suggest that you try the product?

A.   I don't really remember.

Q.   So your curiosity in trying something new.  Did you have any other reasons to originally try Zyn?

A.   It looked cool.  It was appealing.  It was like in the family of looking like mints kind of, like it was like a candy-looking thing so it got to be light, right?  So something that was just an alternative to smoking, no tar bar.  Not hitting the cigarette.  Trying something different.

Q.   So at this point, you had already smoked cigarettes, correct?

A.   A cigarette.

Q.   Oh, just a cigarette?

A.   Yeah.

Q.   Right.  So after that one experience smoking a cigarette, you were looking for an alternative; is that correct?

A.   Not necessarily, no.

Q.   So what's incorrect about my statement?

A.   Cigarettes were disgusting.  Not enjoyable.  Tasted it, (witness makes noise), throw

Page 78

it down.  Zyn I was able to actually suck on it.  It wasn't disgusting.  I got a feeling from it, you know what I'm saying?  And it was better than smoking.

Q.   Was safety a reason that you began using Zyn?

A.   Safety?

Q.   Safety.

A.   Initially probably not safety.  It was just not smoking, so I -- I wouldn't use the word safety.

Q.   Okay.  Were the available flavors a reason that you began using Zyn?

A.   I just tried it.  I don't have no specific reason why in particular -- like man, this is why I tried it.  I just tried it.  Being curious.

Q.   There wasn't anything about the particular flavors offered by Zyn that made you try Zyn; is that right?

A.   I mean, you can say that the fact that it was minty could have been appealing.  The fact that it was like -- it's like less threatening persona than a pack of cigarettes.

Q.   The first time you Zyned, did you -- you described the head rush already.  Did you have any other sensations, feelings, anything from that

Page  79

experience that you recall?

A.   That was my most memorable.  That was the thing that stood out to me the most.

Q.   Were there any negative effects that you can recall?

A.   Not at that time.

Q.   When did you turn 18?

A.   October 5th.

Q.   And that would be 2016; is that right?

A.   That would be 2016, yeah.

Q.   Okay.  From that point forward, did you continue purchasing Zyn in stores?

A.   I bought Zyn throughout the years.

Q.   Were there stores other than Jamal's that you would go to regularly to purchase Zyn?

A.   To say regularly, probably not regularly, but I have purchased from other stores.

Q.   Would it be fair to say you still primarily purchased at Jamal's?

A.   At that time?  What year was that?

Q.   I'm saying at the time you turned 18, so that's 2016 and 2017?

A.   At the time would I still have been going to Jamal's, yeah.

Q.   Did your use of Zyn change after you

Page 80

turned 18?

A.   Did it change?

Q.   Mm-hmm.

A.   It increased.

Q.   How did it increase?

A.   I was able to get it easier as far as being able to get into the store and stuff like that. I'm not in school anymore.  I'm not tied down to several days an hour (sic).

Q.   Did you -- did Jamal's have any Zyn advertising in it?

A.   I don't remember.

Q.   And when I say "advertising," that means like any signage, anything like that?

A.   I don't remember.

Q.   When you -- when you went into Jamal's the day you first purchased Zyn, so back in 2015, were you considering buying any other nicotine products when you went to the store?

A.   I really don't remember my original intent for going in the store that day.

Q.   Okay.

A.   Yeah.

Q.   You understood that Zyn contained nicotine when you purchased it?

Page 81

A.   I wouldn't say that I did know.  I was just trying it.  I didn't really analyze the product and go in there and say what is this.  I was just like let me try one.

Q.   So is it correct that you tried the product and you didn't know whether or not it contained nicotine?

A.   If anything, I would say I knew it didn't contain tobacco.  That was my initial -- I don't know what word you would use for that, but that was my initial anything -- if I had, would say I had a thought about it, it's not tobacco.  That would have been my thought process.

Q.   So let me ask a few questions about that. So first, do you remember what the package of Zyn that you purchased looked like?

A.   It was a circle can, I believe.

Q.   Did it have a statement on it that it contained nicotine?

A.   If it did, I wasn't reading it, and if I did read it, I probably didn't fully understand what that meant.

Q.   In 2015, did you not understand what nicotine was?

A.   Did I not understand what nicotine was?

Page 82

Probably not, no.  No.

Q.   And you hadn't done any kind of research online or otherwise about Zyn before you tried it, right?

A.   No.

Q.   What did you understand the six milligram or three milligram to be referring to if it wasn't referring to nicotine?

A.   I don't know.  I wasn't -- I'm not the type of person that necessarily reads the instructions before they do something.  I just tried it.

Q.   And you said you understood that it -- Zyn didn't contain tobacco; is that right?

A.   Right.  Smokeless product.  Healthier.

Q.   And so you knew that it wasn't a product where you would burn tobacco leaf and inhale it, correct?

A.   Correct.

Q.   And you said it was healthier; is that right?

A.   Yes.

Q.   Why did you believe it was healthier?

A.   Because you're not smoking.  There's no tobacco.  Tobacco I assume is bad.

Page 83

Q.   Is there any other reason that you thought Zyn was healthier, other than what we just discussed?

A.   That it was healthier?

Q.   Yeah.

A.   I mean, other than what we discussed, it's just the overall look of it.  It looks less deadly than the cigarette.  It looks less than the cigarettes.  It's just a little light thing.

Q.   So before you used Zyn for the first time, is it fair to say that you didn't read the label on the can?

A.   As I previously stated, if I did read the can, I didn't understand what it would have meant at that time.

Q.   So you don't -- you just don't recall whether you read the can or not?

A.   Right.

Q.   At that time in 2015, did you understand that nicotine was addictive?

A.   No.

Q.   What was your understanding at that time about whether nicotine posed any health risks?

A.   Sorry.  One more time.

Q.   In 2015 when you started using Zyn, what

Page 84

was your understanding about the health risks that could be created by nicotine use?

A.    There wouldn't have been a knowledge of that.  I would have thought it would just be tobacco, if anything.  I wasn't knowledgeable about nicotine and its addictive things associated with it.

Q.    What did you know about the negative effects, negative health effects of using tobacco?

A.    Smoking is bad for you.  That's like common knowledge amongst people.

Q.    And do you know why it's bad for you?

A.    Give you lung cancer.

Q.    We talked earlier about some of the allegations that you made about injuries which included behavioral, cognitive, mental health industries, gastrointestinal injuries and periodontal injuries.  Do you remember that?

A.    Do I remember we just went over that?

Q.    Yeah.  And that's allegations in your complaint.

A.    Okay.

Q.    When you first used Zyn, did you believe that nicotine could cause any of those injuries?

A.    No.

Q.    Before you first used Zyn, did you know

Page 85

anybody else who had used it?

A.   No.

Q.   Did you know anyone who had used any other nicotine pouch, not Zyn?

A.   No, sir.

Q.   So you were still in -- attending the Christian Academy at the time you first used Zyn; is that correct?

A.   That's correct.

Q.   Do you know any classmates who used Zyn?

A.   No, sir.

Q.   Any classmates who used other nicotine products?

A.   No, sir.

Q.   No one in your high school to your knowledge smoked, for example?

A.   No.

Q.   I think you mentioned earlier that you had tried a cigarette once.

A.   Mm-hmm.

Q.   Who did that cigarette come from?

A.   It would have been like at a cookout, done picked up a short off the ground or something like that.

Q.   How much time passed between your first

Page 86

experience using Zyn and the second time you used Zyn?

A.    It would have been the same day.  I don't really remember.  Same day more than likely, though.

Q.    At what point did you become a regular Zyn user?

A.    It depends on what you consider regular.

Q.    Well, so I -- at what point did you -- strike that.

At what point did you begin using at least one Zyn pouch every day?

A.    That's from the beginning.

Q.    Did that use increase over time?

A.    Yes.

Q.    How many Zyn pouches, approximately, do you use each day now?

A.    Anywhere from three to six average.

Q.    At any point between when you started in 2015 and today, did you average using more than that per day?

A.    I would say yes, especially using the three-milligram packages, sometimes I would do them more frequently than I do now.

Q.    Today do you only use the six milligram?

A.    Yeah.  I use six.

Page 87

Q.   Do you have a favorite flavor?

A.   Just anything mint.

Q.   Does that include the menthol?

A.   Menthol, cool mint.  Just any mint one. Mint variation.

Q.   Winter green, similar?

A.   Yeah.  Any mint variation.

Q.   Have you ever tried any Zyn flavors that are not a mint variation?

A.   No.

Q.   And do you consider menthol to be a mint flavor?

A.   It's minty.  Cool.  Cool flavor.

Q.   So when you first started using Zyn, were you using, like, one pouch a day, two?  This is back in 2015?

A.   To the best of my recollection, I would say probably about two a day max.

Q.   Okay.  And then how did that -- when did that increase to three or four a day?

A.   Within the first four months for sure I was using them quite frequently.

THE VIDEOGRAPHER:  If we can go off the record for a media break.

MR. SCHWAB:  Is that okay with you?

Page 88

MS. GOODMAN:  Yeah.  It's been about an hour.

MR. SCHWAB:  It's been close and we should figure out when lunch is coming.

THE VIDEOGRAPHER:  Going off the record at 11:57 a.m.

(Recess taken -- 11:57 a.m.)

(After recess -- 12:30 p.m.)

THE VIDEOGRAPHER:  We're back on the record.  The time on the video monitor is 12:30 p.m.

BY MR. SCHWAB:

Q.   Good afternoon, Mr. Maultsby.

A.   Good afternoon.

Q.   Do you understand you're still under oath?

A.   Yes.

Q.   When you purchase Zyn, do you typically purchase Zyn with cash, credit card, a debit card?

A.   Cash.

Q.   Do you tend to use Zyn when you feel stressed out?

A.   Yes.

Q.   When else do you tend to use Zyn?

A.   When I wake up in the morning.  When I'm

Page 89

doing strenuous activity.  When I'm trying to get something accomplished in a nice pace of time and when I really need to focus on the task at hand. Those are my typical usage times.

Q.   I apologize if I asked this before.  Have you tried any non-mint, nonmenthol Zyn flavors?

A.   No.

Q.   And you don't have a preference between the various mint flavors; is that correct?

A.   Yeah.  Either one is fine.

Q.   Do you typically use Zyn with friends?

A.   No.

Q.   Typically use it alone?

A.   Alone.

Q.   Do you ever use Zyn while driving?

A.   Yes.

Q.   Is that typical?

A.   It's pretty -- it's a regular activity.

Q.   How about when traveling on trains or planes?

A.   I haven't been on a train or plane in a while, but I would.

Q.   Are there any situations where you've used Zyn and you've tried to hide the fact that you were using it?

Page 90

A.   The overall thing is they don't know I'm using it.  I mean, I don't -- I wouldn't say that I'm hiding it, but it's discreet.

Q.   How long do you typically keep a Zyn pouch in for?

A.   45 to an hour on average.

Q.   What's the longest you can recall leaving a pouch in?

A.   I done fell asleep with one in my mouth, so however long I was asleep that night.

Q.   Have you ever used more than two pouches at the same time?

A.   No.  I only do two at a time.

Q.   Have you ever used two and simultaneously smoked a cigar?

A.   Yes.

Q.   And have you ever used two and simultaneously smoked a cigarette?

A.   A cigarette in particular, I can't recall.

Q.   Do you drink alcohol?

A.   Not really.  I'm not a drinker.

Q.   Have you ever used Zyn with an alcoholic beverage?

A.   I'm not sure.  I'm not sure.

Page 91

Q.   Do you ever premoisten the Zyn pouch before you put it in your mouth?

A.   No.

Q.   Do you ever roll it around before you put it in your mouth?

A.   No.  I just tap the can.  Be like -- pack the can on the back of my hand.

Q.   Have you ever cut the pouch to get the contents out directly?

A.   No.

Q.   Have you ever reused a pouch?

A.   It depends how long in between uses you're talking about.  Like I've popped it out to maybe try something to not alter the flavor so much and then put it back in.  If that's reuse.

Q.   But not -- you haven't had a reuse where you've taken it out and put it away for a couple hours and come back to it?

A.   To the same exact pouch?

Q.   Yeah.

A.   No.

Q.   When you use Zyn today, do you enjoy it?

A.   Yeah.

Q.   What do you enjoy about it?

A.   The feeling that it brings.  The -- I

Page 92

want to say, like, the satisfaction it brings.  It helps me achieve my buzz I guess is the proper way to put it.

Q.   Are there any other things that you enjoy about using Zyn today?

A.   I get to use it in the house, in the bed, on the toilet, at work.  I can always pop it in and it ain't like going to the designated smoking area. There's no designated Zyn area.

Q.   Is there anything else you can think of that you enjoy about using Zyn?

A.   That I enjoy about using Zyn?  Brings me pleasure.

Q.   Does it help you relax?

A.   Yes.

Q.   Does it help you focus?

A.   Yes.

Q.   Does it reduce your anxiety?

A.   Yes.

Q.   Have you found it to help with weight loss?

A.   Weight loss?  Not so much.  I'm not really big on that.

Q.   Does it feel like a cool thing to do?

A.   To Zyn?

Page 93

Q.   Yeah.

A.   Yeah.

Q.   Anything else?  Any other reasons that you enjoy using Zyn other than everything we just discussed?

A.   That pretty much sums it up.

Q.   When you said that Zyn helps you achieve your buzz, how long after you put a Zyn pouch in your mouth do you achieve your buzz?

A.   Well, honestly it's -- this may sound a little weird, but it's kind of an instant thing from the satisfaction of putting it in my mouth.  That's to start.  The flavor of it gets me excited.  It gives me the, (witness makes noise), you know what I'm saying?  So I wouldn't say it affects me immediately, but it immediately brings me pleasure.

Q.   Okay.  So we -- I think I asked you earlier about stores where you've purchased Zyn.

A.   Mm-hmm.

Q.   And we talked about Jamal's for a while. Do you recall that?

A.   Yes.

Q.   Have you purchased Zyn at a 7-Eleven on Lakeshore Way in Lake Alfred?

A.   Yes.

Page 94

Q.   And about how often do you go into that 7-Eleven to purchase Zyn?

A.   That's usually whenever I need it and I think about it at that time.  I stay pretty close to there, so a good portion of my purchases most of the time.

Q.   When you purchase Zyn or other nicotine products at that 7-Eleven, are you asked for ID?

A.   No.

Q.   Have you ever been asked for ID at that 7-Eleven?

A.   At that 7-Eleven, it depends on the person.  Sometimes.

Q.   Have you also purchased Zyn at a Circle K on Hinson Avenue in Haines City, Florida?

A.   Yes.

Q.   And how often have you purchased Zyn there?

A.   I don't have an exact number of times.  I just included some stores I knew I would have went and purchased from.

Q.   Would you say that you more commonly purchase at the 7-Eleven on Lakeshore Way?

A.   Yeah.  That's the place I could say I probably bought a good sum from.

Page 95

Q.   Have you also purchased at a Marathon store on Havendale Boulevard in Winter Haven?

A.   Yes.

Q.   And do you have an idea of how much Zyn you've purchased there?

A.   I have no idea.  I just was mentioning this place because I know I have at least bought a can from each one of those places, but no exact count, honestly.

Q.   And still the case that the 7-Eleven is the one that you probably purchase at most often?

A.   Mm-hmm.

Q.   You also have identified in the past a race track at Havendale Avenue in Winter Haven.  Is that another place where you have purchased at least one Zyn?

A.   Mm-hmm.

Q.   Is that a yes?

A.   Yes.

Q.   Have you ever been asked for age verification at the Circle K?

A.   At the Circle K?  To my recollection, no. I would just say probably.  Not sure.  Not sure.

Q.   What about the Marathon?

A.   Not sure.  Probably not.

Page 96

Q.    And how about at the RaceTrac?

A.    Probably.  I don't really recall.

Q.    Okay.  Do you recall -- do you recall being asked for age verification at the 7-Eleven?

A.    I've been IDed in the past, but a specific instance, I don't really remember.

Q.    Other than those stores that we just talked about and Jamal's, can you think -- can you recall any other store -- specific store where you purchased Zyn?

A.    Specific, I can tell you the name of it, but I wouldn't be able to tell you the location.

Q.    Okay.  Go ahead.

A.    I used to do pest control and I be everywhere, so I wouldn't really know where it's at.

Q.    I see.  Did you -- have you made other purchases at other chains like 7-Eleven?

A.    Yeah.

Q.    So you may have purchased at other 7-Elevens beyond this one in Winter -- sorry, beyond this one in Lake Alfred?

A.    Right.

Q.    But you don't know exactly where they were?

A.    Right.  Central Florida.

Page  97

Q.   And that is -- is that true for anywhere else you've made a purchase?  You may recall having made a purchase at a particular chain, but you wouldn't know exactly where it was?

A.   Correct.

Q.   Have you ever vaped?

A.   Yeah.  I've tried a vape before.

Q.   Did you purchase a vape when you tried it?

A.   I have -- I know for a fact that I have purchased one vape for a fact.

Q.   What vape did you purchase?

A.   It was like dark ice or black ice.  It was like an air freshener favor and I was like you can smoke that?  So I just had to see what it was about.  It was like black ice or dark ice or something.  The brand I'm not really too sure nor the strength but...

Q.   What was your experience when you tried that vape?

A.   Disgusting.

Q.   How do you believe that your use of Zyn affected whether or not you smoke cigarettes or cigars?

A.   Rephrase that, please.

Page 98

Q.   Sure.  Do you believe that your Zyn use affected your decision to begin smoking cigarettes or cigars?

A.   Yes.

Q.   How so?

A.   It made me crave that feeling more and more unknowingly thinking I was just expanding my horizon, per se, but I just tried it.  You asked me how does Zyn make me want to smoke?  Did Zyn make me want to smoke?

Q.   Yes.

A.   Yes, it did.

Q.   And is that true, it made you want to smoke both cigarettes and cigars?

A.   Yeah.

Q.   Why did you begin smoking cigars?

A.   Why did I -- it's cheaper than Zyn.

Q.   Any other reasons?

A.   Price is the main point.  You can get a Black & Mild for a dollar.

Q.   Why did you choose Black & Milds in particular?

A.   Price point.  The fix was pretty strong, quick onset.

Q.   In your experience, is -- actually,

Page 99

sorry.  Strike that.

When you say "quick onset," quick onset of what?

A.   Of the rush, the pleasurable feeling.  It kind of boosts that.  Like with Zyn, like I said, I'm happy with it, but then you smoke with it, too, and it just helps you achieve that feeling without wasting all your pouches.

Q.   What about when you started smoking Newports regularly?  What were the reasons for doing that?

A.   For one, it was a lot of them in a pack. It's about, you know -- what would I say? Rephrase -- ask the question again.  Sorry.

Q.   Yeah.  Did you -- what were the reasons that you began smoking Newports?

A.   I can achieve the feeling, keep it long and it boosts the amount of -- my Zyn.  It boosted my buzz overall.

Q.   Why did you pick Newports in particular?

A.   Why Newports in particular?  That was just to be something that I tried in the past.  Like I said, when I tried it, it was what I tried before. Just gave it another run and it was tolerable at an older age.

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Q.   So when you -- when you -- we talked earlier this morning about, like, how you would -- when you were much younger, you had tried one cigarette; is that right?

A.   Mm-hmm.

Q.   Was that a Newport?

A.   I believe so.  It looked like it.

Q.   Okay.  Did it have a menthol -- do you remember if it had a menthol flavor to it?

A.   It honestly tasted like dirt.

Q.   Okay.  How often do you use Black & Milds and Zyn at the same time?

A.   It's like my get-up.  That's what I do.

Q.   And then when you decided to use Newports, was price any part of that decision?

A.   It was about the quantity I would say.

Q.   Because there's more cigarettes in a pack?

A.   Yeah.  You get a lot of cigarettes.

Q.   If you were concerned about -- if a concern about price is part of what drove you to use Black & Milds --

A.   Mm-hmm.

Q.   -- why didn't you shop around to see if there were cheaper nicotine pouches?

Page 101

A.   It didn't happen like that.  I wasn't looking for it.  I'm not trying to be the budgeter. It's just what it is in that time -- at that time, that's what it was.

Q.   Oh, you mean like at the time you first started purchasing Black & Milds, that was like --

A.   It's the thought --

Q.   -- what you could afford?

A.   Yeah.

Q.   Have you ever looked to see if other nicotine pouches are cheaper than Zyn?

A.   No.

Q.   Would you consider purchasing other nicotine purchases if they were cheaper than Zyn?

A.   I mean, at this point if it's not broken, don't fix it, so that's what we're at.

Q.   Can you approximate, like, I think you said before you use Zyn between three and six times a day on average; is that right?

A.   Mm-hmm.  Yeah.

Q.   On how many of those occasions do you also use Black & Milds?

A.   So out of the -- so if I did six times a day, how many times did I smoke a Black & Mild with it?

Q.   With it.

A.   Probably about every time.  Because sometimes the time will overlap where I still have a Zyn in my mouth and I'm fixing to go smoke, too, so...

Q.   How many Black & Milds do you smoke each day on average?

A.   Three to a pack.  So there's five in a pack.

Q.   Had you seen any advertising for Black & Milds before you started smoking them?

A.   Not to my recollection, no, sir.

Q.   Had you seen any advertising for any cigar brands before you started smoking?

A.   If I did, I didn't take notice to them.

Q.   Had you seen any Newport ads before you started regularly smoking Newports?

A.   I don't think so.

Q.   And had you seen any cigarette ads before you started smoking Newports and taken notice of them?

A.   You asked me -- could you reask the question?

Q.   Sure.  So I just wanted to -- because you made a good clarification before that you may have

Page 103

seen something but not taken notice of it.

A.   Right.

Q.   So before you started smoking Newports, had you taken notice of any advertising for any cigarette brands?

A.   No.

Q.   Have you tried other Middleton brand cigars?

A.   No.

Q.   Are Black & Milds flavored?

A.   I don't think so.  It just says original.

Q.   How soon after you start smoking a Black & Mild do you get a feeling of satisfaction?

A.   It's hard to put a time on it, but it's within my expected range.  It's not too long.  Not a minute.

Q.   Do you have to smoke half the cigar before you get that feeling?

A.   No.

Q.   Would you say it's within the first few puffs?

A.   Not for my peak, but to say that I know I smoked, it would be within a few puffs.

Q.   And where would you feel the peak?

A.   About how far into the cigar?

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Q.   About how far, yeah.

A.   That can also vary from the time that I have taken the Zyn.  So it would depend on the situation at that time.

Q.   Good point.  So in situations where you're not -- you don't have a Zyn in --

A.   Mm-hmm.

Q.   -- about how far into a cigar?

A.   It's going to hit me.  Because if I don't have no Zyn, I don't have that baseline buzz.  It's going to come pretty quickly.

Q.   And then will it come more slowly if you have the Zyn in?

A.   Will the buzz come more slowly?  To me it's not about fast or slow.  It's like a hard or soft.

Q.   Okay.  So describe to me the difference between that buzz feeling when you're -- what did you say?  It's going to hit me hard when you're smoking a Black & Mild without Zyn.  How does that compare to when you smoke a Black & Mild with Zyn?

A.   The pouch is quicker if I'm just, like, regular, but with Zyn it helps me climb to get to my feeling.

Q.   Mm-hmm.

Page 105

A.   It's not necessarily like a sharp achievement.  Like you can't just jump to your highest point, but it helps it.

Q.   Okay.  Do you know how much nicotine you have consumed in a Black & Mild by the time you feel satisfaction?

A.   No idea.

Q.   Do you know how much nicotine you've consumed in a cigarette by the time you feel satisfaction?

A.   No idea.

Q.   And do you know how much nicotine you've ingested from Zyn by the time you feel satisfaction?

A.   No idea.

Q.   I think you said earlier that you've used both three-milligram Zyn and six-milligram Zyn; is that correct?

A.   That's correct.

Q.   Did it feel to you like the three-milligram Zyn had less nicotine in it than the six-milligram Zyn?

A.   It took -- I would say it take more -- trying to look for a better term.  Ask the question again, please.

Q.   Sure.  Did it feel to you like the

Page 106

three-milligram Zyn had less nicotine than the six-milligram Zyn?

A.   I don't know.  I wasn't thinking of it like that.

Q.   So did it -- did you notice a difference of any kind between using the three-milligram Zyn and the six-milligram Zyn?

A.   Mm-hmm.  Yes, sir.

Q.   And what -- what -- can you describe what difference you noticed?

A.   The -- I'm trying to think of a good word to use.  The effects are more profound.

Q.   And what do you mean by profound?

A.   They were clearer.  They were more outstanding.  They were more satisfaction -- satisfactory than the three-milligram pouch.

Q.   Which effects in particular?

A.   A good one is the roller coaster feeling in my stomach.  That's one that I get from smoking tobacco.  It's like a rush.  That's one of the ones that was like...

Q.   Would you feel the effects of the six-milligram Zyn more quickly than the three-milligram Zyn?

A.   I don't know about all that.  I never

Page 107

really paid attention.  Never really analyzed it like that.

Q.    Today am I correct that you use six-milligram Zyn exclusively?

A.    Yes.

Q.    Do you know the names of any other nicotine pouch brands?

A.    No.  I ain't really pay attention like -- no.

Q.    And I think -- am I correct that you also haven't done a price comparison between Zyn and any other nicotine pouch brand; is that right?

A.    No.  I haven't gone and done price comparisons, no, sir.

Q.    Have you ever gone to purchase Zyn at a store and it wasn't available?

A.    Probably not the particular mint flavor that I was looking for at that time.  Like that's how I would get off to, like, the menthol one or something like that if they didn't have cool mint or something like that.

Q.    So you've had an experience where perhaps you went in looking for cool mint and they didn't have it but they had another mint variety; is that fair?

Page 108

A.    Yeah.

Q.    Have you ever had an experience where you went to purchase Zyn and there were no mint varieties and no menthol available?

A.    No.  If anything, it would have been the weaker milligram.

Q.    And in that case, would you just buy the three milligram?

A.    Yeah.  Just buy the three and double up.

Q.    Have you been to the website Zyn.com?

A.    No.

Q.    So, then, fair to say you've never created an account for Zyn.com?

A.    No, sir.

Q.    Have you ever created an account for any tobacco product website?

A.    I don't think so, no, sir.

Q.    Are you a member of the Zyn rewards program?

A.    No, sir.

Q.    Have you ever created an account for a website called Gain Cigars?

A.    I know my wife has in the past.  I know she had -- talking about that little point thing on the back?  Something like that?  I haven't

Page 109

personally, no.

Q.   You have not personally?  Okay.  Has your wife created an account for you in order to redeem points?

A.   I'm pretty sure it's in her name.  I think it's in her name.

Q.   But your wife does not use nicotine products, correct?

A.   Correct.

Q.   So when she's redeeming points, is she redeeming points from your purchases of nicotine products?

A.   It would have been, like -- well, yeah, at one point it would have been where I -- at one point, yeah.  At one point.  Not now.

Q.   Your wife is not currently redeeming, like, any points that you might have?

A.   No.

Q.   Do you remember what she redeemed points for on the cigar website?

A.   I don't even know if she even got anything, honestly.

Q.   Do you know if she ever redeemed points for a hoodie or sweatshirt?

A.   Possibly.  I really don't know.

Page 110

Q.   Do you -- you personally, not her, do you personally own any clothing that advertises cigar brands?

A.   I don't think so.

Q.   Do you own any clothing that advertises Zyn?

A.   No.

Q.   Do you know why your wife redeemed or do you know why your wife set up an account to redeem points for your cigar purchases?

A.   I think it was you can get stuff for the thing on the back, but I believe the prices was outrageous on there or something, so it wasn't even, like, worth doing at the point.

Q.   I think you testified earlier you're not much of an alcohol drinker; is that correct?

A.   That's correct.

Q.   Approximately how often do you consume alcohol?

A.   Twice a year.

Q.   Have you ever considered yourself to be addicted to alcohol?

A.   No.  It's disgusting.

Q.   Have you always been an extremely occasional drinker of alcohol?

Page 111

A.    Yeah.

Q.    Do you use marijuana?

A.    No.  Not at this time.

Q.    When did you stop using marijuana?

A.    When my medical card expired.

Q.    So -- and when was that?

A.    Like two years ago.

Q.    When did you start using marijuana?

A.    When I got my medical marijuana card.

Q.    And when was that?

A.    I don't recall.

Q.    Do you recall about how old you were at the time you started using marijuana?

A.    20 -- probably 24, somewhere up in there approximately.

Q.    Yep.  Do you remember the first time that you tried marijuana?

A.    (Witness nods head).

Q.    What do you remember about that?

A.    I ate a gummy and I didn't like it.

Q.    In the period of time when you were using marijuana, were you primarily consuming gummies or were you smoking?

A.    Gummies, chocolate, tinctures.  It was different little routes of consumption pretty much.

Page 112

All controlled.

Q.   And not burning tobacco leaf -- sorry, marijuana leaf?

A.   I've used flower before in the past, but that wasn't my main route of consumption, no.

Q.   Your main route was different forms of edible --

A.   Edibles, yeah.

Q.   -- marijuana?  So did you -- with your medical marijuana card, did you purchase marijuana?

A.   Yes.

Q.   And today you don't use marijuana at all; is that correct?

A.   That's correct.

Q.   Did you ever consider yourself addicted to marijuana?

A.   No, sir.  Can't stand the loopsy feeling that comes with it.

Q.   When you were using marijuana, approximately how often were you using it?

A.   On an as-needed basis in accordance with the instructions on the container.

Q.   What do you mean the instructions on the -- like, what kind of instructions?

A.   Each thing that you purchase from the

Page 113

dispensary, it comes with a specific set of instructions like a little piece of paper that gives you recommended dosages and times to use so that you won't experience the over-loopy feeling and things of that sort.

Q.   Essentially, so that you -- it has instructions that will prevent you or hopefully prevent you from taking too much at any given time?

A.   Yeah.

Q.   Where did you get your medical marijuana card?

A.   From -- I don't mean to sound funny, but from the marijuana doctor.

Q.   So you visited a doctor and he evaluated you and then gave you a medical marijuana card?

A.   Yes, she did.

Q.   And what -- what symptoms did you have that caused you to go to the medical marijuana doctor?

A.   I had several -- several things that I believe that medical marijuana could have worked out for me.  Nothing that stands out today in particular that I can mention, but I know I had PTSD from my car wreck and that -- that was something that helped me out.

Page 114

Q.   Did it -- at the time did the medical --
did you find the medical marijuana helpful in dealing
with PTSD?

A.   It was calming, yeah.

Q.   Is medical marijuana expensive?

A.   It can get expensive if you -- if you're
frequent there.

Q.   Were you frequent?

A.   I wouldn't say frequent, no.

Q.   Why did you stop using marijuana?

A.   Because my marijuana card expired and --

Q.   Go ahead.

A.   And that was it.

Q.   Did you consider getting your marijuana
card renewed or getting a new one?

A.   Not immediately.  No.

Q.   Why not?

A.   Not worth -- I don't want to say not
worth.  First, you have to have the money to pay for
it.  Then you have to go through your evaluation
process once your order is expired and that is just a
process I haven't been able to go through with at
this time.

Q.   Did you have any bad experience with
marijuana that caused you to not want to continue?

Page 115

A.   Bad?  I wouldn't call it bad.  It's just a feeling I'm not comfortable with.

Q.   And when you say the feeling, you mean the way -- you're not comfortable with the way it makes you feel?

A.   Yes.  It makes you feel less in control I would say.

Q.   Other than marijuana, have you ever used any other illicit drugs?

A.   No, sir.

Q.   Have you ever used prescription drugs in a manner other than the manner that they were prescribed in?

A.   No, sir.

(Exhibit No. 6 was marked for identification.)

BY MR. SCHWAB:

Q.   So I am going to have the court reporter hand you what has been marked as Exhibit 6.  Do you recognize that document?

A.   No, sir.

Q.   So these are what are called your interrogatory responses.

A.   Okay.

Q.   They are essentially responses to

Page 116

questions that my clients have asked.  Do you understand that?

A.   Yes, sir.

Q.   So I want you to turn to page 8.  And I'm going to direct your attention to interrogatory number 9 at the bottom.

A.   Mm-hmm.

Q.   Which says, describe all injuries including physical, psychiatric, psychological, mental, emotional, behavioral or any other health-related impact, illness, condition or other injuries of any kind whatsoever that you assert you have suffered from using Zyn and then it goes on.  Do you see that?

A.   Yes, sir.

Q.   And then if you turn to the next page, page 9, is your response.  Do you see that in bold?

A.   Mm-hmm.

Q.   So I want to ask you about some of these -- some of your responses here.  If you go one, two, three, four sentences down, you will see something that starts with subject to and without waiving said objections.  Do you see that?

A.   Mm-hmm.

Q.   And then it says, plaintiff has suffered

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

injuries and damages that include but are not necessarily limited to, behavioral and cognitive conditions.  Do you see that?

A.   Yes.

Q.   What behavioral conditions have you suffered other than what we've already discussed today?

A.   I pretty much explained it to you already.

Q.   And then are cognitive conditions in your mind, is that essentially the same as the behavioral conditions you've described?

A.   I mean, other than the ability of being able to actually lock in on a task at hand, I would say -- when you say cognitive, like my ability to move and do things?  Like, am I shaking?  What are you asking me?

Q.   So this is your response here that says --

A.   Right.

Q.   I'm sure it was prepared with your lawyers, it says behavioral and cognitive conditions.

A.   Okay.

Q.   So I'm asking whatever cognitive means to you, to identify what those issues are?

Page 118

A.   What does cognitive mean to you?

Q.   This is my chance to ask the questions.

A.   You can't ask?   Cognitive, I would just say I'd be describing my physical -- the physical, I guess you could say, repercussions from --

Q.   Yeah.   So let's -- I just want to make sure I've got those all covered.   So you said earlier anxiety is one that I recall; is that correct?

A.   Yes, sir, that's correct.

Q.   Lack of focus when you were not using Zyn is one of them; is that correct?

A.   That is correct.

Q.   You said irritability; is that correct?

A.   That's correct.

Q.   Okay.   What else?

A.   Headaches, stomach hurting, nauseous, jittery.   I guess that's covered under anxiety.   That falls under not being able to focus, like only worried about my next fix, my next buzz.   It's like, yeah.

Q.   Okay.

A.   That's pretty much it.

Q.   Anything else?

A.   That should be all that I can think of at this time.

Page 119

Q.   Okay.  Next, after behavioral and cognitive conditions, it says nicotine addiction.  Do you see that?

A.   Yes, sir.

Q.   We'll talk about that separately in a second.  And then it says as well as physical injuries that are harmful to plaintiff's general health and dental health.

A.   Mm-hmm.

Q.   What physical injuries have you suffered as a result of your Zyn use?

A.   I have a little tooth decay in the back, but I'm not sure that Zyn caused it.  I ain't going to -- I can't say that for sure.

Q.   Anything else?

A.   Other than the -- down in the cheek, the rough patch of skin.

Q.   Other than that?

A.   Physical injuries, no.

Q.   Okay.  Let me ask you about that rough -- the rough patch of skin.  You just gestured, is that -- is that on the left side of your lower lip?

A.   That's one of the most common places that it will happen because that's where I put it the most.

Page 120

Q. Okay. And can you describe for me what that injury is? Like, what does it feel like? What does it --

A. Ever had a sucker on the side of your cheek for too long and then licked it after the fact?

Q. Yeah. Okay. That's actually a very good description. Is it -- is it there all the time?

A. No. It depends. Like when I -- when I feel it begin to get irritated, I will use a different spot to beat it before it onset, before it gets to that point.

Q. And if you -- so let's say you're feeling that onset on the left side of your face, right?

A. Mm-hmm.

Q. If you then start using Zyn on the right side of your face, does whatever -- does that roughness disappear from the left side?

A. Not immediately, but over time it will -- it starts with irritation.

Q. And will the irritation decrease --

A. Over time.

Q. -- when the pouch is not on it?

A. Right. You just don't use it in that area and it will go away.

Q. Are there any other injuries that you

Page 121

have suffered as a result of your use of Zyn other than what we've discussed?

A.    Not at this time.  Not to my knowledge.

Q.    Now, you've never been diagnosed with any health issue related to Zyn, correct?

A.    Correct.

Q.    Is it correct that you have not consulted with any medical provider or been to a medical facility relating to any Zyn-caused injuries?

A.    Correct.

Q.    I want you to look at the end of this response of interrogatory number 9, the same one we're looking at.  It says, as a result of plaintiff's injuries, plaintiff has visited Modern Day Smiles Dentistry and then it gives an address. Do you see that?

A.    Yes, sir.

Q.    Is it correct that you visited Modern Day Smiles as a result of an injury caused by Zyn?

A.    I wouldn't say it like that.  I went to the dentist.  They said I had tooth decay on one of my back teeth and I know I at one point -- when I used to use Zyn in that area, but like I said, I'm not sure that Zyn caused that injury.

Q.    And the dentist did not tell you that Zyn

Page 122

caused it?

A. Zyn caused it, no.

Q. When did you first go to Modern Day Smiles?

A. I don't remember. It's been a while. It's been years.

Q. Do you remember why you chose to go to Modern Day Smiles?

A. Probably who took the insurance that I had at that time.

Q. Do you remember how you learned about Modern Day Smiles?

A. Probably through the network. You know how they have network hub, for insurance, like you can choose someone that accepts your insurance, your type of insurance, I think it was that type of deal.

Q. Wasn't like a friend or family suggested it to you?

A. No. It's pretty far away from my house actually.

Q. That was my next question.

A. Yes, sir.

Q. So why did you decide to drive that far? Was it because of the insurance?

A. Because of the insurance and that was

Page 123

like a plan that you could use to get your dental there in accordance with your insurance without having to pay that much out-of-pocket for that particular office.

(Exhibit No. 7 was marked for identification.)

BY MR. SCHWAB:

Q.   Let me hand you what I'll ask the reporter to mark as Exhibit No. 7.  Do you recognize these documents, Mr. Maultsby?

A.   Yes, sir.

Q.   And are these your documents from Modern Day Smiles?

A.   Yes, sir.

Q.   Okay.  So ask you to turn to the page that ends in 07 in the lower right-hand corner.

A.   Okay.

Q.   Are you there?

A.   Yes, sir.

Q.   On the bottom of that page to the right you'll see it says date and above that 10/17/2022.  Do you see that?

A.   Mm-hmm.

Q.   Is that yes?

A.   Yes.

Page 124

Q.   So is that the date that you visited Modern Smiles for this appointment?

A.   It would have to be, yes, sir.

Q.   If you look back to the top of the page, it says comprehensive exam, medical history reviewed. Do you see that?

A.   Yes, sir.

Q.   And then it says chief complaint?

A.   Mm-hmm.

Q.   Patient stated I took off my brackets on my own.  I was doing braces and never finished it and want the bonding removed because it is staining and I want a cleaning.  It has been a long time.  My wedding is this week.  Do you see that?

A.   I do see that.

Q.   Do you remember going to Modern Day Smiles to have the bonding for your braces removed?

A.   Yes, that was like part of the cleaning.

Q.   Why did you take your own brace brackets off?

A.   I wasn't able to afford finishing the plan.  You know, it cost thousands of dollars and I was a child when I received them and unforeseeable circumstances didn't allow me to finish the treatment.

Page 125

Q.    When you -- when the braces were put on you, you were still a child?

A.    Yeah.  I was a minor.

Q.    Yeah.  That's --

A.    Yes, sir.  I understand, but yes, sir. Yes, sir.

Q.    Let me ask a better question because I didn't mean to suggest that you were very young.  You were under 18 at the time that the braces were put on you?

A.    Yes, sir.

Q.    Do you remember the name of the doctor who put the braces on?

A.    No.  No, sir.

Q.    Did Modern Day Smiles remove the bonding and do the teeth cleaning?

A.    Yes, they did.

Q.    The dentist on here also notes that your oral hygiene is poor.  Do you see that?

A.    Mm-hmm.

Q.    Do you remember the dentist discussing with you oral hygiene?

A.    Yeah.  She just told me I had a lot of calculus (sic) buildup and that was due to the crowding of my teeth which is something I can't

Page 126

control at this point because I don't have braces, so that was just the effects of having crowded teeth at the bottom and the back, you get that buildup back there and they have to get it out, blow it out with the water picks and things like that.

Q.   Did they suggest that you start using a water pick at home?

A.   No.   They actually told me I should try and get -- what is it called?   Whatever the professional version of a water picking is.   They were like I should try to get that more often, but without insurance, going to the dentist is not really an affordable thing.

Q.   Was this the visit where they also discussed the -- sorry, discovered the issue you said that you had in the back of your mouth?

A.   I believe so.   I think this is where they -- he said it didn't matter because it was a wisdom tooth which is probably why it's not necessarily showing here.   I don't know if it is or isn't, but it's -- I had a wisdom tooth in the back and it's --

Q.   Do you still have your -- that wisdom tooth?

A.   Mm-hmm.

Page 127

Q.   If you turn to the next page, it ends in 08, let's see, three lines from the bottom it says, oral hygiene instructions reviewed with patient. Reviewed brushing and flossing importance.  Do you see that?

A.   Oh, yes, sir.

Q.   So do you remember that discussion with the dentist?

A.   Not really.  It's been years ago.  This was 2022, so no, sir.

Q.   Do you remember them telling you to consider a water pick if your flossing habits did not improve?

A.   No, sir.  Not really, no.

Q.   And then it says reevaluation four to six weeks for SRP/prophy or perio referral.  Do you see that?

A.   Yes, sir, I do.  Second-to-last line right there.

Q.   Do you know what SRP/prophy or perio means?

A.   I have no idea.

Q.   Did you go back to be reevaluated --

A.   No, sir.

Q.   -- four to six weeks after this?

Page 128

A.   Couldn't afford it.

Q.   Have you been back to Modern Smiles since this time?

A.   No, sir.

Q.   Other than everything we've discussed until now, has Modern Smiles ever diagnosed you with any other dental issues?

A.   Dental issues?  Not to my knowledge, no, sir.

Q.   Other than the people at Modern Smiles, have you seen any other dentist since you began using Zyn?

A.   I don't think so.  I don't think so.  I don't remember if I did, but I don't believe so.  I don't think so.

Q.   How about other doctors?  What other doctors have you visited since you began using Zyn?

A.   Besides the marijuana physician, I haven't really been to a primary.  Insurance is not what it used to be for me, so doctors is really out of the question right now.

Q.   You said earlier, right, you had not been to a primary physician since you started using Zyn.  Have you seen a doctor for any other reasons other than the dentist at Modern Smiles?

Page 129

A.   Doctor?  I haven't been to the doctor.  I went to the hospital for COVID.  I've got a cyst on my chest, that was since I was a kid.  Not -- I think that's it.

Q.   Have you seen a doctor about your nicotine addiction?

A.   No, sir.

Q.   Have you seen a doctor about your anxiety?

A.   No, sir.

Q.   Have you seen a doctor about your inability to focus?

A.   No, sir.

Q.   Have you seen a doctor about your stomach issues?

A.   No, sir.

Q.   Do you take any medication to combat those stomach issues?

A.   Nicotine.

Q.   Anything else?

A.   Ginger ale.

Q.   Do you take any over-the-counter medication like Pepto Bismol?

A.   No.

Q.   Have you ever considered using a nicotine

Page 130

replacement product like Nicorette?

A.   No, sir.

Q.   Why not?

A.   Just not really -- probably not going to give me the same feeling, but I don't have a specific answer as to why not.  Just haven't.  Haven't.

Q.   Have you considered whether using a nicotine replacement product would help you quit using nicotine?

A.   I mean, I could have thought about it, but not really, no.

Q.   We're just short of an hour.  This is a good stopping break.  Would you like to take a short break?

A.   Up to you.

Q.   No, it's actually up to you.

A.   I'll take ten.

MR. SCHWAB:  Going off the record at 1:25 p.m.

(Recess taken -- 1:25 p.m.)

(After recess -- 1:36 p.m.)

THE VIDEOGRAPHER:  We are back on the record at 1:36 p.m.

BY MR. SCHWAB:

Q.   Mr. Maultsby, do you understand you're

Page 131

still under oath?

A. Yes, sir.

Q. Earlier today we looked at a series of photos that you took, one of you and some of some Zyn cans. Do you remember that?

A. Yes, sir.

Q. Do you still have those photos on your phone?

A. Probably. The phone that I took them on, yes, sir.

Q. Do you still have that phone?

A. Yes, it's at home.

Q. And I think we also talked a little bit earlier today about a store -- a smoke shop called Jamal's. Do you remember that?

A. Mm-hmm.

Q. And Jamal's is closed now?

A. Yes, sir. It was like a convenient store, smoke shop. Just like -- I want to say a hood store.

Q. What's that?

A. Like the neighborhood store.

Q. Neighborhood store. Did they sell alcohol?

A. Yeah.

Page 132

Q.   Do you remember where Jamal's was located when it was open?

A.   It was on Avenue T in Winter Haven.

Q.   In Winter Haven?

A.   Yes, sir.

Q.   Do you remember approximately when it closed?

A.   Sometime before 2020, I'm sure.  I'm not sure of the exact date, though.

Q.   All right.  Like I said before we stopped, I'd circle back to nicotine addiction, so I'd like to talk about nicotine addiction now.

A.   All right.

Q.   You believe you are addicted to nicotine, correct?

A.   Yes, sir.

Q.   Was there a specific event that made you realize you were addicted to nicotine?

A.   It was somewhat a lot of events that led me to realizing I was addicted.

Q.   Can you describe those events and how that led to you realizing you were addicted?

A.   Well, mainly just overall struggle with the symptoms.  I had ran across like a slide or something that made me say, I wonder if I have a

Page 133

problem.  And then I reached out to my attorney and tried to see what my rights were as far as that and I went from there.

Q.   You said that you saw a slide; is that correct?

A.   Yes, sir.

Q.   Do you mean like -- like you would see in, like, a PowerPoint presentation?

A.   No.  Like an advertisement or something like that.  It was like a -- I don't remember exactly what it was, but it was like something online, like a -- I'd say an advertisement, probably.

Q.   Do you remember if it was an advertisement about, like, legal rights you might have if you were addicted to nicotine?

A.   Something of that nature, yes, sir.

Q.   And you said after that, you reached out to your attorney; is that correct?

A.   Correct.

Q.   And was that your -- the Schlesinger Law Firm that is currently representing you?

A.   Yes, sir.

Q.   Had they represented you previously?

A.   No, sir.

Q.   And why did you reach out to that law

Page 134

firm in particular?

A.   Just trying to see someone that can hear my case.  I don't think it would do much good to try to get questions from Morgan and Morgan.  You know, the large law firm.  You probably won't get to talk to anyone and ask the questions that you need to.

Q.   Was the -- was the advertisement that you saw about nicotine addiction, was that an advertisement from this law firm?

A.   I don't think so.  I don't think so, no, sir.

Q.   Do you remember how you found the Schlesinger Law Firm's name?

A.   Google.

Q.   Do you remember what you Googled?

A.   I don't actually.  No.  Mm-mm.

Q.   Approximately when was this?

A.   Probably, like, late 2024, somewhere up in there.  I said 2004, didn't I?

Q.   You said late 2024.

A.   Yes, sir.

Q.   Is that correct?

A.   Yes, sir.

Q.   Okay.  Late 2004 would be very different.

A.   Right.

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Q.   So late 2024?

A.   Yes, sir.

Q.   So since the time that you realized you were addicted, have there been any breaks, any periods where you felt that you were not addicted?

A.   No, sir.

Q.   So since you realized you were addicted in late 2024, you've consistently felt addicted?

A.   Yes, sir.

Q.   Can you describe the nature, feeling of your addiction for me, please?

A.   I feel crappy.  I feel less than people of my same age, same demographic.  I feel like an addict.

Q.   What do you mean "same demographic"?

A.   People that are of my age, of my color, of my area where I live compared to people that we consider just like me, a regular 27-year-old person.

Q.   Yeah.

A.   I feel less than.

Q.   And why do you feel less than?

A.   I'm addicted to a substance that I wasn't before and I can vaguely remember what it's like to not be, to be able to enjoy your full life uninterrupted by the pull of a substance.

Page 136

Q.   And how do you define addiction?

A.   Can't stop.  Won't stop.  Must have. Need it.  Imperative.

Q.   Under that definition, are there any other activities that you believe you're addicted to?

A.   I would say that I'm addicted to doing what's right morally.  I am a Christian.  Stand for what's right ultimately.

Q.   Anything else under that definition that you would say you're addicted to?

A.   No.

Q.   Do you gamble?

A.   No, sir.

Q.   Do you play video games?

A.   Not really.

Q.   Wouldn't say you're addicted to video games?

A.   No.

Q.   How about shopping?  Do you do a lot of clothes shopping?

A.   Not really, no, sir.

Q.   Anything else you can think of that you're --

A.   That I'm addicted to?

Q.   Under that definition that you gave of

Page 137

can't stop and won't stop.

A.   I mean, not to be funny, but I'm addicted to making my wife smile.

MS. GOODMAN:   That's good.

BY MR. SCHWAB:

Q.   Anything else?

A.   No, sir.

Q.   Can you describe how your nicotine addiction has impacted your life?

A.   It throws me away from consistently spending time with those that I love.  It causes me to lose focus in daily activities.  It causes me physical sickness when I don't have it.  It causes me a lot of stress and anxiety about wanting to get or trying to achieve a specific feeling.  Also I -- how has it impacted my life negatively is what you asked?

Q.   Just how it's impacted your life in general.

A.   Overall?

Q.   Yeah.

A.   Pretty much in a negative light only.  It hasn't enhanced my life.  Well, it gave me the allusion that it was enhancing my life when really it was tearing me down.  What I take as an energy rush is really being addicted.  What I take as a boost is

Page 138

really me feeding my cravings, so, I mean, it has impacted me negatively overall.

Q. When did you realize that the things that you viewed as a positive from your nicotine use were in fact signs of addiction?

A. When did I realize that what I deem positive to be signs of addiction?

Q. Yes, sir.

A. I'd say probably after learning my rights and overall being older now, it allowed me to realize, like, hey, there's a problem, buddy.

Q. Was that in like the late 2020 time period that we already just discussed?

A. Yes, sir.

Q. I think you discussed earlier you never sought medical assistance before dealing with a nicotine addiction; is that correct?

A. That's correct.

Q. Have you ever sought help from anybody, even a nonmedical capacity for help with your nicotine addiction?

A. No, sir.

Q. Have you ever considered seeing a doctor for your nicotine addiction?

A. No, sir. The shame has kept me from

Page 139

going to a doctor.

Q.   Is that the shame of being addicted to a substance that you already described?

A.   (Witness nods head).

Q.   Do you believe that Zyn is any more addictive than any other nicotine product?

A.   Yes.

Q.   And why do you believe that?

A.   It's easier to consume.  It's less of the harsh effects of smoking itself.  Just make you feel like you're doing something better and still getting a good feeling.  It's not smoking.  There's no tobacco in it so...

Q.   So it's -- in your experience, it's easier to consume Zyn because you're not burning and inhaling tobacco?

A.   Yes, sir.

Q.   Does that in your mind make Zyn more addictive than burning and inhaling tobacco?

A.   Does it make it more addictive?  Probably so because it's the ease of use, the convenience, the discreetness.  The fact that I can get my buzz and you don't know.  I can -- I can achieve my feeling and I don't have to disrupt the process of what's going on at that time necessarily.  I just got to pop

Page 140

it in.

Q.   I think we talked earlier, you have tried to quit cold turkey using nicotine products.

A.   Yes, sir.

Q.   More than once, correct?

A.   Yes, sir.

Q.   How many -- approximately how many times?

A.   I don't know.  I'm not sure.

Q.   Have you ever tried to quit Zyn while continuing to use Black & Milds and other tobacco products?

A.   I would have just tried to go cold turkey overall.

Q.   Do you think it's possible to quit using nicotine?

A.   I don't know.

MS. GOODMAN:  Form.  You can answer.

THE WITNESS:  I don't know.

BY MR. SCHWAB:

Q.   In one of your discovery responses you say that you suffer from addiction of nicotine and it's intended consequences.  Other than what we already discussed, are there any other consequences, negative consequences that you have suffered as a result of using nicotine?

Page 141

A.    Yes.

Q.    What else?

A.    Using it -- using my last money to get nicotine products instead of necessities.

Q.    So these are examples -- let me -- let me take a pause before I ask another question.  Do you need to take a break?

A.    No, sir, I'm fine.

Q.    Are you sure?

A.    Yes, sir.

Q.    So are you saying using money to buy a nicotine product instead of things like food or gas?

A.    Gas in my car, right.

Q.    How often has that occurred?

A.    More than I can count.  More than I can count.

Q.    And the nicotine products that you have purchased have been -- is that primarily Zyn and Black & Milds?

A.    Yes, sir.

Q.    Other than everything that we've discussed and using money on nicotine products instead of food and gas, are there any other attendant consequences from your nicotine addiction that we have not discussed today?

Page 142

A.    Probably inability to communicate when I'm ready to get my nicotine buzz.  I don't want to talk when I'm ready to smoke or when I'm ready to pop a Zyn.  Just makes you a crappy person.

Q.    So does that -- do you mean inability to communicate like -- not to communicate that you need a nicotine product, but just to communicate at all?

A.    Right.  Like you may just be trying to ask me where did I get my shirt from, but I'm ready to snap like why are you asking me all of those questions and stuff like that.

Q.    Okay.

MS. GOODMAN:  Are you sure you don't want to take a break?  We can all tell you're a little upset.  Do you want to take a little walk?

THE WITNESS:  I'm okay.  I need to get through it.  I just hate hearing that out loud.

BY MR. SCHWAB:

Q.    Just again, we'll keep offering it to you, but you're more than welcome to take a break whenever you need one.

A.    Yes, sir.

Q.    All right.  Okay.  So then other than everything that we've now discussed, including the couple of issues you just raised, are there any other

Page 143

negative consequences that you have suffered from your nicotine addiction?

A.   Can't do nothing without it, man.  Helps me get through.

Q.   Anything else?

A.   No, sir.

Q.   Okay.  When did you first start experiencing these negative symptoms?

A.   I'm not sure when it first started.  I can say I mostly noticed them when my wife started bringing them up once I -- once she started saying it to me and telling me how I was acting, then I just -- I ain't dumb, so just put it together.

Q.   So once your wife started raising some of these issues, that brought it to your notice.  Is that fair?

A.   (Witness nods head).

Q.   Once you noticed these issues, did you notice them changing over time?

A.   I wouldn't say it changed.  It could be I get a little more angry, a little more antsier, but it's more so it's making me act this way.

Q.   So is it fair to say these issues have been fairly consistent even though they may have increased in severity over time?

Page 144

A. Have the issues been consistent?

Q. Yes.

A. Yes, sir.

Q. Do you have a family history of anxiety?

A. Not to my knowledge.

Q. Did you have any issues with anxiety before you began using Zyn?

A. No, sir.

Q. Did you have any anger issues before you started using Zyn?

A. No, sir.

Q. So I'm at a natural stopping point for me if you want to take a break now.

MS. GOODMAN: Okay.

MR. SCHWAB: Or I can launch into the next set of questions.

MS. GOODMAN: How do you feel? You want to keep going?

THE WITNESS: It's all right.

MS. GOODMAN: Let us know if you get to a point where you want to take a break.

MR. SCHWAB: We'll keep going.

BY MR. SCHWAB:

Q. Do you believe the Zyn product is defective?

Page 145

A.    Yes, sir.

Q.    What do you believe to be defective about Zyn?

A.    The addictive nature, the way that you can think that it's safer or even more controllable, but you can't really control how much you suck it down.  You can stop smoking.  Sure you can say you can spit out the Zyn, but it tastes good.  It don't really make you think that you going to want the whole pack.  You know what I'm saying?  It's like you -- it seems like a controllable thing, a cool harmless controllable thing when it's the exact opposite.

Q.    Okay.  Are there any other ways in which you believe Zyn is defective?

A.    I mean, the overall appeal of it for it to actually be an adult product made me feel like it was cool, safe and it's not.  It just isn't.  It looks like candy, tastes like chewing gum and the effects are even worse.

Q.    Any other ways in which you think the product, the Zyn product is defective?

A.    I don't know.  I don't know.  No, sir.

MR. SCHWAB:  So I'm going to take a break.  Can we go off the record?

Page 146

MS. GOODMAN:  Yeah.

THE VIDEOGRAPHER:  Going off the record at 1:57.

(Recess taken -- 1:57 p.m.)

(After recess -- 2:02 p.m.)

THE VIDEOGRAPHER:  Back on the record at 2:02 p.m.

BY MR. SCHWAB:

Q.   Mr. Maultsby, do you understand that you're still under oath?

A.   Yes, sir.

Q.   When we took a break, we were discussing the ways in which you believe the Zyn product is defective.  Do you remember that?

A.   Yes, sir.

Q.   So I want to ask you about a few of your answers.  Okay?

A.   Mm-hmm.

Q.   You said that one way in which it was safer is that it was -- sorry, one way in which it was defective is that it was controllable.  Do you remember that?

A.   Yes, sir.  Well, it appeared controllable.

Q.   It appeared controllable.  Can you tell

Page 147

me a little bit more about what you mean when you say it appeared controllable?

A.   I'm not really a pro or well-versed in the subject, but I just felt like it was something that wouldn't be as needed or as harmful or like if you smoke a cigarette, smoke it two draws, you can flick it.  It's nothing.  It's nasty anyways.  You got a Zyn in your mouth, you suck on it for an hour and a half and you won't think about it.  Taste like mints.  You're not smoking.  You ain't choking, you know.

Q.   So it didn't have -- Zyn doesn't have some of the negative sensations that come with inhaling tobacco smoke.  Is that fair?

A.   Yes, sir.

Q.   And is that why it felt more controllable to you?

A.   I would just say -- yes, sir.  It felt more controllable because of that.  I feel like smoking is perceived as addiction automatically.  It just doesn't seem like something you would necessarily have to be addicted to.

Q.   You also said that you view the product as defective because it appeared safer.  And was that for similar reasons?

Page 148

A.   Safer than tobacco.

Q.   That's -- you just said safer.  Did you mean safer than tobacco?

A.   Yes, sir.

Q.   And is that for the same reasons that you just described?

A.   Yes, sir.

Q.   You also said that Zyn was defective because it looks like candy; is that correct?

A.   Yes, sir.  To me it does.  The packaging.

Q.   Is there a -- oh, so let me understand that.  So are you saying that the Zyn pouch itself looks like candy or the packaging looks like candy?

A.   The packaging look like a snack, look like a treat almost.  It's appealing.

Q.   And why?

A.   Why is it appealing to me?

Q.   Yeah.  Like why does it look like a treat to you?

A.   I mean, if you just take a look at some of the candy containers and things, it's quite similar, honestly.

Q.   Is it similar because of the shape of the package or what is similar to your eye?

A.   Color scheme, the shape.  The way that

Page 149

it's -- it looks -- the appearance of it.

Q.   What candy in particular are you thinking of when you're thinking it looks similar to Zyn?

A.   Pocket mints.  It's not a brand.  It's a thing.  You obviously know that, but just pocket mints in general.

Q.   Like -- so like a brand of pocket mint would be like an Altoid?

A.   Like Altoid or something like that.

Q.   Any other type of candy that you think the Zyn packaging brings to mind?

A.   It can look like an Ice Breaker packet but look like a Mentos pack probably.  There's not circular cans that are actually white, I don't think, if you were trying to get some of the candy silver or something I think.  It just don't look like the harsh.

Q.   Just so I'm sure, you're not saying, though, that the Zyn pouch itself looks like candy; is that right?

A.   It looks like a piece of gum.

Q.   What kind of gum do you think it looks like?

A.   I don't know if you're familiar with like a chicklet, the little two pack that comes in the

Page 150

little box, something like that or like anything. It's little white things, inconspicuous.  It looks like candy, man.

Q.   Chicklet is like a hard-shell gum?

A.   Mm-hmm.

Q.   It doesn't come in a cloth pouch, though, right?

A.   No.  But it's the same color.

Q.   And shape?

A.   And shape.

Q.   I see.  You also said that Zyn was defective because it was addictive; is that correct?

A.   In my mind, but I'm no expert.

Q.   Yeah.  I'm asking for your -- in your own view only.

A.   Do I think that Zyn is addictive? Highly.

Q.   And you think that makes it defective?

A.   From my understanding defective, as I said, I'm not a pro at it, but I think so.

Q.   And what is your understanding of defective?

A.   Not performing as it -- not performing. From my perspective, it's not performing as it was promised or as it was shown.  If I take something

Page 151

that's going to make your hair grow and there's Nair in the bottle, it's defective.

Q.   That's a good example.  So in your view, Zyn was not promised to be or shown to be addictive?

A.   Right.  It didn't seem as though it's an addictive product.

Q.   Okay.  So the last thing that you said -- at least that I have here in my notes that you said as to why it was defective -- is that it appeared cool.  Do you remember that?

A.   Yes, sir.

Q.   What do you mean by that?

A.   Cool, modern, not smoking tobacco, not walking around smelling like a bag of smoke, that's pretty much cool to me.  I can come in here with you-all and not smell like I just left the bar, but I still can get my feeling.

Q.   And that -- in your view, that made it defective because it wasn't performing the way it was promised?

A.   Actually I don't have a promise of what Zyn would have given me.  There's no -- I don't have a promise to go by.  I just...

Q.   When you're saying something 's defective, what is your understanding of defective?

Page 152

A.   Not working as it was supposed to.   It's not doing -- I don't know.   I'm not a -- I think that's left up to people that really know.   I don't know.

Q.   Did you think Zyn was not working as it was supposed to because it was, you know, didn't create smoke, didn't make you stink of smoke and all of those things?

A.   Ask me again.

Q.   Yeah.   Do you think that Zyn was not working as it was supposed to because it didn't make you stink of smoke?

A.   I wouldn't say that because overall I never thought that Zyn would do what it does.   I didn't think that it would be this -- it wouldn't have me like this.   I don't know.   I don't know.

Q.   Did you -- did you at some point think Zyn was not addictive?

A.   I wouldn't say that I thought that it was not, but I can't say that I knew that it was either.

Q.   And that would be true even if there was a warning label on the Zyn package that says it's addictive?

A.   Right.   Because like I said, I didn't even see it, to my remembrance; and if I did, didn't

Page 153

know what that really meant.  Candy can be addicting.

Soda can be addicting.  Alcohol can be addicting, but

that didn't necessarily mean I would be dependent on

it feeling tremors and having headaches and acting

certain ways.  I never thought that would be a part

of using Zyn.

Q.   Is alcohol a defective product because it

can be addictive?

A.   I don't know.  I don't drink alcohol.

Q.   You ever complain to anyone about any of

these issues that you say made the product defective?

A.   I don't recall.

Q.   Have you ever tried to return a purchased

package of Zyn on the basis that it was defective?

A.   No, sir.

Q.   Have you ever tried to return any

nicotine product on the basis it was defective?

A.   I don't think so, no, sir.

Q.   Is there anything you wish you knew about

the Zyn product before you used it --

A.   Yes, sir.

Q.   -- that you know now?  And what is that?

A.   That I would be here at this point in my

life where nicotine essentially runs my life.

Q.   So fair to say you wish you had known

Page 154

before using Zyn that nicotine was addictive?

A.   Yes, that it was so addictive.

Q.   What warnings do you think Zyn should have given to consumers?

A.   I'm not sure.

Q.   Do you have any ideas as to what warnings Zyn should have included on its cans?

MS. GOODMAN:  Form.

THE WITNESS:  I'm no expert, but probably could have included a pamphlet, more warnings. I'm not sure.  I'm really not sure, sir.

BY MR. SCHWAB:

Q.   Is there a particular warning or piece of information that Zyn could have included in its advertising or on its cans that would have prevented you from purchasing it?

MS. GOODMAN:  Form.

THE WITNESS:  Are you asking me is there anything that you-all could have put that could have warned someone -- warned me of the potential dangers of nicotine addiction?

BY MR. SCHWAB:

Q.   Yeah.  Is there something that if you had learned about it before purchasing and using Zyn, you would never have purchased and used Zyn?

Page 155

MS. GOODMAN:   Form.

THE WITNESS:   Yes.   If I knew what I know now, I would have never used Zyn.   I believe that's what you're asking me.

BY MR. SCHWAB:

Q.   That is what I'm asking.   So is it that if you had known that Zyn -- strike that.

When you purchased Zyn, did you know it contained nicotine?

A.   No, sir.

Q.   If you had known at the time you purchased Zyn that it contained nicotine, would you still have purchased it?

A.   I don't think that I would have, probably, but I wasn't sure of the addictions of nicotine or stuff like that.   In my mind it's tobacco.   That's my thought process, tobacco is bad, not nicotine.

Q.   So if you had known that both that Zyn contained nicotine and that nicotine is addictive, would you not have purchased it to begin with?

MS. GOODMAN:   Form.

THE WITNESS:   I wouldn't have done that.

BY MR. SCHWAB:

Q.   You would not have?

Page 156

A.   I would not have.

Q.   Do you know what warnings Zyn does give to consumers?

A.   I don't know word for word, so no, sir.

Q.   Can you say that again?

A.   I don't know it word for word, verbatim, but I -- so I'm not sure what it actually says, but I'm sure there's a warning on there now.

Q.   So is it fair to say you know that Zyn gives you some warnings, but you don't recall exactly what they are?

A.   Yes.

Q.   Do you recall reading any warnings that Zyn includes on its packages?

A.   No, sir.

Q.   Do you recall reading any warnings that Zyn included in any advertising?

A.   No, sir.

Q.   In your complaint that you allege that Zyn is not intended for people under the age of 26; is that correct?

A.   Say that again.

Q.   One of your claims in this case is that Zyn is not intended or should not be intended for anyone under the age of 26.

Page 157

A.    Okay.

Q.    Is that correct?

MS. GOODMAN:  Form.

THE WITNESS:  I believe so.

BY MR. SCHWAB:

Q.    Why do you believe that Zyn should not be used by anyone under the age of 26?

A.    Well, personally, to be addicted to a substance before you even fully have grown into a man or woman is completely unfair, especially under the pretenses that it was safe.

Q.    So two questions about that, why do you pick the age of 26 at the point in which you are fully grown into a man or woman?

A.    I believe that's how it goes.  You're not fully an adult until you're near 30s, like fully developed in the brain, physically, growing into your man size, man strength.  I'm speaking as a man.  Your build is different when you're 16.

Q.    Where did you acquire the information that led you to the belief that 26 was the correct age?

A.    I don't remember -- I don't recall where I first heard that information, but I do believe it to be true.

Page 158

Q.    You're aware that the legal age to purchase nicotine products is 21, correct?

A.    I can say I probably know that now, yes, sir.

Q.    When you first used Zyn, what ages did you think it was intended for?

A.    When I was growing up, I think you had to be, like, 18 to smoke and drink in Florida, I think. The age thing never really affected me as far as how old I was at the time.

Q.    Because you went to Jamal's, correct?

A.    That and my age at the different time.

Q.    And then you turned 18?

A.    Mm-hmm.

Q.    Yeah.  So when I first asked you about that age of 26, you said personally to be addicted to a substance before you've even fully grown into a man or woman is unfair, especially under the pretenses that it was safe.  Other than what we've discussed about the appearance of the package and the appearance of the product itself, what other reasons did you have to believe that Zyn was safe?

A.    There were no tobacco in it.  You don't have to smoke it.  If you just suck on it, there's no risk of dropping something on your clothing and

Page 159

burning yourself, staining your clothes with ashes, smelling like smoke.  Those are all better alternatives than tobacco use.

Q.   Anything else?

A.   Not that I can think of at this time.

Q.   You also allege in the complaint that Zyn should have included a warning that it delivered nicotine at levels greater than nicotine replacement therapies.  Does that sound right to you?

A.   Yes, sir.

Q.   Okay.  You've never used nicotine replacement therapy, correct?

A.   Correct.

Q.   And you've never investigated it as the possibility to quit nicotine?

A.   I've never tried.  I've seen Nicorette commercials before.  I've heard radio ads, but I never went to purchase the item, no, sir.

Q.   Do you know what levels of nicotine exist in Nicorette or other nicotine replacement therapies?

A.   No, sir, but I'm pretty sure it's a safe assumption to assume it's not as great as a cigarette or any other tobacco product.

Q.   Did you think that Zyn was a nicotine replacement therapy?

Page 160

A.    No, sir.

Q.    You mentioned earlier that you had gone to the hospital for COVID; is that correct?

A.    Mm-hmm.

Q.    When was that approximately?

A.    Somewhere near during the height of COVID, so it would have to be like 2020, somewhere up in there.  Around the heavy everybody-getting-sick times.

Q.    Were you severely sick with COVID?

A.    Yes.

Q.    Did you get admitted to the hospital?

A.    No.  I ain't get -- it wasn't even no room I don't think.  You know, the hospitals were -- came out to die, the thing that made you breathe, I don't think you was getting in at that time.

Q.    Tell me, can you describe just briefly like how badly you had COVID, what the symptoms were?

A.    Bad.  Couldn't work.  Couldn't hold anything down.  Sore throat.  Can't taste.  Couldn't smell.  That was like my first time catching it and that was like the absolute worst.  It was like the worst cold you could ever get.  The worst flu you ever get.  It was -- I had a lot of phlegm, a lot of difficulty breathing.  Had to sit up a lot.  Laying

Page 161

down made it horrible.  It was just a rough experience.  The best way I can describe COVID is an extreme flu or something.

Q.   How long did it take you to recover from that first bout of COVID?

A.   Well, within -- around that time it was -- the standard procedure was you get your first positive and I think you tested like three days later and then a week later.  It was like a little process they had.  You had to go through the thing, get it up your nose.  It was a -- whatever the recommended bout was before they said you wasn't no longer contagious. That was the time frame I was technically down or...

Q.   Did you still have symptoms after you were no longer contagious?

A.   It took me a while to get my taste back, my smell.  My senses were low after that sickness.

Q.   Have you ever been evaluated for whether you have long COVID?

A.   I'm not sure, no, sir.  I haven't done any follow-ups.  Just at that time fear.  I got to go to the hospital.  It wasn't...

Q.   Did you contract COVID subsequently?

A.   Mm-hmm.

Q.   Have you had it more than once?

Page 162

A.   Yes, sir.

Q.   How many times?

A.   I think I had COVID like three times.  I probably had up to like -- well over five positives, but you can't say you had it from the same instance.

Q.   So three instances?

A.   That I can for sure say I tested positive, yeah.

Q.   Were the other two as severe as the first one you describe?

A.   No.  It gets better.  Except for the -- well, the third time I think it was a mutation and it wasn't as severe, but I was still sick.  It just gets -- it hits you differently each time.

Q.   Did you -- so the second and third time, did you have different symptoms than what you just described, additional ones?

A.   I wouldn't say additional.  I wasn't as down and out body-wise.  The aches or the -- what's the word?  I wasn't as lethargic, able to hold my head up, able to drive a little bit, go to the store, go to Publix and get me a little soup, stuff like that.

Q.   Did you have any brain fog when you had COVID?

Page 163

A.   I was out of it, man.  Brain fog.  I wasn't really trying to focus on any activities.  I was genuinely sick at those times, so I would say yes because I wasn't trying to -- it was nothing.

Q.   Approximately when was the last time you had COVID?

A.   I think I last contracted COVID when I came back from my honeymoon, I think.  That was around '22, the end of '22, beginning of '23.  Somewhere in there.

Q.   Okay.  I want to change gears here and talk about Zyn advertising.  Okay?

A.   Okay.

Q.   Can you describe any specific Zyn advertisement that you've seen?

A.   They be on the pole.  Like I know at Wawa there is one over there by the vacuum on the pole.  Sometimes you'll pull up in front of a store.  I'm not sure about, like, mainstream gas stations, but neighborhood store and stuff have parking bollards in front of the door.  You pull up and there's poles so you can't drive into the store and sometimes there be a little thing on there like it be -- depending on the store, because it's not going to be like a Wawa or a RaceTrac, but stores that have burglar bars on

Page 164

the window, they like to put the size with the ZIP ties inside of the burglar bars and stuff like that.

Q.   Yep.  Any of those stand out to you in your mind like where you can say to me oh, I remember I saw, you know -- I saw this -- I remember seeing this one that was a picture of a beach?

A.   No.  I can't really remember the specifics of the signage, no, sir.

Q.   Do you remember seeing any Zyn advertising other than on the outside or inside of stores?

A.   I don't recall.

Q.   Do you remember seeing any Zyn advertising on television?

A.   Not a big TV watcher.

Q.   Is that a no?

A.   That's a no.

Q.   Have you seen any Zyn advertising online?

A.   Possibly.  I'm not sure.

Q.   Any specifics in advertising that you can remember seeing online?

A.   Not sure.

Q.   You said earlier that you are locked out of your -- or have no control over your Facebook account; is that correct?

Page 165

-WPD   Document 211-6   Entered on FLSD Docket 04/06/2026   Page 166 of 237

A.   That's correct.

Q.   When did you get locked out of that account?

A.   Probably 15 years ago.  It's -- if you ever go look at it, however I looked back then, you can tell I was obviously super young.  I just did away with it, but didn't delete it properly.  Now you can go in and see me on there.

Q.   So when you were like 15 or something?

A.   Yeah.

Q.   Okay.  Do you, even though you can't get into that account, do you -- in the 15 years since, do you still go on Facebook?

A.   No, sir.

Q.   Do you go on any social media sites?

A.   When I do scroll, it's like laying in the bed, my wife showing me a video, things like that.  Like I do see social media, but am I active in community, no, I don't post.  None of that.

Q.   And when you -- when you look at social media, is it primarily your wife showing you social media?

A.   Yes, sir.

Q.   Do you have an Instagram account?

A.   No, sir.

Page 166

Q.   Do you ever scroll Instagram yourself?

A.   Yes, accompanied.  It's like we scrolling together.  We just laying in the bed just chilling.

Q.   Okay.

A.   Like that.

Q.   But you're never, like, on your phone just randomly looking at Instagram by yourself?

A.   No, sir.

Q.   Is that -- how about TikTok?  Do you and your wife look at TikTok together?

A.   Yeah.  She has a TikTok.

Q.   Same thing where you're looking at it with her only?

A.   Yes, sir.  That's like a together time.

Q.   How about does she have a -- sorry.  Strike that.

You have -- other than the defunct Facebook account, you have no social media accounts?

A.   No, sir.

Q.   Does she have any other social media accounts other than Instagram, Facebook, and TikTok?

A.   No, sir.

Q.   So you don't look at Snapchat with her?

A.   No.

Q.   Or X.com formerly known as Twitter?

Page 167

A.    No, I don't do Twitter.

Q.    Any other social media that you look at with her that you can think of?

A.    No, sir.  No.

Q.    Was the first time that you saw any of the Zyn advertising that you've described after you first purchased Zyn at Jamal's?

A.    I believe so, yes, sir.  First time I actually noticed it.

Q.    Right.  Have you seen Zyn advertising in magazines?

A.    No, sir, I don't read magazines.  No, sir.

Q.    Do you listen to podcasts?

A.    Not really, no, sir.

Q.    To your recollection, did you ever hear a Zyn advertisement on a podcast?

A.    No.

Q.    How about on the radio?  Have you ever heard Zyn on the radio?

A.    I want to say possibly.  I don't think so, no.

Q.    Nothing you can recall today?

A.    Nothing I can recall, right.

Q.    Have you seen Zyn advertising on

Page 168

billboards?

A.   Not to my recollection, no, sir.

Q.   Every Zyn advertisement you've seen said that Zyn contained nicotine, correct?

MS. GOODMAN:  Form.

THE WITNESS:  I can't say that truthfully without guessing or making up a fabricated answer for you.  I can't say that truthfully.

BY MR. SCHWAB:

Q.   Do you recall seeing in the advertisement for Zyn that did not say that Zyn contained nicotine?

A.   Did I say advertising that said Zyn does not contain nicotine?

Q.   No.  Did you see a Zyn advertisement that did not include a statement Zyn contains nicotine?

A.   Can't recall.

Q.   Can you recall seeing any Zyn advertisement that did not include the statement that nicotine is addictive?

A.   No, sir.  I don't -- I don't pay much attention to signs.

Q.   So I know you can't remember any specific Zyn advertisements, but did you have any impression of what Zyn advertising meant to you?

A.   No, sir.

Page 169

Q.   Did you come to any understanding about Zyn based on the advertising you described?

A.   Did the advertising help me understand what Zyn is and was?  Is that what you're asking me?

Q.   Yes.

A.   No.

Q.   Did any advertising make you want to use Zyn or -- sorry.  Strike that.

Did any advertising make you want to continue using Zyn?

A.   I can't say that truthfully, no, sir.

Q.   Did any of the advertisement that you saw, so separate and apart from the packaging and everything we already discussed, did any of the advertising that you saw make you think that Zyn was safe?

MS. GOODMAN:  Form.

THE WITNESS:  I don't know.  I don't know.

BY MR. SCHWAB:

Q.   Did any of the advertising you saw make you think that Zyn was cool?

MS. GOODMAN:  Form.

THE WITNESS:  The advertisement wouldn't make me think it was cool, no.

Page 170

BY MR. SCHWAB:

Q. Did any Zyn advertising you saw make you think that Zyn was youth-oriented?

MS. GOODMAN: Form.

THE WITNESS: You said excluding packaging?

BY MR. SCHWAB:

Q. Right. I'm talking about just advertising, not the packaging.

MS. GOODMAN: Form.

THE WITNESS: I wouldn't know because I didn't -- I haven't necessarily paid attention to the signs. Still don't pay attention to the signs to this day.

BY MR. SCHWAB:

Q. Did any of your friends use Zyn when you started using Zyn?

A. Not to my knowledge.

Q. The first time you bought Zyn at Jamal's, was that the first time that you had seen a package of Zyn?

A. I think so, yes, sir.

Q. Do you remember what the package looked like at that time?

A. It was round. I know that, I believe.

Page 171

Pretty much all I remember about that.  I didn't really take in that day.  Never thought I'd be time stamping that time, so I didn't really take in too much about it, but I -- no.

Q.   Do you remember what color it was?

A.   I think it was the green one.

Q.   Was the package the same size as it is today?

A.   I literally physically couldn't tell you that.

Q.   Have you ever compared Zyn's packaging to the packaging of other nicotine pouch brands?

A.   No, sir.

Q.   So just so I have this right, you have not seen any advertising or marketing for Zyn on Instagram to your recollection?

A.   Correct.

Q.   You have not seen any advertising or marketing for Zyn on Facebook to your recollection, correct?

A.   Correct.

Q.   Have you seen any advertising or marketing for Zyn on Reddit?

A.   On Reddit?  No.

Q.   Have you seen any advertising or

Page 172

marketing for Zyn on Snapchat?

A.   No.

Q.   You have not seen any advertising or marketing for Zyn on TikTok, correct?

A.   Correct.

Q.   And you have not seen any advertising or marketing for Zyn on Twitter or X.com, correct?

A.   Correct.

Q.   Have you ever seen a Zyn tent or trailer or truck at an in-person event?

A.   No, sir.

Q.   Have you ever heard about Zyn tents being present at events?

A.   No, sir.  I don't go to events.  Just church events.

Q.   I apologize if I asked you this already. Have you ever been on the website Zyn.com?

A.   No, sir.

Q.   Have you ever visited other websites, not Zyn.com, to gather information about Zyn?

A.   No, sir.

Q.   Have you ever purchased Zyn online?

A.   No, sir.

Q.   So we just talked about social media sites.  Have you seen Zyn advertisements online on

Page 173

other sites?

A.   Mentally I'm trained to ignore ads honestly, so no, sir.  Ads are a nuisance to me.

Q.   So would it be fair to say whatever -- whether you've seen or not, ads, they did not make any impression on you?

MS. GOODMAN:  Form.

THE WITNESS:  I probably could -- I would say I just -- you said did they not make an impression on me?  I was busy trying to skip it.

BY MR. SCHWAB:

Q.   That's fine.

A.   Yeah.

Q.   Have you ever seen any social media content with people promoting their own personal use of Zyn?

A.   I don't know.  I may have seen someone using a nicotine pouch online, but to say it was a Zyn is not fair.  I'm not sure.

Q.   Have you ever heard the term Zynfluencer?

A.   I've heard of that.

Q.   And what does that term mean to you?

A.   That's like -- that would be someone who's a social media influencer that pushes Zyn, just off of the name alone.

Page 174

Q.   Have you ever seen any posts from anyone like that that you're aware of?

A.   If they passed my page, I would have changed it.  That would have made me cringe.

Q.   Have you ever received any e-mails about Zyn?

A.   I don't think so.

MR. SCHWAB:  This is a good breaking point for me.  Can we take a short break?

MS. GOODMAN:  Sure.

THE VIDEOGRAPHER:  Going off the record at 2:39 p.m.

(Recess taken -- 2:39 p.m.)

(After recess -- 2:49 p.m.)

THE VIDEOGRAPHER:  We are back on the record at 2:49 p.m.

BY MR. SCHWAB:

Q.   Good afternoon, Mr. Maultsby.  Do you understand that you are still under oath?

A.   Yes, sir.

Q.   Before we took a break, I was asking you about Zyn advertising and marketing.  Do you remember that?

A.   Yes, sir.

Q.   And now I'm going to show you a few --

Page 175

and I know you said you don't focus on advertising and marketing.  I'm going to show you a few examples now.  Okay?

A.    Okay.

(Exhibit No. 8 was marked for identification.)

BY MR. SCHWAB:

Q.   Going to ask the reporter to hand you what will be marked as Exhibit 8.  Do you recognize this document?

A.    No, sir.

(Exhibit No. 9 was marked for identification.)

BY MR. SCHWAB:

Q.   I'll ask the reporter to hand you what has been marked as Exhibit 9.  Same question, do you recognize this advertisement, sir?

A.    No, sir.

(Exhibit No. 10 was marked for identification.)

BY MR. SCHWAB:

Q.   I'll ask the reporter to hand you what has been pre-marked as Exhibit 10.  Mr. Maultsby, do you recognize this document?

A.    No, sir.

Page 176

Q.   Do you recall having seen this particular piece of advertising in the past?

A.   No, sir.

(Exhibit No. 11 was marked for identification.)

BY MR. SCHWAB:

Q.   I'll ask the reporter to hand you what has been marked as Exhibit 11.  So same question, and Mr. Maultsby, have you seen this advertisement before?

A.   No, sir.

(Exhibit No. 12 was marked for identification.)

BY MR. SCHWAB:

Q.   I'll ask the reporter to hand you what has been marked as Exhibit 12.  And I'll ask you the same question, have you seen the advertisement in Exhibit 12 before?

A.   No, sir.

Q.   Okay.  You can put those aside.  Are there any particular statements or slogans that Zyn has used in its advertising that you consider misleading?

A.   Not to my recollection, no, sir.

Q.   We've talked a few times today about your

Page 177

belief that Zyn was safer than a tobacco product.  Is

that correct?

        A.   Yes, sir.

        Q.   And you said that one of the reasons for

that, I think, you said that one of the reasons for

that is that Zyn did not contain tobacco; is that

correct?

        A.   Correct.

        Q.   What caused you to believe that Zyn did

not contain tobacco?

        A.   It's not a tobacco product.  It doesn't

say tobacco.  And when you put it in your mouth, it's

clearly not brown.  Doesn't stink like a tobacco

product.  Usually tobacco got to be smoked and if

it's mouth tobacco, I think it's wet.  It's --

        Q.   And it's brown -- is it fair to say,

like, a mouth tobacco is brown?

        A.   Right.

        Q.   Because --

        A.   It doesn't look like a mouth tobacco,

chewing tobacco.

        Q.   Sitting here today, do you think that Zyn

does contain tobacco?

        A.   I assume so, yeah.  I don't see any

tobacco, if that's what you're asking.  I don't see

Page 178

any tobacco.

Q.   So why do you think Zyn contains tobacco as opposed to containing just nicotine?

A.   Well, it do the same thing.  Did the same exact thing.

Q.   Are you aware of any other -- any other plants or vegetables from which nicotine can be derived other than tobacco?

A.   No, sir, I don't.

Q.   Do you know if nicotine can be created synthetically in a laboratory?

A.   I'm not sure.

Q.   If nicotine created synthetically in a laboratory had the same effect as nicotine derived from a tobacco leaf, would you have a preference for one or the other?

A.   I'm not in that situation, sir, so I can't say.

Q.   Would you agree that nicotine does not contain tobacco leaves?  Sorry.  Strike that.  That was a terrible question.

Would you agree that Zyn does not contain any tobacco leaves?

A.   At this point I don't know what it contains.  I haven't done a chemical analysis.  I

Page 179

don't know.

Q.   Do you have any understanding of where the nicotine in Zyn comes from?

A.   No, sir.

Q.   Are you aware of any products, including Zyn, that use nicotine that was created in a lab?

A.   No, sir.  Not really an expert on nicotine and tobacco.

MS. GOODMAN:  Let me just instruct the client because I -- just in terms of where this questioning is going.  There may be some questions and some of the past questions are things that you may know something because of conversations you had with attorneys, but only answer as to information that you have that's totally separate from things you may have learned in consultation with your attorneys.

THE WITNESS:  Okay.

BY MR. SCHWAB:

Q.   And to be clear, I don't want you to answer about any questions that -- with information you've learned from your attorneys.

A.   Okay.

Q.   Do you think there's any difference between nicotine and tobacco -- do you think there's

Page 180

any difference between nicotine and tobacco as it relates to health?

MS. GOODMAN:  Form.

THE WITNESS:  The consumption at this point I think I would say is different.  I don't have to smoke a Zyn.

BY MR. SCHWAB:

Q.  So that would be a difference between a cigarette and a Zyn or a cigar and a Zyn, correct?

A.  No, sir.  You said what's the difference between tobacco and Zyn, didn't you?

Q.  Yeah.  Let me ask the question again.  Do you think there's any difference between nicotine and tobacco as it relates to health?

MS. GOODMAN:  Form.

THE WITNESS:  Do I think there's a difference -- do I think there's a difference between nicotine and tobacco when it comes to health?  I feel like just nicotine won't give you lung cancer because you don't have to smoke it.  It's about the form of use for me.  That's what I think is different about it.

BY MR. SCHWAB:

Q.  Do you think there's any difference as to health between chewing tobacco and nicotine?

Page 181

MS. GOODMAN:  Form.

THE WITNESS:  As it relates to health?

BY MR. SCHWAB:

Q.   As it relates to health.

A.   I mean, one of the pretty obvious things is you won't have brown goop down your teeth and down your gums, just like it's cleaner.

Q.   Anything else you can think of?

A.   The difference between tobacco and nicotine -- chewing tobacco and nicotine when it's related to health, I'm not sure.  I'm not really -- I don't know the exact -- the exact -- I don't know all about it.

Q.   You've explained a few times today that you believe Zyn was safer than smoking cigarettes.  Did you have a view as to whether Zyn was safer than other nicotine pouches?

A.   Honestly, Zyn is how I got introduced to nicotine pouches and as it shows, I've pretty much stuck with that one kind within that spectrum of flavors.  I never really ventured out.  If it ain't broke, don't fix.

Q.   Do you think that Zyn is more addictive than other nicotine pouch brands?

MS. GOODMAN:  Form.

Page 182

THE WITNESS:  I wouldn't be able to compare.

BY MR. SCHWAB:

Q.   Do you think Zyn is more addictive than cigarettes?

MS. GOODMAN:  Form.

THE WITNESS:  Yes.

BY MR. SCHWAB:

Q.   Why?

MS. GOODMAN:  Form.

THE WITNESS:  Ease of use.  I can do it whenever, however.  Don't got to inconvenience others.

BY MR. SCHWAB:

Q.   So I'm going to ask you about this lawsuit and your familiarity with the legal system. Okay?

A.   Okay.

Q.   My understanding, from your interrogatory responses, is that you have been involved in two prior lawsuits; is that correct?

A.   Well, I am not really sure how it turned out.  I started out with a claim.  A car wreck claim and I -- I don't know if it really finished as a lawsuit.  I'm not too sure.  It's all wrapped up now,

Page 183

but I'm not too sure if it was like an actual lawsuit.

Q.   Let me -- and I can show you the interrogatory in a second if this doesn't refresh you, but I'll tell you what the two that you identified were and see if this helps.  One was Darryl Maultsby, II versus Wukitsch, Leah.

A.   That's the car accident.

Q.   And it involved an automobile accident. And the second one was a lawsuit between you and Chamberlin, Randy also involving a car accident?

A.   Yes, sir.

Q.   Okay.  As to the Leah case, when did that accident occur?

A.   I believe it was the end of 2022.

Q.   Were you the plaintiff in that case?  Did you sue Mr. or Ms. Leah?

A.   Yeah.  I was the person that got hit.

Q.   You said earlier that you had suffered PTSD from an automobile accident.  Was this the accident?

A.   Yes.  It made me, like, very, very -- I hate when people drive up behind me when we sit at lights now.  I need you to stop on brakes in enough time because when you're not really paying attention

Page 184

and they hit you from the back, it does bother you later.

Q.   So, I'm sorry, is Wukitsch, Leah a man or woman?

A.   Leah, that's a lady.

Q.   Oh, Leah's the first name.  Okay.  So did -- Ms. Wukitsch rammed you from behind with her car?

A.   Uh-huh, yes, sir.

Q.   Did you suffer any physical injuries?

A.   Yes, sir.

Q.   What happened just at a high level?

A.   My lower back, my shoulder.  I have several torn things and stuff like that.  I don't know the exact terms, but there's stuff wrong with my back and my shoulders.

Q.   Was it a pretty severe accident?

A.   No one died.

Q.   Short of anyone dying, though, it sounds like it was -- she hit you pretty hard; is that fair?

A.   Yes, sir.

Q.   The second lawsuit is against Randy Chamberlin, also an automobile accident.  Were you also hit in that example?

A.   Yes, sir.

Page 185

Q.   And did you have any physical injuries there?

A.   Yes, sir.

Q.   High level, what happened to you there?

A.   Same thing, different areas of my back, different parts of my shoulder, my neck was injured. Just the common things that come with a car crash.

Q.   Did you get rear-ended again in this instance?

A.   Yes, sir.

Q.   Did you have any PTSD or other mental suffering from that car accident, the Chamberlin one?

A.   I mean, to this day I'm leery at red lights because both times it happened at the light doing the right thing and they texting and driving, drive right into the back of you, boom.  It already happened.

Q.   Do you remember how these lawsuits resolved?

A.   They just -- I don't really know the legal process that my lawyers took.

Q.   Do you remember if there was a trial where you had to testify in front of a jury?

A.   No, sir.  I didn't do that.

Q.   Okay.  Would it -- does it sound right

Page 186

that those cases reached some sort of settlement outside of court?

A.   Yes, sir.

Q.   Okay.

A.   I didn't go to court.

Q.   Other than those two cases, have you been involved in any other lawsuits?

A.   No, sir.

Q.   In any other -- in any other capacity?

A.   No, sir.

Q.   Have you ever received money from a class action settlement?

A.   I don't think so.

Q.   Have you ever tried to join a class action case other than this one?

A.   No, sir.

Q.   Have you ever filed a workers' compensation claim?

A.   Workers' compensation?  No.

Q.   Have you ever filed for bankruptcy?

A.   I don't think so.

Q.   Have you ever testified in court?

A.   No, sir.

Q.   Do you know if your father has ever been involved in class action cases?

Page 187

A.   I wouldn't know.  I don't think so.

(Exhibit No. 13 was marked for identification.)

BY MR. SCHWAB:

Q.   Okay.  I am going to hand you what will be marked Exhibit 13.  Have you seen this document before, Mr. Maultsby?

A.   Yes, I have.  I forgot about this.

Q.   So what is this document?

A.   It is a class action complaint.

Q.   At the top it says the plaintiffs are Sean burke, Huy Tran, Nadia Ali and Darryl Maultsby. Do you see that?

A.   Yes, sir.

Q.   Is that Darryl Maultsby you?

A.   Yes, sir, I remember this now.

Q.   Okay.  So you have been involved in a class action case before, correct?

A.   Yes, sir.

Q.   What is this case about?

A.   Basically the drink had too much -- it fermented too far.  It was supposed to have alcohol in it and it's all health benefits.  I wasn't looking to get drunk.  I remember that.

Q.   So this is a lawsuit about a Kombucha

Page 188

drink where the allegation was it fermented until it contained alcohol?

A.   Yes, it was supposed to be for gut health and there was alcohol within it.

Q.   So when did you become involved in this class action lawsuit?

A.   To be honest, it's been a while.  I really don't remember.  I forgot all about it honestly so -- and the time frame I couldn't tell you.  It's probably on here, though.

Q.   If you look at the bottom, it says filed 10/6/22.  Do you see that?

A.   Okay.  Yes, sir.

Q.   Does that sound about right that you became involved in this case in 2022?

A.   Probably so, yes, sir.

Q.   Do you know what has happened to this case?

A.   It's done.

Q.   It's over?

A.   Yes, sir.

Q.   Did you continue to serve as a class representative in this case all the way through the conclusion?

A.   I guess.  I don't know.

Page 189

Q.   How did you become involved in this case?

A.   Well, we was -- I was on my little healthy journey with gut balance and stuff like that and -- how did I get to this?  I really think I just looked -- somewhere I heard about it being alcohol in it and I went and I searched and I just tried to contact someone regarding that and that had to be one of the Google recommendations that came up.

Q.   Similar to how you found your lawyers in this case?

A.   Through Google, yes.

Q.   Okay.  If you turn to page 30.

A.   30.

Q.   So almost all the way to the end.

A.   Okay.

Q.   Turn back a little bit.  There's a signature page on page 30.  So were these your -- the lawyers representing you in this case?

A.   Yes, sir.

Q.   Did you reach out to any of these lawyers with your concerns about nicotine?

A.   No, sir.

Q.   Why not?

A.   Because at the time I wasn't really aware that I was addicted to nicotine.

Q.   Well, sorry.  When you -- you described earlier that you saw some kind of a post or advertisement that made you think you might be addicted to nicotine and you reached out to the Schlesinger Law Firm, correct?

A.   Yes, sir.

Q.   At that time that you reached out to the Schlesinger Law Firm, did you consider reaching out to any of these lawyers from your Kombucha class action?

A.   No, sir.

Q.   Why not?

A.   Because I did my own research again and I found somebody different.

Q.   Okay.  Were you dissatisfied with any of these attorneys?

A.   They didn't do nothing bad to me.

Q.   Did this case settle?

A.   I'm assuming so.  I never been to court.

Q.   Did you receive a payment?

A.   Yes, sir.

Q.   How much?

A.   Do I have to answer that?  They made me sign an NDA.

Q.   What's that?

Page 191

MS. GOODMAN:  They had you sign an NDA?

THE WITNESS:  (Witness nods head).

MS. GOODMAN:  Then you cannot disclose it at this time.

BY MR. SCHWAB:

Q.   So you signed -- I just want to make sure I have the record clear.  You signed a nondisclosure agreement or NDA as to the settlement amount; is that correct?

A.   As to the case, period, honestly, but I'm here, I can't lie, but I'm not supposed to mention it or talk about it.

MS. GOODMAN:  Yeah.  You should not mention anything and the attorneys can file some kind of motion to set that aside or to have a limited disclosure, but we're not at a point to address that today.  So you should not answer any more questions about the settlement or -- we can go outside and he may -- maybe he can -- I don't think he can answer any questions.  I don't know how broad that NDA is and I'm learning about it for the first time today.

MR. SCHWAB:  We are going to ask for the NDA to be produced in this litigation as that's the basis that he can't talk about this anymore.

Page 192

BY MR. SCHWAB:

Q.   I have some other questions about the NDA, but consistent with your lawyer's instruction here, I'm not asking you for any specifics about the document itself or about anything else that is contained in that NDA or in the settlement agreement. Okay?  So please don't offer that in response to my questions.

A.   Okay.

Q.   Were you presented by -- with the NDA by your attorneys in that case?

A.   (Witness nods head).

Q.   And did you read it and sign it?

A.   Yes.

Q.   And send it back to your lawyers?

A.   Yeah.

Q.   Do you still have a copy of that document?

A.   No.

Q.   Would your lawyers still have a copy of that document?

A.   Possibly.

MS. GOODMAN:  Form.

(Exhibit No. 14 was marked for identification.)

Page 193

BY MR. SCHWAB:

Q.   Okay.   I am now going to ask the court reporter to mark an exhibit as Exhibit 14.

MS. GOODMAN:   Another lawsuit?

MR. SCHWAB:   Yes.

THE WITNESS:   What is this?

BY MR. SCHWAB:

Q.   And we're not going to dig into this in any great detail.

MS. GOODMAN:   I think we'll take a break. There's no question pending?

MR. SCHWAB:   There's not a question pending.

MS. GOODMAN:   Want to make sure that we navigate any other NDAs that I wasn't aware of properly.

MR. SCHWAB:   Sure.   Can we go off the record, please?

THE VIDEOGRAPHER:   Going off the record at 3:13 p.m.

(Recess taken -- 3:13 p.m.)

(After recess -- 3:22 p.m.)

THE VIDEOGRAPHER:   Back on the record at 3:22 p.m.

BY MR. SCHWAB:

Page 194

Q.   Mr. Maultsby, do you understand you're still under oath?

A.   Yes, sir.

Q.   So I'm going to have you to look at Exhibit 14, which you were handed before you asked to take a break.  Okay?  Do you recognize this document?

A.   Yes.

Q.   What is this document?

A.   It is a class action complaint.

Q.   And if you look over the bottom half of the page in the left-hand side, you'll see a whole bunch of names.  Do you see that?

A.   Yes, sir.

Q.   And among those names it reads DM, D period, M period, a minor, by and through their guardian ad litem Darryl Maultsby.  Do you see that?

A.   Yes, sir.

Q.   Is this Darryl Maultsby here you?

A.   Yes.

Q.   And who is DM?

A.   That would be me.  It was a misunderstanding as far as how it was made.  They clearly didn't explain it properly because what I'm reading now is not what they told me on the phone.

Q.   So let me ask you where it says DM --

Page 195

strike that.

If you look at the top of the page, Mr. Maultsby, you will see something that says filed 1/15/25.  Do you see that?

A.   Yes, sir.

Q.   So this was filed a year ago today.

A.   Okay.

Q.   So you were not a minor a year ago today, correct?

A.   No, sir.

Q.   All right.  So when it says here DM, a minor --

A.   Mm-hmm.  That's incorrect.

Q.   It's simply incorrect; is that right?

A.   Yes, sir.

Q.   Mr. Maultsby, do you have any children?

A.   No, sir.

Q.   Do you have any nieces or nephews who go -- sorry, strike that.

Do you have any nephews that go by DM?

A.   No.

Q.   Any nieces that go by DM?

A.   No, sir.

Q.   Can you explain how your name came to appear incorrectly in this caption?

Page 196

A.    Well, from my understanding, this was for TikTok.  At the time I would have had the account and it basically was saying that we were exposed to -- I think they were taking our information or exposing us to information, but now I'm seeing it was for a child and I'm clearly not a child so I have to get that corrected.  That's all I can tell you.  I'm clearly not a minor.  I don't have any children.  So there was a misunderstanding with the person who, I guess you say, intook me, did the intake on me.

Q.    Oh, yeah.  Intake.

A.    Okay.  So...

Q.    So if you turn to page 7 of this document.

A.    Okay.

Q.    Paragraph 25 --

A.    Okay.

Q.    -- says again, plaintiff, DM, a minor by and through their guardian ad litem, Darryl Maultsby, it says plaintiff DM and Darryl Maultsby are natural persons and residents and citizens of the state of Florida.

A.    Uh-huh.

Q.    Do you see that?

A.    Uh-huh.

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Q.   And then again it's true that you were a resident in the State of Florida at this time, correct?

A.   Yes, sir.

Q.   But there was no person DM, correct?

A.   Yeah.   I'm DM.   I'm Darryl Maultsby.

Q.   Okay.   It also says, during the class period, DM created and used a TikTok account while under the age of 13.   That is false?

A.   Yes, sir.

Q.   You also told me earlier that you did not have a TikTok account, correct?

A.   I don't have one at this time, no, sir.

Q.   So it's also false that you use a TikTok account, correct?

MS. GOODMAN:   Form.

THE WITNESS:   To this day, right, that's false.   I don't use TikTok today.

BY MR. SCHWAB:

Q.   Now, you did say earlier that your wife has a TikTok account?

A.   Yes, sir.

Q.   Correct?   It says here that you regularly viewed content on the TikTok platform.   Is that part of this accurate?

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

A.    That would be accurate for the time.

Q.    That you regularly looked at TikTok?

A.    Yeah.  I visited it, showing me videos, look this up, look that up.

Q.    Oh, in the same way you described earlier where the two of you would be scrolling the platform?

A.    The same thing, that's the time.

Q.    Okay.  Before I showed this to you today, did you realize that you had been included as a 13-year-old plaintiff when in fact you are a grown adult?

A.    No, sir.  I didn't know it was like that. It wasn't -- I would never put it for a child.  I thought it was just for TikTok accounts in general.

Q.    When you spoke to the lawyers about being included in this lawsuit, did you explain that you never created your own TikTok account?

MS. GOODMAN:  Let me just instruct you that just like you can't reveal our attorney/client privilege, you shouldn't reveal any attorney/client privilege in the other case.

THE WITNESS:  That's something I spoke with my lawyer about.

BY MR. SCHWAB:

Q.    And spoke only after you had retained

Page 199

them as your lawyer?

MS. GOODMAN: It can be before you retained a lawyer. In consultation with an attorney, it's still covered by attorney/client privilege, so any conversations with your attorneys you should not reveal here.

THE WITNESS: Okay.

BY MR. SCHWAB:

Q. And you'll take your attorney's advice?

A. On?

Q. Not --

MS. GOODMAN: I'm instructing you. It's not advice to be taken or not taken. I'm instructing you --

THE WITNESS: Yes, ma'am.

MS. GOODMAN: -- that just like our attorney/client privilege, you have attorney/client privilege with attorneys on other cases that should not be revealed today.

THE WITNESS: Okay.

BY MR. SCHWAB:

Q. Without revealing any privileged information, how did you decide to become involved in this lawsuit?

A. I don't think I can say. I don't think I

Page 200

can say.

Q.   So the only information you have about how you decided to become involved in this lawsuit is from communications with these lawyers?

A.   Yeah.

Q.   Do you know anything about this lawsuit that you can share with me that did not come from the lawyers?

A.   That TikTok mishandled information for TikTok users is what I was under the impression of. TikTok users were -- I wouldn't even say a data breach or something to that extent had happened.

Q.   Okay.  So I -- I asked you earlier today if you had been involved in any other class actions and you told me no.

A.   Right.

Q.   Remember that?

A.   Yeah.

Q.   And since then I've shown you two different lawsuits that were class actions that you were involved in, correct?

A.   Okay.

Q.   So, right?

A.   I mean --

Q.   You were involved in the Kombucha class

Page 201

action?

A.   Yes, sir.

Q.   And you're also involved in the class action I just showed you related to TikTok, correct?

A.   Okay.

Q.   So I'm going to ask again, are there any other class actions now, other than this case, the Kombucha case, and the TikTok we just looked at, are there any class actions that you are involved in?

A.   I don't want to make up anything, but I honestly don't think so, sir.  I don't remember.  I didn't even remember this honestly -- or this one.  I didn't even remember this one, so let me just say no. I don't -- if I do, I don't remember.

Q.   For the record, when you're saying you don't remember, you're referring to the Kombucha case, correct?

A.   Yeah.  I didn't even remember about this. I didn't even think to mention this.

Q.   Did you remember the TikTok case?

A.   I remember how it comes about now.  I just know that now it's incorrectly done.  What you're telling me and what I'm seeing here is not what the person on the phone was explaining to me.

Q.   Okay.  And again, I don't want any

Page 202

communications with your attorney.  Thank you.  Just so I have this clear, at any point in time have you ever had your own TikTok account?

A.   Yes, sir.

Q.   When was that?

A.   A couple years ago.  It's been a few years since I actually personally had my own TikTok.

Q.   And how -- for your own TikTok, when did you start that account?

A.   I don't know.  I would say it's been over five years probably.

Q.   And approximately how long did you have it for?

A.   Until I had switched phones and wasn't able to get back into my iCloud, so that would have been probably two years maybe.  Three years maybe.

Q.   Is this another situation like the Facebook one where you simply can't get back into the account?

A.   Right.  Once you don't have the phone number, it's virtually impossible to get back into your old device, the phone's off, switched devices, got a new number, now you can't get the verification code to -- basically you can clone your phone to your new phone.  I wasn't able to do that.

Page  203

Q. How often did you use your own personal TikTok account as opposed to using TikTok with your wife?

A. Not much. It would have been on some, babe, look at this recipe, look at this, like that.

Q. Do you recall seeing any Zyn advertisements on your own TikTok account?

A. No, sir.

Q. Any social media posts about Zyn on your own TikTok account?

A. No, sir.

Q. So other than Facebook and TikTok, both of which you have defunct accounts for, do you have any other defunct social media accounts?

A. No, sir.

Q. You didn't have a Snapchat that you're locked out of?

A. Probably back in high school maybe. I think I had Snapchat back in the past, but I -- definitely not today.

Q. How about Instagram?

A. Oh, I used my wife's Instagram when I do.

Q. But did you ever at one time have your own Instagram account?

A. No. I'm not photogenic. I don't take

Page 204

photos and stuff like that.

Q. I think you said earlier, am I correct, that when you first purchased and tried Zyn, you did not know that it contained nicotine?

A. I don't think I did. And I certainly wasn't aware of the fix -- of the effects of nicotine, to be clear. If I did, I didn't know the effects of it, but I don't think so.

Q. At the time, you did know that Zyn was an age-restricted product, though, correct?

MS. GOODMAN: Form.

THE WITNESS: I'm assuming so, yeah. Yeah. I don't recall. I'm not going to make up anything.

MS. GOODMAN: Don't guess.

THE WITNESS: I don't know.

BY MR. SCHWAB:

Q. So you didn't know whether Zyn, at the time you first purchased Zyn, you did not know whether it was age restricted?

A. Right. Because I wouldn't have been IDed for it so...

Q. Do you remember if it was sold from behind the counter like other tobacco products?

A. I don't remember. It's been a while.

Page 205

It's been almost ten years.  I wouldn't remember.

Q.   When was the last time you reviewed your complaint which we looked at at the beginning of the day today?

A.   The one regarding this case?

Q.   Yes.  The one regarding this case.

A.   The last time I reviewed it?

Q.   Yes.

A.   Probably two days ago maybe.

Q.   How did you learn about the things that you allege in this complaint?

A.   How did I learn --

MS. GOODMAN:  Form.

THE WITNESS:  How did I learn about my addiction?

BY MR. SCHWAB:

Q.   How did you learn about -- strike that.

Let's strike all of my question.

MS. GOODMAN:  Good.

MR. SCHWAB:  I will strike the form objection question as well.

BY MR. SCHWAB:

Q.   How did you learn about the claims in the complaint about Zyn's chemical makeup?

MS. GOODMAN:  And just instructing you

Page 206

that anything that is attorney/client privilege, so he's asking you if you know, in this entire complaint, things that you knew outside of what you might have learned from attorneys.

THE WITNESS:  None.

BY MR. SCHWAB:

Q.   So outside of your injuries and your addiction, everything else in the complaint is something you learned from your attorneys?

MS. GOODMAN:  Form.  I think you need to be specific.  There's a lot of content.

THE WITNESS:  Could you please specify further exactly what you would like to know?

BY MR. SCHWAB:

Q.   Sure.  So you said before that you couldn't answer my question because it would involve communications with attorneys.

A.   Right.  And what was the question?

Q.   So the question is, what portions of this complaint --

A.   Mm-hmm --

Q.   -- come from you and not your attorneys?

MS. GOODMAN:  Form.

THE WITNESS:  I mean, I've discussed all of my issues with my lawyers, so I don't think

Page  207

I'm going to be able to answer that without bleeding into our conversation.

BY MR. SCHWAB:

Q.   So I'll give you an example of some of the things in your complaint and see if we can make this a little more concrete.  Outside of conversations with your lawyers, do you have any personal knowledge about whether or not Philip Morris International exerts operational control over its subsidiaries?

A.   I didn't understand that question at all.

Q.   Do you have any personal knowledge about the relationship between Philip Morris International and Swedish Match?

A.   I don't know.  That would be my attorneys.

MS. GOODMAN:  Counsel, just to not waste time, there's obviously some content in this complaint that this person would not know, this plaintiff would not know those things.  You're going to go through every paragraph that relates to --

MR. SCHWAB:  Is this an objection or what are we doing?

MS. GOODMAN:  I'm trying to move things

Page 208

along.  That's fine.

BY MR. SCHWAB:

Q.   Do you have any personal knowledge of Philip Morris' advertising practices?

A.   No, sir.

Q.   So paragraph 10 of your complaint, Mr. Maultsby, says -- let me -- why don't you get there.  It's page 9.

A.   I'm there.

Q.   Says, Plaintiff Darryl Maultsby is a citizen of the State of Florida and resides in the State of Florida.  Do you see that?

A.   Yes, sir.

Q.   And if you go down, it says, Plaintiff Darryl Maultsby continues to use Zyn to this day because of his addiction.  Do you see that?

A.   Yes, sir.

Q.   And the next sentence says, Plaintiff Darryl Maultsby was influenced by Zyn's marketing and advertising.  Do you see that?

A.   Yes, sir.

Q.   But today you testified that your purchases were not driven by Zyn's marketing and advertising, correct?

MS. GOODMAN:  Form.

Page 209

THE WITNESS:  Signs and stuff, it would be kind of hard to say that that drove me if I can't really remember it.  At that time it's not to say that it didn't help me make a decision, but as to what I remember today, it had nothing to do with it.

BY MR. SCHWAB:

Q.   I see.  The sentence before the one I just read is the one that says you continue to use Zyn to this day, correct?

A.   Yes, sir.

Q.   And you continue to use Black & Milds to this day; is that right?

A.   Yes, sir.

Q.   Do you continue to use cigarettes to this day?

A.   Seldomly.

Q.   And when you do, is it Newports?

A.   Yes, sir.

Q.   To what extent have Black & Milds contributed to your nicotine addiction?

A.   I mean, it's just an add-on.  It just was another plot to the addiction at this point, looking at it from this standpoint.  It was just an add-on.

Q.   Would you say the same about cigarettes?

Page 210

A.   Yeah.  It's just an enhancer of what I'm already getting.

Q.   What is your goal with bringing this lawsuit?

A.   My personal goal?

Q.   Yes.  Your goal for yourself.

A.   I wouldn't wish this on anyone.  Young, old.  I just don't want it to happen again.  I wouldn't want anyone to suffer the physical problems that come with nicotine addiction.  I just wouldn't.  It's not a -- it's not a great habit to have.  It's not a great thing to be tied in with.

Q.   And how would you hope that this lawsuit would achieve that goal?

A.   It would be known.  People would be aware of the actual damages that it can cause.  It's not cool, clean, better.  It's addicting.

Q.   Do you hope that the court will order Zyn disclose additional information to consumers?

A.   That would be wise, let people know what they're getting into.

Q.   What kind of information?

A.   I mean --

MS. GOODMAN:  Form.

THE WITNESS:  -- possibly how addicting

Page 211

it can be.  Same thing that Altoids can put a little paper in there that says Altoids.  You can put a little paper in this that says hey, take this but it's going to change your life.

BY MR. SCHWAB:

Q.   So you're talking about putting something inside the packaging --

A.   Yeah.  If I grab it, let me see.  Let me see that it's dangerous.  Tell me that my life is going to be changed forever.  Tell me I'm going to be upset when I don't have it.  Tell me that.

Q.   Do you think that telling someone that a product is addictive is not enough?

A.   I mean, it would depend on the person's individual perception of addictive.  As I previously stated, soda can be addictive.  Candy can be addictive.  Chips can be addictive.  It's how you take it.  Just because you say I want more doesn't mean I'm going to be shaking when I don't got it.  I ain't shaking when I don't got Doritos but I do want some.

Q.   In terms of your goals for yourself, do you have separate or different goals for the class that you're proposing to represent?

A.   I just want the truth to be known.  I

Page 212

don't really have no -- I don't got the technical answer to that.  I don't know.  I just want what's right to be right.  What's right to come forward.

Q.    Do you think that class members who are happy with their purchase of Zyn should be entitled to anything?

MS. GOODMAN:  Form.

THE WITNESS:  Just because you're happy with an addiction doesn't mean you're not addicted.  You're just comfortable with your spot in life which I obviously am not.

BY MR. SCHWAB:

Q.    Are you seeking money damages in this lawsuit?

A.    I'm not really sure.  Whatever my law team has done up, that will be good enough for me.  Whatever they -- whatever they end up doing, I know they doing the right thing.

Q.    Approximately how many Zyn cans do you purchase each week today?

A.    Two, sometimes three.  On my four-day weekends I get an extra one.  Depending on what I'm doing, going fishing or anything like that or somewhere where I might necessarily be able to smoke, I buy more, but usually it's about two to three is my

Page 213

average purchase amount.

Q.   I think you said earlier that you buy Black & Milds in the five pack?

A.   Yes.

Q.   Is that correct?

A.   Sometimes.

Q.   Today, approximately how many Black & Mild packs do you buy in a week?

A.   In a week, at least seven.

Q.   And approximately how often do you buy a pack of cigarettes to smoke when you're doing yard work?

A.   That can last me quite a while.  That's not too often.  I might buy cigarettes, realistically, probably about three times a year.  Sometimes they go stale, so not that often.  Not too much.  Quarterly.

Q.   Once every three months or so?

A.   Yes, sir.

Q.   Have you ever bought a roll of Zyn?

A.   Oh, no, no.

Q.   I think -- apologies if I asked this. Have you purchased Zyn online?

A.   No.

Q.   Have you ever purchased any other

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

nicotine products online?

A. I don't think so.

Q. Have you ever purchased Zyn in a state other than Florida?

A. Possibly, yes. Possibly.

Q. What state would that be?

A. That would have been in Nevada.

Q. Were you there for a trip?

A. I worked there briefly. I was on a little job out there and I was probably there for like two weeks or so. Nothing crazy.

Q. So when was this?

A. Years ago. I don't even really remember the date. I have to do some digging to remember that.

Q. So you said you were there for about two weeks?

A. Yeah. It wasn't no -- I didn't do it long term at all.

Q. So would it be fair to say that if you did purchase Zyn in Nevada, it would have been no more than five or six cans?

A. That would be fair to say.

Q. Okay. Other than that time you spent in Nevada, any other time you might have purchased Zyn

Page 215

outside of the State of Florida?

A.   Not to my knowledge.  I ain't really been nowhere.

Q.   Have you ever used coupons buying Zyn?

A.   I don't think so.

Q.   Have you ever used any kind of buy one, get one free or buy one, get one discounted offer?

A.   No.  I'm not a couponing type of person. I don't do all that.

Q.   To your recollection, have you always paid whatever the sticker price was in the store for Zyn?

A.   Yeah.  Whatever the price is, I just paid it.

MR. SCHWAB:  Can we go off the record?

MS. GOODMAN:  Sure.

THE VIDEOGRAPHER:  Going off the record at 3:48 p.m.

(Recess taken -- 3:48 p.m.)

(After recess -- 4:02 p.m.)

THE VIDEOGRAPHER:  Back on the record at 4:02 p.m.

BY MR. SCHWAB:

Q.   Good afternoon, Mr. Maultsby.  Do you understand you're still under oath?

Page 216

A.   Yes, sir.

Q.   Before we went off, you mentioned a job in Nevada.  Do you recall that?

A.   Yes, sir.

Q.   Just at a high level, what type of job was that?

A.   Drilling, core drilling.

Q.   Earlier today we discussed two lawsuits you were involved in arising out of people rear-ending you in their cars.  Do you recall that?

A.   Yes, sir.

Q.   In either of those accidents did you suffer a concussion?

A.   Not -- I don't think I was diagnosed with a concussion, if I recall correctly.  I don't think so.

Q.   Thank you for your time today, Mr. Maultsby.  I don't have any other questions.

MS. GOODMAN:  That was less than ten minutes.

MR. SANDALS:  I have no questions at this time.

CROSS-EXAMINATION

BY MS. GOODMAN:

Q.   Okay.  Mr. Maultsby, it's been a long

Page 217

day, but I do have some questions that I want to ask of you and I'm going to pop around to some topics. Okay?

A.   Okay.

Q.   Now, when we first got started in this deposition about an hour in, do you remember that you got pretty upset?  You got a little bit -- you were very uncomfortable and we took a break.  Do you remember that?

A.   Yes, ma'am.

Q.   Tell us what was going on at that moment when you needed to step out.

A.   I was experiencing symptoms of needing a Zyn intake, tobacco or nicotine.  I was I guess the word would be fiending.  I was experiencing anxiety, strong onset of just uncontrollable emotions.  It just got heavy for me.  I was ready to go pop a pouch.

Q.   Were you experiencing stomach pains?

MR. SCHWAB:  Objection.  Leading.

MS. GOODMAN:  That question wasn't leading.

THE WITNESS:  I did.  I was experiencing nausea.  I was gagging a little bit.  And I don't think he had quite noticed yet, but when my eyes

Page 218

began to well up, I think the court reporter had noticed I wasn't doing too hot at that moment.

BY MS. GOODMAN:

Q.   And when we agreed to take a break and you stepped out, did you -- what did you do?

A.   I went to my truck, I took a Zyn, sat down, I took a few puffs off my Black & Mild and then I came back in after a drink of water.

Q.   And did you feel better physically when you took the Zyn and --

A.   Yes, ma'am.

Q.   Okay.  Now, a little bit later you got emotional when talking about the amount of money that you've spent over time on Zyn?

MR. SCHWAB:  Object to form.

BY MS. GOODMAN:

Q.   Correct?

A.   Yes, ma'am.

MR. SANDALS:  Join the objection.

BY MS. GOODMAN:

Q.   Tell us, why did you get emotional at that point in the deposition?

A.   It sucks to hear you partake in an activity, especially when people are tending you to be a certain way, to hear myself say I'm addicted to

Page 219

something, it really hurts.

Q.   Do you know how much money you spend per week on Zyn products?

A.   I probably -- probably like 30, 35 bucks maybe.  I don't always buy it alone, but I can say about two cans run me about $26, $27, something like that.

Q.   Have there been times where you were short on money for gas or other necessities and it was because you spent money on Zyn?

MR. SCHWAB:  Object to the form and leading.

MR. SANDALS:  Join.

THE WITNESS:  Definitely going to sometimes pick Zyn over other things.  I just got a line of gas, I ain't going to be sick, aggravated and don't got gas.  It just don't make sense to me.  It don't sound logical to a regular person, but...

BY MS. GOODMAN:

Q.   Have you ever gotten into arguments with your wife about how much money you use on Zyn products?

A.   Absolutely.

Q.   How often does that happen?

Page 220

A.    Every time I don't got some.  Every time I -- it's my turn to do something or it just be that particular time and I don't have it.  First thing, oh, if you ain't -- so it's quite often.

Q.    You told us earlier that there have been times where you tried to quit?

A.    Yes, ma'am.

Q.    And specifically there have been times where you tried to quit Zyn, correct?

A.    Correct.

Q.    Have there been times when you specifically tried to stop purchasing Zyn so that you could save money and use it on other things for your household?

MR. SCHWAB:  Object to the form.  Leading.

MR. SANDALS:  Join.

THE WITNESS:  Yeah.  There's been times I've tried to quit so that there can be money other places for my life.

BY MS. GOODMAN:

Q.    Do you have an idea of how many times you've tried to quit?

MR. SCHWAB:  Object to the form.

MR. SANDALS:  Join.

Page 221

BY MS. GOODMAN:

Q.   Zyn specifically.

MR. SCHWAB:   Object to the form.

THE WITNESS:   No.   Last year alone probably twice, maybe three times, maybe.

BY MS. GOODMAN:

Q.   And, like, in 2025 --

A.   Yes, ma'am.

Q.   -- two or three times, is that what you're referencing?

A.   Yes, ma'am.

Q.   And of those times, what was the longest amount of time that you were able to quit Zyn?

MR. SCHWAB:   Object to the form.

MR. SANDALS:   Join.

THE WITNESS:   Sometimes not even a whole day.   Maybe a couple days, maybe.   Maybe.   But it's never -- I never could hit that peak without the Zyn, so maybe a couple -- maybe a day or two along with I really did no Zyn.

BY MS. GOODMAN:

Q.   No Zyn a day or two, is that what you said?

A.   Yes, ma'am.

Q.   Now, when you were talking about your

Page 222

addiction earlier, you made a comment that you got emotional because you hate hearing it out loud.  Do you remember making that statement on the record?

A.   Yes.

Q.   What did you mean by that?

A.   Never want to admit you a sucker.  Never want to admit you down.  Never want to acknowledge the fact that you do have a problem, but at this point it's pretty obvious.  I mean, it's just like a -- it's basically admitting your defeat to me.  It's basically saying you're a loser.  You can't kick it.  It's like beating myself up when I'm simply just talking about it but it's hard to hear.

Q.   Now, thinking back to the last time that you tried to quit, what were you experiencing when you eventually went back to using Zyn?

A.   What did I experience once I got back to the Zyn?

Q.   What were you experiencing that made you go back to it?

A.   All the symptoms previously described of nausea, headaches, irritability, inability to focus, restlessness, all those things come with not using.  And once you got used to it and once you got hooked on it, it's kind of like -- it's like it's impossible

Page 223

to quit.  You just feel like -- (witness makes gesture) -- when you don't have it.

Q.   Now, you said that when we took that first break and you went outside and you did use Zyn at that time, correct?

A.   Yes, ma'am.

Q.   Have you -- do you have it on your person now?

A.   Yes, I think.  I got it in my pocket.

Q.   Okay.  Have you used it again throughout the day?

A.   Yes, ma'am.

Q.   How many pouches have you used since we got started in the deposition today?

A.   I think that was pouch three.  When I just went to the bathroom, I just spit it out and that was like the third one.

Q.   So you've used three pouches just since we started the deposition today?

A.   Yes, ma'am.

Q.   Okay.  Can you pull out the package?

A.   (Witness complies).

Q.   Does the package say anywhere on -- keep it out.  Does it say anywhere on it that if you don't use it, you're going to feel physical symptoms of

Page 224

withdraw?

MR. SCHWAB:  Object to the form.

MR. SANDALS:  Join.

THE WITNESS:  No ma'am.

BY MS. GOODMAN:

Q.  Does the package say that over time you're going to need to increase your use of it?

MR. SCHWAB:  Object to the form.

MR. SANDALS:  Join.

THE WITNESS:  No.

BY MS. GOODMAN:

Q.  Does the package say anything about you may experience nausea if you don't use this product?

MR. SCHWAB:  Object to the form.

MR. SANDALS:  Join.

THE WITNESS:  No, ma'am.

BY MS. GOODMAN:

Q.  Does the product say anything about having headaches if you cease using the product?

MR. SCHWAB:  Object to the form.

MR. SANDALS:  Join.

THE WITNESS:  No, ma'am.

BY MS. GOODMAN:

Q.  Would you have purchased that product if you knew that you were going to become physically

Page 225

dependent upon the product?

MR. SCHWAB:  Object to the form.

MR. SANDALS:  Join.

THE WITNESS:  Absolutely not.

BY MS. GOODMAN:

Q.   Would you have purchased that product if you knew that over time you're going to need a higher dose of the product?

MR. SCHWAB:  Object to the form.

MR. SANDALS:  Join.

THE WITNESS:  No.  No, ma'am.

BY MS. GOODMAN:

Q.   Okay.  You mentioned that you don't have a specific recollection of seeing specific advertisements over time, correct?

MR. SCHWAB:  Object to the form.

MR. SANDALS:  Join.

THE WITNESS:  Right.

BY MS. GOODMAN:

Q.   You do believe that you may have seen something on like -- you said on poles?

A.   Mm-hmm.

Q.   At gas stations or something like that; is that correct?

A.   Yes, ma'am.

Page 226

Q.   Okay.  Do you remember seeing any signs that told you that if you used Zyn, you will become physically dependent upon this product?

MR. SCHWAB:  Object to the form.

MR. SANDALS:  Join.

THE WITNESS:  No, ma'am.

BY MS. GOODMAN:

Q.   Would you have purchased this product if you had seen an advertisement or a poster at your store that told you caution, using Zyn might cause you to become physically dependent upon this product over time?

MR. SCHWAB:  Object to the form.

MR. SANDALS:  Join.

THE WITNESS:  No, ma'am.

BY MS. GOODMAN:

Q.   Is there anywhere on that can of Zyn that tells you that using this product can be unsafe for someone who is under 27 years old?

MR. SCHWAB:  Object to the form.

MR. SANDALS:  Join.

THE WITNESS:  No, ma'am.

BY MS. GOODMAN:

Q.   No.  Have you ever had a situation where you wanted to use Zyn but you simply did not have any

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

on you or you didn't have access to it?

A.   Yes, ma'am, that happens.

Q.   And when that happens, how do you feel when you feel that you need it but you cannot access it?

A.   Aggravated.  Ready to go.  That's usually at work type of thing, store be closed.  I work at night.  Be ready to go.  Just over it.  Need to sit down.  Sometimes just be feeling a little sick. Nausea's a big one when it comes to nicotine usage for me.  That comes and goes with the usage.

Q.   Okay.

A.   That would have been my reaction to not having it.

Q.   And you use the language ready to go. What do you mean by that?

A.   I'm at work.  I don't get off until 3. It's 10:00.  I'm ready to go.  I can't get to the store.  I don't got no Zyn.  I ain't got no tobacco. I'm ready to go.  I want to be away from people.  I want to be to myself.  I don't want to hear nobody talking because I ain't got my buzz.  I'm irritated. It's sickening to say out loud, but it is what it is.

Q.   Have you ever had a situation at work where you snapped at a coworker or your manager or

Page 228

somebody got into a situation where, you know, you didn't act appropriately because you were, you know, needing your Zyn?

MR. SCHWAB:  Object to the form.

MR. SANDALS:  Join.

THE WITNESS:  I'm typically a reserve guy, so there has been times where I have -- I would say stepped out of character because I didn't have -- you got to me a little bit more than I would like for you to have.  It's happened.

BY MS. GOODMAN:

Q.   Now, you've also mentioned that you will have nausea when you're -- when you need your next hit of Zyn; is that right?

A.   Yes, ma'am.

Q.   And has the nausea ever resulted in actually vomiting?

A.   I've thrown up from Zyn before.

Q.   How often has that happened?

A.   It depends.  It can happen anywhere from two to three times a week.  Sometimes it can happen -- usually it happens in the morning.  It just depends, though.  Sometimes it's random, like I might just need it this time.  I'm not nauseous, but this

Page 229

time I'm really about to throw up and I know it's because I need to get off real quick and then I'll be all right.

Q.   Now, you were shown a bunch of advertisements of Zyn and you just simply do not recall any specific ad, correct?

MR. SCHWAB:  Object to the form.

MR. SANDALS:  Join.

THE WITNESS:  Just don't want to be a liar.  I'm sure I've seen some of them, but to say that I can remember that's exactly what it said wouldn't be the whole truth so therefore I just said I don't really recall.  I'm sure I've seen some of those signs, but to say that I remember exactly what they said, it's been years.

BY MS. GOODMAN:

Q.   Just to go back for a moment about your purchases of Zyn.  If you had known that purchasing Zyn and using Zyn would cause you to become physically dependent on the product, would you have spent as much money purchasing those products?

MR. SCHWAB:  Object to the form.

MR. SANDALS:  Join.

THE WITNESS:  No, ma'am.

MS. GOODMAN:  Okay.  That's all I have.

Page 230

Thank you.  Anything further?

MR. SCHWAB:  I have a couple questions.

REDIRECT EXAMINATION

BY MR. SCHWAB:

Q.   So in response to one of your lawyer's questions right now, you said, I've thrown up from Zyn before.  Do you recall that?

A.   Yes, sir.

Q.   Does that mean that you threw up after putting a Zyn in your mouth or something else?

A.   No.  From needing the Zyn.

Q.   Is it from needing Zyn specifically or from needing nicotine?

A.   My fix for that personally is it being in my mouth, the salivation with the little whatever comes off of it, it kind of -- I think that's what soothes the nausea.

Q.   Does smoking a Black & Mild, for example, not soothe the nausea?

A.   That make me cough and stuff like that. That don't really soothe the nausea.

Q.   Your attorney just asked you several questions about attempting to quit Zyn.  I just want to make sure I understand correctly.  Have you ever tried to quit Zyn while continuing to use other

nicotine products?

A.   No.   When I went cold turkey, I've gone cold turkey.

Q.   So all the quitting discussions that you just had were in reference to quitting nicotine entirely; is that correct?

A.   I guess you could say that.  It's really more so my nicotine intake is just my main thing, so when I'm not doing this, I'm not getting -- because it's almost like you're itching on your left shoulder and scratching on your right shoulder.  It's dissatisfaction at that point.  I can't get the feeling that I get from Zyn and smoking or don't doing Zyn, that I would from smoking alone.

Q.   So when you try and go cold turkey, though, are you still smoking Black & Milds or no?

A.   Not -- not necessarily, no.  It don't last that long to really even see.

MR. SCHWAB:  That's it for me.

MR. SANDALS:  No questions.

MS. GOODMAN:  We will read.  If it's being ordered, we'll order a copy.

Does my office have a standing order?

THE COURT REPORTER:  I don't believe so.

MS. GOODMAN:  Okay.  Same order.  All

Page 232

electronic, no copies.

THE VIDEOGRAPHER:  Would anybody like to order a copy of the video?

MS. GOODMAN:  Not at this time.

MR. SCHWAB:  Yes, please.

THE VIDEOGRAPHER:  This concludes today's videotaped deposition of Darryl Maultsby.  We are going off the video record at 4:21 p.m.

THE COURT REPORTER:  Just to confirm on the record, you want a rough draft?

MR. SANDALS:  Yes.

(The deposition was concluded at 4:22 p.m.)

Page 233

REPORTER'S DEPOSITION CERTIFICATE

I, SARA MILLER, a Notary Public of the State of Florida, County of Orange, do hereby certify that I was authorized to and did stenographically report the foregoing deposition of DARRYL MAULTSBY, II; that a review of the transcript was requested; and that the transcript, pages 5 through 233 is a true and complete copy of the stenographic notes.

I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative of employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the outcome of this action. Dated this 30th day of January, 2026.

*Sara Miller*

_____

Sara Miller,

Stenograph Shorthand Reporter

Page 234

ELANA B. GOODMAN, ESQUIRE

Egoodman@schlesingerlaw.com

January 30, 2026

RE: Kelly v. Philip Morris International, Inc.

1/16/2026, Darryl Maultsby, II (#7836718)

The above-referenced transcript is available for review.

Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason, on the attached Errata Sheet.

The witness should sign the Acknowledgment of Deponent and Errata and return to the deposing attorney. Copies should be sent to all counsel, and to Veritext at (production-ca@veritext.com).

Return completed errata within 30 days from receipt of testimony.

If the witness fails to do so within the time allotted, the transcript may be used as if signed.

Yours,

Veritext Legal Solutions

Page 235

Kelly v. Philip Morris International, Inc.

Darryl Maultsby, II (#7836718)


                    E R R A T A   S H E E T

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____


_____    _____

Darryl Maultsby, II                       Date


Page 236

Kelly v. Philip Morris International, Inc.

Darryl Maultsby, II (#7836718)


ACKNOWLEDGEMENT OF DEPONENT


I, Darryl Maultsby, II, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.


_____     _____
Darryl Maultsby, II                            Date


*If notary is required


                    SUBSCRIBED AND SWORN TO BEFORE ME THIS

                    _____ DAY OF _____, 20____.




                    _____

                    NOTARY PUBLIC

Page 237